**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**
**Judge James A. Parker, sitting by designation**

Civil Action No. 11-cv-542 JAP-KLM

**RICHARD PERKINS, and**
**RICHARD MILLER,**
        Plaintiffs,

**vs.**

**FEDERAL FRUIT AND PRODUCE COMPANY, INC. and**
**MICHAEL MARTELLI,**
        Defendants.

**MEMORANDUM OPINION AND ORDER**
**ON DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

At the conclusion of a trial held May 16-25, 2012, the jury returned a verdict in favor of

Plaintiffs Richard Perkins (Perkins) and Richard Miller (Miller) and against Defendants Federal

Fruit and Produce Company, Inc. (FFP) and Michael Martelli (Martelli). The Court entered

judgment based on the jury's verdict. *See* MEMORANDUM OPINION AND ORDER (Doc. No.

145); JUDGMENT IN FAVOR OF RICHARD PERKINS AND RICHARD MILLER (Doc. No.

146) (Judgment). The jury found in favor of Perkins on his claims against FFP and Martelli

under 42 U.S.C. § 1981 and Title VII[1] for disparate treatment based on race during Perkins'

employment, for discriminatory discharge from his employment, and for retaliation in response

to his oral and written complaints of racial discrimination. The jury also found in favor of Miller

on his claims against FFP and Martelli for retaliatory discharge based on Miller's complaints

about racial discrimination and his testimony at a Union arbitration hearing in which Miller

---

[1] Title VII of the Civil Rights Act of 1964 is codified in 42 U.S.C. §§ 2000e to 2000e–17.

1

testified about Martelli's use of racial epithets at FFP. The parties agreed to submit Special Interrogatories to the jury on each claim, and the parties agreed that the jury's answers to the Special Interrogatories would constitute the jury's verdict. The jury's verdict is recorded in eight sets of Special Interrogatories. (Doc. No. 143-12.)

On Perkins' claim against FFP for disparate treatment, the Court entered judgment on the jury's verdict and awarded to Perkins $10,000 in compensatory damages for emotional pain and mental anguish and $65,000 in punitive damages. On Perkins' claim for disparate treatment against Martelli, the Court entered judgment on the jury's verdict and awarded Perkins $10,000 in compensatory damages for emotional pain and mental anguish and $65,000 in punitive damages. On Perkins' claim against FFP for discriminatory discharge, the Court entered judgment on the jury's verdict and awarded Perkins $5,000 in compensatory damages for emotional pain and mental anguish and $65,000 in punitive damages.[2] On Perkins' claim against Martelli for discriminatory discharge, the Court entered judgment on the jury's verdict and awarded Perkins $15,000 in compensatory damages for emotional pain and mental anguish and $65,000 in punitive damages.[3] On Perkins' retaliation claim against FFP, the Court entered judgment on the jury's verdict and awarded Perkins $50,000 in compensatory damages for emotional pain and mental anguish and $350,000 in punitive damages. On Perkins' retaliation

---

[2] The Court set aside the jury's award of $3,000 to Perkins on this claim for lost wages and benefits because the award was not supported by the evidence, and the award was duplicative of the lost wages and benefits awarded to Perkins on his retaliation claim. Memorandum Opinion and Order (Doc. No. 145 at 7.)

[3] The Court set aside the jury's award of $6,500 to Perkins on this claim for lost wages and benefits because the award was not supported by the evidence, and the award was duplicative of the lost wages and benefits awarded to Perkins on his retaliation claim. Memorandum Opinion and Order (Doc. No. 145 at 7.)

claim against Martelli, the Court entered judgment on the jury's verdict and awarded Perkins $50,000 in compensatory damages for emotional pain and mental anguish and $150,000 in punitive damages.[4]  For Perkins' retaliation claims against FFP and Martelli, the jury awarded to Perkins $26,697 in lost wages and benefits against both FFP and Martelli.  In the Judgment, the Court imposed joint and several liability on FFP and Martelli for these damages.[5]

On Miller's retaliation claim against FFP, the Court entered judgment on the jury's verdict awarding $50,000 in compensatory damages for emotional pain and mental anguish and on the jury's verdict awarding $50,000 in punitive damages.[6]

In the MEMORANDUM OPINION AND ORDER (Doc. No. 145) and in the Judgment, on Miller's retaliation claim against Martelli, the Court set aside the jury's verdict and ordered a partial new trial on Miller's "damages" because the jury awarded punitive damages despite having no opportunity to award compensatory damages.  However, the Court did not specify whether the new trial would be on compensatory damages only or whether the new trial would be on both compensatory as well as punitive damages.  To the extent that the Court's ruling in the MEMORANDUM OPINION AND ORDER (Doc. No. 145) was unclear, the Court amends

---

[4] In the MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR RECONSIDERATION AND TO VACATE TRIAL AND JUDGMENT AND/OR FOR A NEW TRIAL the Court will grant a new trial on this claim.

[5] In the MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR RECONSIDERATION AND TO VACATE TRIAL AND JUDGMENT AND/OR FOR A NEW TRIAL, the Court will grant a new trial on the amount of lost wages and benefits to which Perkins is entitled.

[6] In the MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR RECONSIDERATION AND TO VACATE TRIAL AND JUDGMENT AND/OR FOR A NEW TRIAL, the Court will grant a new trial on the amount of compensatory and punitive damages to which Miller is entitled on this claim.

and clarifies that ruling here.  Because the jury was given no opportunity to award compensatory damages on Miller's retaliation claim against Martelli despite being given the opportunity to award compensatory damages on all other claims, the Court reasonably infers that the jury may have incorporated an amount of compensatory damages into its $200,000 award of punitive damages against Martelli.  Therefore, the Court concludes that on Miller's retaliation claim against Martelli, a new trial is necessary on both the amount of compensatory damages for emotional pain and mental anguish and on punitive damages.  The inclusion of both compensatory and punitive damages is important to give a jury the clear opportunity to award compensatory as well as punitive damages and thereby fulfill the purposes behind each. *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (noting that compensatory damages are intended to redress a plaintiff's concrete loss, while punitive damages are aimed at deterrence and retribution) (citing *Cooper Industries Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001)).  Additionally, it is important to have a jury separately award compensatory and punitive damages for purposes of determining acceptable proportionality. *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. at 418 (stating that ratio of punitive damages to compensatory damages is one factor in determining constitutionality of punitive damages award); *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1122-23 (10th Cir. 2004) (noting that the ratio of actual to punitive damages is a factor in examining whether district court abused its discretion in remittitur order); *Bielicki v. Terminix Intern., ?Co., L.P.*, 25 F.3d 1159, (10th Cir. 2000) (upholding district court's ruling that punitive damages were reasonable based on ratio between punitive and compensatory damages and other factors); and *Deters v. Equifax Credit Information Svcs.,Inc.*, 202 F.3d 1262, (10th Cir. 2000) (noting that "ratio of the punitive damages awarded to the actual harm inflicted on the plaintiff" is one guidepost in determining

whether a punitive damage award is constitutionally excessive).  Thus, a new trial on damages

for Miller's retaliation claim against Martelli must include both compensatory damage and

punitive damage components.

In DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

PURSUANT TO FED. R. CIV. P. 50(b) (Doc. No. 163) (Motion), Defendants renew their

motions for directed verdict made at trial and ask the Court to set aside the jury verdict under

Fed. R. Civ. P. 50(b).[7]  The Court will deny the Motion.

This MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS'

MOTION FOR JUDGMENT AS A MATTER OF LAW should also be read in conjunction with

the Court's MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR

RECONSIDERATION AND TO VACATE TRIAL AND JUDGMENT AND/OR FOR A NEW

TRIAL in which the Court vacated the verdict and Judgment in other respects as mentioned in

previous footnotes, and with the Court's MEMORANDUM OPINION AND ORDER

GRANTING IN PART DEFENDANTS' MOTION FOR REMITTITUR.

---

[7] Defendants Federal Fruit and Produce, Inc. (FFP) and Michael Martelli (Martelli) are renewing their motions for judgment as a matter of law made at the close of the Plaintiffs' case and at the close of the evidence. (*See* Tr. 1240:9 – 1262:9; Tr. 1291:1-10.) In ruling on the Motion, the Court has also considered PLAINTIFFS' AMENDED RESPONSE TO DEFENDANTS' MOTION (sic) JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(b) (DOC. 163) (Response); and DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW (DKT. NO. 163) (Doc. No. 184) (Reply). The Court requested and has received supplemental briefing and to the extent that briefing is relevant, the Court has considered that briefing as well. *See* DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S REQUEST FOR ADDITIONAL ANALYSIS ON PUNITIVE DAMAGES ISSUES (Doc. No. 188); PLAINTIFFS' SUPPLEMENTAL BRIEF RE: COURTROOM MINUTES DATED NOVEMBER 19, 2012 (DOC. NO. 186) (Doc. No. 189); and DEFENDANTS' REPLY IN SUPPORT OF SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S REQUEST FOR ADDITIONAL ANALYSIS ON PUNITIVE DAMAGES ISSUES (Doc. No. 190).

I.  Standard of Review

At trial, the Court denied Defendants' motion for judgment as a matter of law made at the

close of Plaintiffs' evidence and renewed at the close of all of the evidence.  Rule 50(b) allows

Defendants to assert a post-trial motion for judgment as a matter of law:

> (b) Renewing the Motion After Trial; Alternative Motion for a New Trial.  If the court
> does not grant a motion for judgment as a matter of law made under Rule 50(a), the court
> is considered to have submitted the action to the jury subject to the court's later deciding
> the legal questions raised by the motion. No later than 28 days after the entry of judgment
> . . . the movant may file a renewed motion for judgment as a matter of law and may
> include an alternative or joint request for a new trial under Rule 59.  In ruling on the
> renewed motion, the court may:
>
> > (1) allow judgment on the verdict, if the jury returned a verdict;
> > (2) order a new trial; or
> > (3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

Judgment as a matter of law is appropriate when the "evidence points but one way and is

susceptible to no reasonable inferences which may support the opposing party's position."

*Hampton v. Dillard Department Stores, Inc.*, 247 F.3d 1091, 1099 (10th Cir. 2001).

> The standard for judgment as a matter of law under Rule 50 mirrors the standard for
> summary judgment under Rule 56. Thus, the court must review all of the evidence in the
> record, . . . drawing all reasonable inferences in favor of the nonmoving party, but
> making no credibility determinations or weighing any evidence . . . .

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000) (emphasis added).  *See also*

*Henry v. Storey*, 658 F.3d 1235, 1237–38 (10th Cir. 2011) (holding that judgment as a matter of

law is appropriate if, after a party has presented its evidence, a reasonable jury would not have a

legally sufficient evidentiary basis to find in favor of that party).  In employment discrimination

cases, the Court should consider a number of factors: ". . . the strength of the plaintiff's *prima*

*facie* case, the probative value of the proof that the employer's explanation is false, and any

6

other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Robinson v. Cavalry Portfolio Services, LLC*, No. 08-5020, 365 Fed. Appx. 104, **6 (10th Cir. Feb. 10, 2010) (unpublished opinion) (reversing denial of employer's motion for directed verdict and holding that employee failed to establish *prima facie* case of disparate treatment and retaliation) (citing *Reeves*, 530 U.S. at 148-49).

## II.  Background

Perkins is an African-American, and Miller is Caucasian.  Martelli owns a 12.5% interest in FFP and manages FFP's daily operations as a produce delivery company.  Angel Mondragon (Mondragon) was Perkins' and Miller's direct supervisor.

### A.  Perkins' Employment with FFP

Perkins began work for FFP on October 3, 2008 as a Class B Truck Driver. (Tr. 964:14-15.)  Perkins was a member of Teamsters Local Union No. 455 (Union).  The terms and conditions of employment at FFP with respect to its truck drivers was at all relevant times governed by a Collective Bargaining Agreement (CBA), effective from October 1, 2007 to October 1, 2011.  (Tr. 348:22-24; Ex. G.)  During Perkins' and Miller's employment at FFP, Jesse Medina (Medina) was the Union's business representative at FFP.  Article 13 of the CBA describes FFP's Progressive Discipline Policy:

> 1st offense– Written "verbal" warning
> 2nd offense–Written warning
> 3rd offense– 2nd Written warning and suspension
> 4th offense– Termination.

(Ex. G at 9.)  Article 16 of the CBA prohibits discrimination on the basis of race. (Ex. G at 12.) Under the CBA, all employees were to receive a copy of FFP's work rules and were required to sign an agreement to abide by the rules. (*Id.* at 8; Ex. O FFP 00861-00863.)  In response to an

7

employee's unsatisfactory job performance, FFP management could issue a "warning notice" according to the CBA's progressive discipline policy. (*Id.*)  Warning notices, known as write ups, were considered "current" for 15 months after issuance. (*Id.* at 9.)  When issuing a write up, an FFP supervisor or manager would first present the write up to the employee to sign, but if the employee refused to sign the write up, the supervisor would note "refused to sign" on the line provided for the employee's signature.  The Union received a copy of each write up within 7 days, and all write ups were kept in an employee's "permanent file" at FFP. (*Id.*)

On February 10, 2009, Perkins and three other FFP employees became a Union stewards to "manage certain issues between management and the CBA members." (Tr. 969:20-21; Tr. 355:15 Medina testimony.)  Although Perkins received no disciplinary write ups from the time he was hired in October 3, 2008 until February 10, 2009, after Perkins became a Union steward, Perkins received several write ups primarily from operations manager Mondragon.  (Tr. 1028:12-21.) [8]

On February 28, 2009, Mondragon issued the first write up to Perkins stating that Perkins and another African-American truck driver, Gary Moore (Moore), were sitting in a truck while paperwork was prepared for their routes. (Tr. Ex. D FFP 00167.)  Mondragon claimed that this behavior was unacceptable because after drivers inspect their trucks and wait for their delivery paperwork, drivers are expected to help load produce into trucks in the warehouse.  On February

---

[8] During his employment at FFP, Perkins received several disciplinary write ups.  All but one of Perkins' write ups were for first level offenses. (*See generally* Trial Ex. D.)  During his employment at FFP, Perkins filed several Union grievances, usually in response to write ups Perkins received that Perkins claimed were unjust. (*Id.*)  When an employee prepares a Union grievance, the grievance is presented to an FFP supervisor or manager, who can sign the grievance, but if he refuses to sign, a notation "refused to sign" would appear in place of a signature. (Ex. D.)

28, 2009, Perkins filed a Union grievance challenging this write up as "unfounded and unjust."
(Ex. D FFP 00166.)

On March 2, 2009, Perkins requested that Mondragon meet with him to discuss Union
issues.  Mondragon asked Chris Salazar, another FFP supervisor, to attend the meeting with him.
Perkins, Gary Moore (Moore) and Jorge Morales, FFP employees who were Union stewards,
also attended the meeting. (Tr. 589:9-12.)  Mondragon testified that racial discrimination was not
discussed at this meeting. (Tr. 589:9-12.)  However, Perkins testified that at the March 2, 2009
meeting he complained to Mondragon that on February 28, 2009 Perkins and Moore were
written up, but other employees, who were Latino, were not written up for the same conduct.
Perkins further testified that, in response, Mondragon stated that Perkins and Moore were written
up because "they were black." (Tr. 983:2-6 .)  Moore testified that he also heard Mondragon say
that Moore and Perkins were written up because "they were black." (Tr. 163:21-23.)  In his
testimony, Mondragon denied that he made this statement. (Tr. 589:9-12.)

On March 4, 2009, Perkins filed a grievance asserting that on February 28, 2009, Perkins
observed FFP owner Martelli doing work reserved for Union members in violation of the CBA.
(Tr. 975:19-22.)  On March 5, 2009, Union representative Medina sent a letter to FFP
complaining that management was "conducting bargaining unit work," and that management
was "disrespecting employees." (Ex. NN FFP 0047.)  FFP did not respond to this letter. (Tr.
361:2-10 Medina testimony; Tr. 496:22-25 520: 23-521:6; 523:2-8 Stan Kouba testimony.)
Perkins' March 4, 2009 grievance and Medina's March 5, 2009 letter contained no allegations of
race discrimination. (*Id.*)

On March 11, 2009, Perkins received a second write up.  On that date at approximately
5:30 am, Perkins and another truck driver, Roberto Villa Moreno (Moreno), were talking outside

while doing the daily pre-trip inspection of their trucks. (Tr. 1010:1-14 Perkins testimony.)

After observing Perkins and Moreno, Martelli drove up to Perkins and Moreno and told them to

"stop the bull-shit and get back to work." (Tr. 272:22-25 Martelli testimony.)  Perkins claims

that, after a verbal altercation with Moreno, Martelli yelled racial epithets at Perkins and

Moreno. (Tr. 1011:14-16; 1013:23-25 Perkins testimony; Tr. 147:19-149:16 Moreno testimony.)

Perkins and Moreno testified that as Martelli walked into the office area of the FFP warehouse,

they heard Martelli yell to Mondragon, "I am fucking tired of that nigger and Mexican[,]" and

they heard Martelli order Mondragon to "write up the nigger and fire the spick." (Tr. 1014:16-

20; Tr. 147:19-149:16.)  Miller testified that he was in the warehouse and heard Martelli use

these racial epithets. (Tr. 201:1-8.)  Both Mondragon and Martelli testified that Martelli was

angry and was yelling, but that Martelli did not say the racial epithets. (Tr. 573:4-9 Mondragon

testimony; Tr. 284:24-285:8 Martelli testimony.)

 Perkins grieved the March 11, 2009 write up.  This grievance mentioned Article 13, the

progressive discipline policy of the CBA, but Perkins did not describe Martelli's use of racial

epithets, particularly the term "nigger," in this grievance. (*See* Ex. D FFP 00171.)

 At trial, Perkins and Union representative Medina testified that on March 11, 2009

Perkins prepared an additional written grievance that was presented to Mondragon, who did not

sign it.  Perkins testified he then gave the additional grievance to Medina, but the Union

misplaced it. (Tr. 1088:9-17 Perkins testimony; Tr. 376:1-379:4 Medina testimony.)

 On March 19, 2009, Perkins was written up for delivering the wrong type of lettuce, but

Perkins claimed he asked another warehouse employee to help him identify the type of lettuce

indicated on the pick sheet, and the employee identified the wrong kind of lettuce. (Ex. D FFP

00174.)  Believing that he was unjustly disciplined for another employee's mistake, on March

10

23, 2009, Perkins filed a grievance concerning this write up. (Ex. D FFP 00173.)  On March 23,

2009, Perkins  submitted an additional grievance, which stated, "Racially discriminated against

since becoming steward violating Article 16 of contract agreement and Item C-7 of company

policy." (*Id.*)  Article 16 of the CBA prohibits racial discrimination and Item C-7 of FFP's Work

Rules prohibits employees from discriminating against fellow employees. (Ex. G FFP 0012 and

Ex. O FFP 00862.)

On March 24, 2009, Perkins was written up for loading the wrong kind of bananas into

his truck. (Ex. D. FFP 00169.)  Perkins testified that while his truck was still in the warehouse,

Moore noticed the mistake, Perkins unloaded the wrong bananas, loaded the correct bananas, and

Perkins delivered the correct bananas on time. (Tr. 1030:5-1031:5.)  This write up was recorded

as a "2nd Offense written warning." (Ex. D FFP 00169.)  Perkins grieved this write up. (Ex. D.

FFP 00168.)

On March 31, 2009, Perkins received another write up for not wearing his FFP badge.

(Ex. D. FFP 00178.)  Perkins grieved this write up stating that his FFP badge was in his truck,

but Perkins was not allowed retrieve it. (Ex. D FFP 00177.)

On April 9, 2009 Perkins was written up for wearing tennis shoes in the warehouse,

instead of the required work boots. (Ex. D FFP 00179.)  On April 10, 2009, Perkins grieved the

write up as unjust and stated that CBA "Article 13 and any other that may apply" were violated.

(Ex. D FFP 00180.)

On April 10, 2009, Perkins was written up for not checking in at the warehouse at the end

of his shift. (Ex. D FFP 00181.)  April 10, 2009 was Good Friday, and Perkins had twelve

deliveries on that day.  At 5:30 pm, Perkins returned to the warehouse after making the

deliveries and put the truck keys and paperwork in the outside mailbox.  On April 21, 2009,

Perkins grieved the write up. (Ex. D FFP 00182.) Perkins testified that he had been previously instructed, "if [he] got back and no one was at the warehouse," Perkins was to park his truck, lock his truck, and put the truck keys and his paperwork in the mailbox to be retrieved by the night shift supervisor. (Tr. 1038:24-1039:17.) Mondragon testified that on April 10, 2009, Perkins did not follow instructions correctly, and that Perkins was supposed to leave his keys and paperwork with the night crew, not in the mailbox. (Tr. 583:19-584:14.) Mondragon explained that employees were to leave the keys and paperwork in the mailbox only if there was no one at the warehouse. (Tr. 585:5-9.) Mondragon also testified that the night crew supervisor called him from an FFP phone to report that Perkins had left the keys and paperwork in the mailbox. (Tr. 585:12-16.) Mondragon further testified that this call indicated that the night crew supervisor was at the warehouse when Perkins arrived at 5:30 pm, and that Perkins should have left the keys and paperwork with the night crew supervisor. (*Id.*)

On April 14, 2009, Perkins hand-delivered to FFP owner, Stan Kouba, a letter stating that Perkins believed the write ups he had been receiving were racially discriminatory. (Ex. I; Tr. 1046:4-1051:3.) After delivering the letter, Perkins had a short meeting with Stan Kouba. Perkins admitted that he did not discuss Martelli's use of racial epithets at this meeting. (Tr. 1049:9-12.) Perkins testified that Stan Kouba responded by saying that he took offense at an employee playing the race card, and Perkins interpreted this and other statements as an insufficient response to a serious charge of racial discrimination. (Tr. 1047:3-16.)

On April 21, 2009, Perkins was written up for a lack of attendance, which Perkins claimed was an excused absence. (Ex. D FFP 00183.) Perkins and Mondragon testified that Perkins called Mondragon on Monday, April 20 in the evening and told Mondragon he had to attend a court hearing and could not work the next day, Tuesday, April 21. (Tr. 1051:14-25

12

Perkins testimony; Tr. 586:3-21 Mondragon testimony.)  Mondragon recorded on the write up

that he was disciplining Perkins not for just Perkins' April 21st absence, but also for a recent

pattern of absences that averaged about one per week. (Ex. D. FFP 00183.)  Perkins testified that

in his conversation with Mondragon on April 20, 2009, Perkins asked Mondragon if he could

switch his day off, scheduled for Wednesday, April 22, 2009, to Tuesday, April 21, 2009, so that

Perkins did not have to miss an extra day of work for which he would not receive pay.  Perkins

testified that Mondragon approved the switch of Perkins' day off from Wednesday to Tuesday,

but when Perkins arrived at work Wednesday, Mondragon did not assign a route to Perkins.

Perkins incurred one day of unpaid leave as a result. (Tr. 1053:22-1054:24.)  Perkins grieved this

write up citing CBA Article 13.  The evidence showed that Perkins followed FFP policy with

regard to his April 21, 2009 absence by giving advance notice to Mondragon the previous night.

(Ex. D FFP 00184; Tr. 1051:16-1052:13.)  Perkins also testified that Latino employees had

missed work without permission and had not been written up:

> Q. Now the second page of this April 21st entry, you made notes, particularly right here.
> What's -- please discuss with the jury what was the relevance of these two note entries.
> A. I found out that Carlos Cornelius and another driver had missed work on Wednesday
> and Thursday. He was not written up, and he was also allowed to work that Saturday. . . .
> to make up for missing one of those days.
> The other note I made was concerning Enrique. Because I was not allowed to
> work on that Wednesday, that Wednesday was Enrique's day off, he was allowed to
> work.

(Tr. 1055:6-16.)

On April 23, 2009, Perkins was written up by Supervisor Dennis Nakashima

(Nakashima) for not responding to a page. (Ex. D FFP 00185.)  In the write up, Nakashima

stated that he tried to page Perkins several times while Perkins was out on a delivery, but Perkins

did not call back. (*Id.*)  Nakashima wrote that supervisor Alfonso Diera (Diera) also tried to call

Perkins with no response. (*Id.*) Perkins testified that he checked his radio, and observed that he had received only one page "at 12:45 for about 14 seconds." (Tr. 1056:11.) Perkins said he determined later that day that Nakashima and Diera had been calling the wrong number. (Tr. 1056:16-22.) Perkins testified, "[t]he only page I received that day came from Dennis, 12:45, and it lasted for 14 seconds. I was still written up for not answering a page." (Tr. 1056:23-25.)

On May 4, 2009, Perkins filed two grievances: one stating that he experienced "harassment since becoming a union steward" and one stating as an ongoing violation "Retaliation for Discrimination grievance." (Ex. D FFP 00186-00187.) Perkins explained that he filed the second grievance, ". . . because I complained of racial discrimination I was being retaliated against." (Tr. 1057:13-15.)

On May 10, 2009, Mondragon issued the tenth and final write up to Perkins for "unknown whereabouts for 3+ hours." (Ex. D FFP 00189.) This write up was a 4th Offense write up, and Perkins' employment was terminated. two days later on May 12, 2009 (*Id.*) On May 10, 2009, Perkins was assigned a delivery to Rancho Liborio #7 in Commerce City. (*Id.*) Perkins left the warehouse at 7:30 am but did not return until 12:06 pm. (*Id.*) On the write up, Mondragon stated that he spoke to and got a written statement from the receiver at Rancho Liborio #7, Miguel Angel Montenegro (Montenegro), who reported that Perkins had arrived at Rancho Liborio # 7 at 8:00 am and had left at 8:30 am. (*Id.*; Ex. D. FFP 00192.) Mondragon also received from Oliver Macias, an FFP employee, and his wife Lorene Macias, a written statement that they had seen an FFP truck near 64th Street and Quebec in Commerce City at 8:50 am that morning. (Ex. D FFP 00196.) Mr. and Mrs. Macias' statement, attached to the write up, indicated that seeing an FFP truck "grabbed [their] attention, since we knew there wasn't (sic) any stops on that side of town." (*Id.*) Mondragon submitted his own written statement that he

personally saw Perkins driving eastbound on I-70, about 5 miles from Rancho Liborio #7, at around 10:30 that morning. (Tr. 542:10-17; 593:24-25.)

Perkins testified that on May 10, 2009, he arrived at Rancho Liborio #7 at about 7:45 am, that he had to wait for two trucks to be unloaded, and that he left Rancho Liborio #7 between 10:30 and 11:00 am. (Tr. 592:10-18; 594:5-7.)  On Perkins' trip ticket, the document that Perkins prepared after completing a delivery, Perkins recorded arriving at Rancho Liborio #7 at 7:45 am and leaving Rancho Liborio #7 at 11:00 because there were "2 Trucks b 4 me." (Ex. D FFP 00191; Tr. 1075:8-16.)  In his trial testimony, Perkins explained that after leaving Rancho Liborio #7, he drove to Church's Chicken, located at 64th Street and Quebec in Commerce City, to get lunch before returning to the FFP warehouse. (Tr. 1066:1-25.)  After arriving at the Church's Chicken, Perkins discovered he had left his wallet at his apartment.  Perkins then drove 30 to 35 minutes to his apartment in Aurora, located in the area of Peoria and Iliff, to retrieve his wallet. (Tr. 1067:1-7.)  Perkins testified that he felt he needed to immediately retrieve his wallet because it contained his commercial drivers license (CDL), which he needed to drive. (Tr. 1067:11-19.)  After retrieving his wallet, Perkins drove back to the same Church's Chicken to pick up his lunch and returned to FFP just after noon. (Tr. 1071:4-11.)

Defendants claim that Perkins was discharged for "unknown whereabouts" and also for dishonesty because Mondragon believed that Perkins misrepresented on his trip ticket that he left Rancho Liborio #7 at 11:00 am, whereas the Rancho Liborio #7 receiver Montenegro reported that Perkins left Rancho Liborio #7 at 8:30 am. (Tr. 591-19-20 Mondragon testimony.)  Perkins' trip ticket information also conflicted with Mr. and Mrs. Macias' statement that they had seen an FFP truck driving at 64th and Quebec at 8:50 am, and the trip ticket did not match Mondragon's belief that he had seen Perkins on I-70 at 10:30 am. (Tr. 712:1-714:11.)  Dishonesty is a cause

15

for immediate discharge under the CBA, and being "off route" is cause for immediate discharge

under FFP's work rules. (Ex. G at 8; Ex. O.)  The termination write up, however, stated that

Perkins was discharged for "unknown whereabouts" and did not specifically mention dishonesty

as a reason for discharge. (Ex. D FFP 00189.)

     Perkins presented evidence that several Latino and Caucasian drivers were written up,

but not fired, for similar offenses. (Tr. 595:19-600:15; Ex. T.)  For example, Mondragon testified

one employee pulled over his truck and slept without informing FFP:

> Q. . . . On January 23, 2009, Mr. Frank DaPaepe, who is a Class A driver at Federal
> Fruit, was written up by you for an unauthorized stop. Do you see that?
> A. Yes, I do.
> Q. Okay. In your description here, supervisor comments, you indicate that Mr. DaPaepe
> had pulled over and slept in his vehicle for about two and a half hours; is that right?
> A. Yes.
> Q. Later that same day Mr. DaPaepe pulled over again and slept for 33 minutes; is that
> right?
> A. Yes.
> Q. And that's totally unacceptable, isn't it?
> A. Yes.
> Q. And Mr. DaPaepe only got a written warning; isn't that true?
> A. Yes.
> Q. And Mr. DaPaepe, once again -- let's see, two months later you wrote you him up a
> second time for unauthorized stop, on March 26, 2009; is that right?
> A. Yes.
> Q. Okay. On this particular date, Mr. DaPaepe pulled his vehicle over and slept for
> approximately six hours; is that right?
> A. Yes.
> Q. And as it relates to Mr. DaPaepe, because the whereabouts were unknown, you had to
> actually use GPS to find Mr. DaPaepe, didn't you?
> A. Yes.
> Q. And Mr. DaPaepe, . . . only received a written warning; isn't that right?
> A. Yes.
> Q. Is Mr. DaPaepe an African American?
> A. He is not.

(Tr. 600:22-602:4.)

     Perkins grieved his termination. (Ex. D FFP 00188.)  On November 5, 2009 Perkins filed

a CHARGE OF DISCRIMINATION (Ex. E) with the Equal Employment Opportunity

Commission (EEOC) alleging race discrimination, discriminatory discharge, and retaliation by

FFP.  On January 10, 2010, Perkins received a right to sue letter from the EEOC. (Am. Compl.

Ex. A.)

On August 26, 2010, Perkins entered into a SETTLEMENT AGREEMENT with the

Union and FFP resolving several of Perkins' Union grievances. (Ex. P.)  Perkins settled certain

grievances for $54,523.76, but the settlement did not resolve his claims of race discrimination,

race disparate treatment, or retaliation under Title VII and § 1981.  Perkins filed this case on

March 4, 2011 and his Amended Complaint on March 24, 2011. (Doc. Nos. 1 and 7.)

B.  Miller's Employment With FFP

Miller began working for FFP as a Class A truck driver on November 19, 2008. (Tr.

198:4-5.)  On March 5, 2009, Miller received two disciplinary warnings: one for not wearing his

ID badge and one because he "accidentally hit a building at Buckley Air Force Base," causing

minimal damage. (Tr. 198:11-200:7.)

Miller testified that on the morning of March 11, 2009, he was standing about 25 to 30

feet away from the office area of the warehouse and that he heard Martelli yelling to Mondragon

"fire the spick and write up the nigger" in reference to Moreno and Perkins. (Tr. 200:24-201:22.)

Miller said that in his thirty-year employment history he had never witnessed a manager use

these types of racial slurs. (Tr. 201:24-202:1.)  Miller testified that he spoke to Mondragon at

about 9:00 am that day and complained that the language Martelli used was "inappropriate and

unacceptable." (Tr. 202:8-15.)  Miller testified that Mondragon responded, "[t]hey'll do what

they want." (Tr. 202: 18-19.)  Miller did not talk to Martelli about Martelli's use of racial

epithets because Miller "was afraid he would lash out at me." (Tr. 203:8-12.)

17

On June 23, 2009, Miller was called as a witness in Moreno's Union arbitration hearing on Moreno's discharge. (Tr. 204-21-25.)  Miller testified specifically about Martelli's use of racial epithets on March 11, 2009. (Tr. 205:8-10.)  Martelli and another FFP owner, Stan Kouba, were present at the arbitration hearing during Miller's testimony. (Tr. 228:1-6.)  Miller's employment was terminated on July 10, 2009, seventeen days after his testimony at Moreno's arbitration. (Tr. 206:3-5.)

At trial, Miller testified about the events leading to his termination on the morning of July 10, 2009:

> A.  I went out where we park the trucks at night and to retrieve a truck.  I was coming around to hook up to a trailer.  I was looking out my right side for the trailer number that I needed to hook onto.  And I had to swing out to the left while I was still watching to the right of me, and I collided with another truck.

(Tr. 208:16-21.)  In Miller's notes written after the accident, Miller accepted 100% responsibility for the accident, but at trial Miller testified that he believed he was 50% at fault for the accident. (Tr. 209:5-17.)  The other driver, Enrique Arenas, a Latino, was not written up or disciplined after the accident. (Tr. 209:21-25; 301:25-302:1.)  Miller was fired within a few hours of the accident, but no one from FFP interviewed Miller in connection with the accident and no estimate of the damage costs was obtained prior to firing Miller. (Tr. 211:5-13; 300:16-18.)  Miller testified he believed he was fired "[b]ecause I testified at [Moreno's] arbitration.  They were just out to get rid of me."  (Tr. 211:17-18.)

Defendants presented evidence that FFP imposed different discipline against drivers who had accidents based on the particular circumstances.  After having accidents, some drivers were suspended, some drivers were written up, some drivers were put on a probationary period, and some drivers were fired. (Tr. 693:7-14 Mondragon testimony; Ex. Y.)  Mondragon testified as to

18

the reason Miller was fired:

> Q. . . . Why did you terminate [Miller]?
> A.  I think it was because of the severity of the accident and that it was in our parking lot. To have that severe of an accident in a parking lot, that's–I mean, it's not enclosed, . . . I mean it's a big area, but to have that kind of an accident in our parking lot just floored me. . . . I really don't believe that type of accident should have happened in our parking lot.

(Tr. 701:21-702:8.)

However, Miller highlighted for the jury evidence that some FFP drivers were involved in serious accidents, but were not fired. (Tr. 229:16-25 Miller testimony; Tr. 602:7:608:19 Mondragon testimony.)  For example, Mondragon testified about accidents involving other FFP employees:

> Q. Okay. And so even after three accidents, Mr. Savacoll is not terminated, right?
> A. Right.
>  . . .
> Q. You would agree that Mr. Pennegar was only terminated after his fourth accident?
> A. Yes.
>  . . .
> Q. Do you recall Mr. Alverez having a major accident involving flipping a truck?
> A. I believe so.
>  . . .
> Q. Do you recall whether or not he was terminated?
> A. No, he wasn't.

(Tr. 608:10-19.)

On November 5, 2009, Miller filed a CHARGE OF DISCRIMINATION with the EEOC complaining he was discharged in retaliation for his "complaint of race discrimination, [his] testimony against an owner of Federal in a legal proceeding and due to [his] association with former Federal African-American employee Richard Perkins, . . . ."  (Ex. F.)  On January 10, 2010, Miller received a right to sue letter from the EEOC.  (Am. Compl. Ex. A.)

On March 30, 2010 through a Union grievance settlement, Miller was reinstated and

19

received $26,615.40 in lost wages, but Miller resigned his employment on June 2, 2010. (Tr.

242:25-243:12.)

III.  Discussion

      A.  <u>Perkins' Verdict Against Martelli Individually For Disparate Treatment Under 42</u>
<u>U.S.C. § 1981 Will Be Upheld.</u>

      In the Motion, Defendants argue that the verdict against Martelli must be set aside

because, as a matter of law, Martelli cannot be liable for disparate treatment during Perkins'

employment at FFP.  Defendants correctly assert that for Perkins to establish a claim against

Martelli for racially disparate treatment under § 1981, Perkins had to prove that during the time

Perkins worked at FFP, Martelli personally subjected Perkins to adverse employment action and

that Perkins' race was a motivating factor for the adverse employment action.  "A claim seeking

personal liability under section 1981 must be predicated on the actor's personal involvement."

*Allen v. Denver Public School Bd.,* 928 F.2d 978, 981, 983 (10th Cir. 1991) *overruled on other*

*grounds*, *Kendrick v. Penske Transp. Services Inc.*, 220 F.3d 1220 (10th Cir. 2000) (affirming

summary judgment for defendant on § 1981 claim for wrongful termination from employment

because there was no evidence that the principal of defendant school had any personal

involvement in "the termination proceedings. . . .")  Defendants also correctly assert that Martelli

was directly involved only in one event during Perkins' employment at FFP: Martelli's use of

racially degrading language on March 11, 2009 while ordering Mondragon to write up Perkins.

The evidence showed that after the March 11, 2009 incident, Martelli did not directly interact

with Perkins until Martelli approved of Mondragon's decision to fire Perkins on May 10, 2009.

According to Defendants, since the jury separately awarded Perkins compensatory damages

against Martelli for discriminatory discharge, the Court may uphold the verdict on Perkins'

disparate treatment claim against Martelli only if Martelli's March 11, 2009 order to write up

Perkins is separately actionable as disparate treatment.  In other words, Defendants maintain that

in examining Perkins' disparate treatment claim, the Court must disregard Martelli's

involvement in Perkins' discharge from employment.  Defendants reason that since Perkins

received a damages award on his claim for discriminatory discharge, Perkins may not also

recover damages for disparate treatment based on the discharge because it would allow Perkins

to collect a double recovery for the same conduct and injury.  Defendants further assert that, as a

matter of law, the single disciplinary write up should not be considered an actionable adverse

employment action.[9]  Defendants ask the Court to conclude that, as a matter of law, Martelli

cannot be liable to Perkins for disparate treatment.  In response, Perkins asserts that Martelli's

approval of Mondragon's decision to terminate Perkins' employment should be considered as

evidence supporting both Perkins' disparate treatment claim and Perkins' discriminatory

discharge claim against Martelli and that the jury's damage awards on both claims should be

upheld.

    If two claims "arise from the same operative facts, and seek identical relief, an award of

damages under both theories will constitute double recovery." *J.M. v. Hilldale Independent*

*School Dist.*, No. 08-7104, 2010 WL 3516730, **14 (10th Cir. Sept. 10, 2010)  (unpublished

opinion) (citing *Mason v. Okla. Turnpike Authority*, 115 F.3d 1442, 1459 (10th Cir. 1997)).  At

---

[9] Prior to trial, Perkins argued that he was subjected to adverse employment actions when he received unfavorable truck and route assignments; however, Perkins abandoned that assertion at trial in final argument.  The Court reiterates its finding that the unfavorable truck and route assignments cannot, as a matter of law, support Perkins' claim for disparate treatment or retaliation.  "[A] mere inconvenience or an alteration of job responsibilities" does not constitute an adverse employment action. *Piercy v. Maketa,* 480 F.3d 1192, 1203 (10th Cir. 2007) (citation omitted).

first glance, Perkins' disparate treatment and discriminatory discharge claims against Martelli

appear to be based on the same conduct: 1) Martelli's March 11, 2009 racially derogatory order

to write up Perkins; and 2) Martelli's May 10, 2009 approval of Mondragon's decision to fire

Perkins. (*See* Tr. 200:8-201:22 Miller testimony; Tr. 314:25-315: 7 Martelli testimony; *Cf.* Tr.

568:11-569:6 Mondragon testimony).   However, Perkins did not seek identical relief against

Martelli for disparate treatment and discriminatory discharge.   Perkins presented evidence that

he experienced emotional distress immediately following the March 11, 2009 incident.   Bernice

Perkins, Perkins' mother, testified  that Perkins called her the night of March 11 and was

emotionally distraught:

> Q. Now, Mrs. Perkins, when your son called you in March of 2009 and relayed to you
> that he was called a nigger, what would you -- how would you characterize the tone in his
> voice?
> A. He was very upset, and he was crying. And I told him: You know who you are.
> Q. Okay. And after that incident when he told you what he was called, that incident, did
> you continue to have weekly phone calls with your son?
> A. Yes, I did.
> Q. Okay. During some of these phone calls leading up to his termination, did you discuss
> his write-ups?
> A. Yes.

(Tr. 955:14-25.)

> Q. During this time period, after he relayed to you that he was called that word, how did
> he sound at that period of time, between when he was called that word and when he was
> terminated?
> A. He was crying. He was very upset.

(Tr. 956:7-11.)   Perkins also presented evidence regarding his emotional distress after he was

terminated from employment at FFP.   Bernice Perkins testified:

Q. Okay. And after his termination, did you consider -- did you continue to have weekly
phone calls with your son about how he was doing?
A. Yes, I did.
Q. Okay. And did your son seem depressed to you?
A. Yes, he did.
Q. And are you aware that after he was terminated your son became homeless?
A. Yes, I am.
Q. And are you aware that -- are you aware that your son had to sleep on the floor?
A. Yes, I am.
Q. And did you ever have a concern that your son was suicidal?
A. Yes, I did.
Q. Okay. What was your concern?
A. My concern was, he had been humiliated, called a name –
. . .I can't imagine somebody calling somebody the N word, humiliating your child like
that. His integrity -- every time I talked to him, he was very depressed.

(Tr. 956:12-957:22.)

Perkins asked (1) for compensatory damages for emotional distress caused by the March

11, 2009 incident and experienced during the time period before he was fired and (2) for separate

compensatory damages for emotional distress caused by the termination of his employment.

Even though these two claims are supported by the same operative facts, Martelli's order to

write up Perkins and Martelli's involvement in Perkins' discharge, Perkins did not seek

"identical relief" for both claims.  Hence, the award of separate compensatory damages on each

claim does not constitute a double recovery. *J.M. v. Hilldale Independent School Dist.*, 2010 WL

3516730, at **14.  In sum, the verdict in favor of Perkins on his claims of disparate treatment

and discriminatory discharge against Martelli can be supported by the same evidence.

However, the jury's verdict on Perkins' disparate treatment claim against Martelli would

stand even if it was based only on Martelli's March 11, 2009 order to write up Perkins.  The

Tenth Circuit defines "adverse employment action," liberally and does not limit such actions to

monetary losses. *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998)(citing *Berry*

*v. Stevinson Chevrolet,* 74 F.3d 980, 986–87 (10th Cir. 1996)).  Instead, the Tenth Circuit "takes

23

a case-by-case approach, examining the unique factors relevant to the situation at hand." *Sanchez v. Denver Pub. Sch.*, 164 F.3d at 532 (internal quotations omitted) (citing *Jeffries v. Kansas*, 147 F.3d 1220, 1232 (10th Cir. 1998)).  The alleged adverse employment action, however, must be more than "'a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).

In some cases, the Tenth Circuit has held that a single disciplinary action, such as a write up, that does not have a significant effect on an employee's status, is not considered an actionable adverse employment action.  For example, in *Dick v. Phone Directories Co., Inc.*, the Tenth Circuit Court of Appeals affirmed summary judgment in favor of an employer on a retaliation claim. 397 F.3d 1256, 1270 (10th Cir. 2005).  The Tenth Circuit concluded that a single disciplinary warning was insufficient to constitute an actionable adverse employment action.  The court stated, "Ms. Dick alleges only one instance of a disciplinary action. Moreover, she does not allege that the single write-up has any bearing on her likelihood of being fired. On these facts, Ms. Dick has not demonstrated any harm to her future employment prospects. The single write-up is not an adverse employment action." *Id.* (citation omitted).  In contrast, the jury in this case could have reasonably inferred that a write up initiated by Martelli, as an owner and general manager of FFP, accompanied by Martelli's highly offensive racial epithet, carried greater weight and would have had a more serious negative effect on Perkins' employment status.  Martelli's other order on March 11, 2009 to fire Moreno, which Mondragon carried out, supports this inference.

In *Medina v. Income Support Div'n, New Mexico*, the Tenth Circuit noted that a single write up could be considered an adverse action, "if it affects the likelihood that the plaintiff will be terminated, undermines the plaintiff's current position, or affects the plaintiff's future

24

employment opportunities." 413 F.3d 1131, 1137 (10th Cir. 2005) (citation omitted).  However, the court in *Medina* held that the single warning letter issued in that case, "[fell] short of an adverse employment action[,]" and noted that the letter was not placed in the employee's personnel file. *Id.*  In this case, Martelli, in a very hostile manner using extremely demeaning language, ordered Mondragon to write up Perkins and to fire another employee, Moreno.  From this, the jury could reasonably infer that the nature of this particular write up significantly undermined Perkins' position at FFP.  And, unlike the warning letter in *Medina*, the write up ordered by Martelli stayed in Perkins' personnel file until he was fired two months later.  The jury could have reasonably inferred that this write up also affected the decision to fire Perkins. District courts in the Tenth Circuit have applied the Tenth Circuit's interpretation of adverse employment action by focusing on the effect that a disciplinary action has on an employee's position. *See, e.g., Rice v. Kansas,* No. 08- 4132, 2011 WL 2078752, *11 (D. Kan. May 26, 2011) (unpublished decision) (denying plaintiff's motion for summary judgment on her claim of retaliation and stating, "[a] single write-up which fails to demonstrate any harm to one's future employment prospects is not an adverse employment action.") (citing *Dick*, 397 F.3d at 1270); and *Duran v. State of N.M.Dept. of Labor*, 143 F. Supp. 2d at 1285, 1288 (D. N.M. 2001) ("There is no evidence that the warning letter or inability to attend the Governor's Conference . . . affected Plaintiff's employment . . . by leading to future discipline or preventing future advancement. Therefore, these disciplinary actions did not . . . constitute an adverse employment action.") (citation omitted).

Following the guidance of the Tenth Circuit, the Court concludes that, under these unique circumstances, the March 11, 2009 write-up ordered by Martelli would have been sufficient to constitute an actionable adverse employment action.  Thus, the Court will uphold the jury's

25

verdict and the Judgment awarding Perkins $10,000 in compensatory damages for emotional

distress caused by the March 11, 2009 incident and $65,000 in punitive damages against Martelli

for his disparate treatment conduct, even without factoring in Martelli's later approval of the

termination of Perkins' employment.

>    B.  Perkins' Jury Verdict Against FFP For Disparate Treatment Is Supported By
>        The Evidence.

Next, Defendants contend that, as a matter of law, the eight write-ups given to Perkins by

Mondragon and the one write up given to Perkins by Nakashima, both acting for FFP, should not

be viewed, either separately or in the aggregate, as "adverse employment action," because the

write ups did not increase Perkins' risk of termination, did not result in immediate consequences,

and did not disqualify Perkins from any job-related benefits or opportunities.  However, this

argument ignores the progressive nature of the CBA discipline policy, which provides for

suspension on the third offense and for termination of employment on the fourth offense. *See*

*Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998) (upholding jury verdict

on retaliation and finding that several disciplinary write ups were sufficient to constitute adverse

action as a matter of law).  Notably, Perkins received two write ups for the same type of offense:

1) a first offense write up on March 19, 2009 for pulling the wrong type of lettuce; and 2) a

second offense write up on March 31, 2009 for loading the wrong kind of bananas.  Under the

CBA progressive discipline policy, Perkins would have been suspended if he had committed the

same offense a third time, and Perkins would have been discharged if he had incurred a fourth

offense write up. (Ex. G at 9.)  Under the CBA policy, one can reasonably infer that each write

up brought Perkins closer to discharge.

Defendants assert that since, in their view, Perkins was not fired under the CBA

progressive discipline policy, but instead was fired "for cause" under the CBA, the write-ups did

not constitute adverse employment action because they did not lead to termination. (Ex. A at 8.)

Defendants claim that Perkins was fired for "unknown whereabouts" and for dishonesty. The

CBA provides for immediate discharge for dishonesty. (Ex. G at 8.)  However, the CBA also

provides for immediate discharge for "violations of work rules, . . . ." (*Id.*)  And, FFP's work

rules say, "ANY DRIVER CAUGHT OUTSIDE THEIR DELIVERY AREA WITHOUT

CAUSE WILL BE TERMINATED."[10] (Ex. O FFP 00863; Ex. B Section C ¶ 9; Section G ¶ 1E.)

At trial, Defendants stressed both of these reasons as "just causes" for firing Perkins apart from

the progressive discipline policy.  But, this does not mean that Perkins cannot recover on a

separate claim for disparate treatment based on the write ups, and Perkins proved that the write

ups were themselves racially motivated adverse employment action.  The numerous write ups,

given to Perkins during a three and one-half month period, were properly considered by the jury

as adverse employment action because the write ups brought Perkins closer to discharge.

In *Roberts v. Roadway Express*, *supra*, the Tenth Circuit upheld a ruling that written

warnings were adverse employment actions noting that the more warnings Roberts received, the

more likely he was to be terminated:

---

[10] Perkins' termination notice stated that he was discharged for "Unknown whereabouts for 3+ hours."  (Ex. D FFP 00189.)  However, the termination notice alluded to dishonesty:

Richard left the whse @ 7:25 am with one delivery to Liborio #7 Commerce City.  He didn't return to the warehouse until 12:06 pm.  On his route sheet he wrote in that he had 2 trucks in front of him. I spoke with Miguel, the receiver at Liborio #7.  He said that Federal driver arrived at around 8:00 am and he finished receiving him around 8:30 am. His statement is attached!

(Ex. D FFP 00189.)

> As to the written warnings, Roadway contends that they had no adverse effect on the terms and conditions of Roberts's employment because, after a nine month term of "validity," they could not be used to support disciplinary actions such as termination. But the record indicates that the more warnings an employee received, the more likely he or she was to be terminated for a further infraction. . . . This alone is enough to constitute adverse action.

*Id.* at 1104.  The *Roberts* court cited *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997), in support of its analysis. *Id.*  In *Kim*, the Eighth Circuit Court of Appeals noted, "[t]here was also evidence that [employer] had 'papered' [plaintiff's] file with negative reports including two written reprimands. These are the kind of serious employment consequences that adversely affected or undermined [plaintiff's] position, even if he was not discharged, demoted or suspended." *Id.  See also Marx v. Schnuck Markets, Inc.,*76 F.3d 324, 329 (10th Cir. 1996) (noting that a pattern of retaliation began with plaintiff being "written up"); *Clark v. Yellow Transportation, Inc.*, 2009 WL 2710196, *10+ (D. Kan. Aug 25, 2009) (unpublished decision) (denying summary judgment to defendant and finding that two written warning letters were adverse actions even though the letters were not current under the Collective Bargaining Agreement because the letters stayed in the employee's personnel file); *cf. DeWalt v. Meredith Corp.*, 484 F. Supp. 2d 1188, 1198 (D. Kan. 2007) (finding that various memoranda from employer and verbal reprimand were not adverse actions because no evidence of record suggested that any of these incidents "placed him in jeopardy of being terminated or demoted.").

Defendants contend that this case is distinguishable from *Roberts* because FFP's Progressive Discipline Policy outlined in the CBA does not provide that an employee could be terminated for several first-level offenses. (Ex. G at 9.)  However, in *Roberts*, the Tenth Circuit did not indicate whether the write ups were for minor offenses.  Roadway argued that even though Roberts received over twenty written warnings, along with a suspension and termination,

over a two-year period, the warnings had no adverse effect on Roberts's employment because

after a nine-month term of validity, they could not be used to support disciplinary actions such as

termination. *Id.* at 1104.  The *Roberts* court rejected this argument and concluded, "the record

indicates that the more warnings an employee received, the more likely he or she was to be

terminated for a further infraction." *Id.*  Thus, it appears that the Tenth Circuit rejected

Roadway's argument – that many of the write ups should not be considered because they became

invalid for disciplinary purposes – and concluded that the cumulative effect of the write ups in

general would be sufficient to constitute an adverse employment action. *Id.*

     In addition to arguing that *Roberts* is distinguishable, Defendants cite, *Rennard v.*

*Woodworker's Supply, Inc.*, 101 Fed. App'x. 296, 307-08 (10th Cir. 2004) (unpublished

decision).  In *Rennard*, the Tenth Circuit affirmed a summary judgment in favor of the defendant

in a sexual harassment, retaliation and constructive discharge case.  The evidence showed that

the plaintiff was given a disciplinary write up for failing to timely report several instances of

sexual harassment and that the plaintiff was told to improve or face suspension or a final

warning. *Id.* at 300.  Suspension was the second step in the employer's progressive discipline

program. *Id.*  The plaintiff asserted that she also received negative remarks on a performance

evaluation but conceded that she was given satisfactory marks elsewhere in the evaluation. *Id.* at

308.  The court noted that the plaintiff failed to support her allegation that the performance

evaluation was the reason she was denied a promotion. *Id.*  The court concluded that summary

judgment for the defendant was proper because the "plaintiff failed to put forth sufficient

evidence to establish that either the reprimand or the performance evaluation were adverse

employment actions[,]" and the plaintiff proffered no evidence that either the reprimand or the

performance evaluation "had any immediate or practical effect on her job status." *Id.*  Unlike

*Roberts*, which bears a strong resemblance to this case because it involved multiple disciplinary write ups, *Rennard* had a markedly different scenario, one reprimand and one performance evaluation that did not lead to termination.

Defendants attempt to distinguish *Roberts* by arguing that in this case, the CBA does not allow discharge based on several low level write ups. However, the Court questions this premise. Although the CBA does not specifically provide for discharge based on a certain number of low level offenses, the CBA does provide that "[v]iolations of work rules" would be deemed sufficient grounds for discharge. (Ex. G at 8.) Thus, under the language of the CBA, it appears that write ups even for low level offenses, if they involved violations of FFP's work rules, could support a decision to discharge an employee. Moreover, the CBA notes that warning notices, "will be considered current for 15 months after issued. . . . and [w]arning notices will be a part of each employee's permanent file." (Ex. G, CBA Art. 13.) Hence, it would be reasonable to infer that the warning notices are maintained in an FFP employee's permanent file for review by FFP management when making decisions about a particular employee's status within the company. In addition, Mondragon admitted at trial, after viewing a copy of the transcript from an earlier employment hearing involving Perkins' discharge, that Perkins must have known that his job was in jeopardy after he had received so many write ups during a short time period. (Resp. Ex. 1.) At trial, Mondragon was questioned about this previous testimony:

> Q. Now, Mr. Mondragon, after reading your testimony at Mr. Perkins' unemployment hearing, does that refresh your recollection of whether or not you told the hearing officer that Mr. Perkins would have known his job was in jeopardy based on the multiple write-ups he had?
> A. Yeah, my answer was, "I am sure he did."

(Tr. 591:6-11.)

30

The evidence supports the jury's verdict because the cumulative effect of multiple disciplinary write ups, considered apart from Perkins' discharge, can constitute adverse employment action.  Thus, the Court will uphold the jury's verdict against FFP on Perkins' disparate treatment claim.

C.  Perkins Proved His Claim Against FFP For Discriminatory Discharge.

FFP argues that Perkins failed to produce sufficient evidence that his discharge was racially discriminatory because Perkins' evidence did not contravene the "abundant and uncontroverted evidence . . . that no discrimination occurred." (Mot. at 11 citing *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1114 (10th Cir. 2005).  As mentioned earlier, FFP presented evidence that Perkins' employment was terminated "for cause" under the CBA for "unknown whereabouts" and for dishonesty.  Perkins maintains that these reasons were a pretext for discrimination.  FFP points out that its stated reasons for firing Perkins are bolstered by evidence that Mondragon thoroughly investigated Perkins' explanation for his late return from the delivery on May 10, 2009 before Mondragon recommended to Martelli that Perkins be fired. Mondragon testified that he noted the excessive mileage on Perkins delivery truck,[11] and that he got written statements from Montenegro, the Rancho Liborio #7 employee who received

---

[11] Mondragon testified,

Q. As part of your investigation into this matter, Mr. Mondragon, did you determine the number of miles that Mr. Perkins put on the truck, May 10th of '09?
A. I did.
Q. And what did you determine was the number of miles he put on the truck that day?
A. It was well over a hundred. I think I came up with 130, somewhere in that area.
Q. And how many miles would you estimate Liborio 7 is from Federal Fruit & Produce?
A. Eight -- six, eight miles.

(Tr. 718:22-719:7.)

Perkins' delivery on the morning of May 10, 2009, and from Mr. and Mrs. Macias, who observed Perkins' truck in Commerce City that morning. FFP points out that even Perkins' own explanation, that he was late because he had retrieved his wallet containing his CDL at his apartment, would have justified firing him because driving without a CDL violated the law and FFP's policies.

In employment discrimination cases, a plaintiff may show that the stated reason for his discharge was pretextual with evidence the employer "treated [the plaintiff] differently from other similarly-situated employees who violated work rules of comparable seriousness[.]" *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007) (quoting *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d at 1230). And, in order to set aside the jury's verdict on this claim, Defendants must show that the evidence viewed in the light most favorable to Perkins "points but one way" to the conclusion that Perkins was discharged for the stated reasons and not for discriminatory reasons. *Jones v. United Parcel Service*, 674 F.3d 1187, 1195 (10th Cir. 2012). Defendants have failed to make this showing. Perkins presented evidence from which the jury could infer that the stated reasons for firing Perkins were pretextual. There was evidence that several non-African-American drivers, who had committed similar and even more egregious violations, were not fired. *See* Mondragon testimony Tr. 596:5–602:4 (comparing several employees' infractions to Perkins' infractions and failure to fire those employees). Hence, the Court will not set aside the jury's verdict on Perkins' discriminatory discharge claim against FFP.

D.   Perkins and Miller Presented Sufficient Evidence To Submit Punitive Damages To The Jury.

Defendants assert that Plaintiffs' claims for punitive damages should not have been

submitted to the jury because Plaintiffs failed to show that either FFP or Martelli acted with the requisite state of mind in connection with Perkins' and Miller's employment terminations. Defendants again point to the evidence that Mondragon carefully investigated Perkins' late return on May 10, 2009 before recommending to Martelli that Perkins be fired.  Defendants point out that there was no evidence that Mondragon had an ulterior motive or that Mondragon tried to falsify information to support a decision to fire Perkins. Defendants further contend that one of the key factors in determining whether an employer's decision makers acted with the requisite state of mind is the extent to which Plaintiffs proved Defendants were trained in and familiar with the dictates of Title VII. *See Levelle v. Penske Logistics*, 197 Fed. Appx. 729, 736-37 (10th Cir. Aug. 11, 2006) (unpublished opinion) (reversing district court's decision to send punitive damages to the jury finding that plaintiff did not produce any evidence that the decision makers knew the requirements of the ADA or knew their actions risked violating the law).

Whether sufficient evidence was presented to support punitive damages is a question of law.  *Juarez v. ACS Government Solutions Group, Inc.*, 314 F.3d 1243, 1246 (10th Cir. 2003) (upholding the denial of a Rule 50(b) motion on the issue of punitive damages).  Punitive damages are available under Title VII and § 1981 if the plaintiff proves that an employer engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  *Id.* at 1247 (citing 42 U.S.C. § 1981a (b)(1) (1994)).  " . . . [A] plaintiff must prove that the defendant acted with malicious, willful or gross disregard of a plaintiff's rights over and above intentional discrimination." *Id.* (citation omitted).

In *Juarez,* the Tenth Circuit upheld a jury award of punitive damages on evidence that the manager and other supervisory employees received some EEO training and that one of the managers was the Equal Employment Opportunity Officer at the employer's site. *Id.*  In *Juarez*,

33

the evidence included a "merit spreadsheet" prepared by defendants to determine which employees would be laid off, but the plaintiff presented evidence that the spreadsheet was used "merely in an attempt to justify the termination of certain individuals." *Id.*  The *Juarez* court found that not all of the categories listed on the spreadsheet were used in the termination decision and that the jury could infer from the evidence that the spreadsheet was an after-the-fact attempt to justify plaintiff's employment termination or to cover up a discriminatory discharge. *Id.*

Defendants also cite *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999), in which the United States Supreme Court held that punitive damages are only available in a "sub-set of cases" involving intentional discrimination in which the plaintiff shows that the employer acted with "malice or with reckless indifference to the [plaintiff's] federally protected rights." *Id.* at 535.  Plaintiffs counter that the court in *Kolstad* broadly defined malice and reckless indifference: "[t]he terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.*

Both the CBA and the FFP Work Rules, admitted as exhibits at trial, contained broad prohibitions against racial discrimination, and the jury was entitled to infer that members of FFP management and Martelli knew that racial discrimination was prohibited at the FFP workplace. (*See* Ex. G at 12; Ex. O at 2.)  Perkins maintains that the evidence supports a finding that Martelli acted with the requisite knowledge that he may have been violating federal law, the CBA, and the FFP Work Rules.  On March 11, 2009, Martelli loudly used racial epithets in front of other employees while ordering Mondragon to write up Perkins for standing outside with Moreno during a pre-trip inspection of their trucks.  The jury reasonably determined that malice

34

or reckless disregard for anti-discrimination law was behind Martelli's open use of "nigger," a term that is considered particularly humiliating and racially offensive.  In addition, the evidence showed that on May 10, 2009, Martelli approved Mondragon's recommendation to fire Perkins for "unknown whereabouts" even though other drivers had committed similar or even more egregious infractions and were not fired.  This evidence supports sending to  the jury the question of awarding punitive damages against Martelli individually under § 1981 for discriminatory discharge.

As for the evidence supporting punitive damages on Perkins' claim against FFP for discriminatory discharge, Mondragon testified that he recommended firing Perkins for being out of his delivery area and for dishonesty, but Perkins elicited testimony from Mondragon that he had not fired Latino and Caucasian employees for similar infractions.  Mondragon also admitted giving Perkins numerous write ups for infractions when Latino or other non-African-American employees were not comparably disciplined for similar infractions. (Tr. 595:19-602:4.)  After receiving Perkins' letter complaining of racial discrimination, FFP owner Stan Kouba accused Perkins of playing the "race card."  From this the jury could infer that Stan Kouba, acting for FFP, did not take Perkins' race discrimination complaints seriously. (Tr. 507: 22-508:1.)  This evidence was sufficient to present the issue of punitive damages to the jury on Perkins' claim of discriminatory discharge against FFP based on the actions of these members of FFP management.

Defendants also argue there was insufficient evidence to send the issue of punitive damages to the jury on Miller's retaliatory discharge claim.  Miller points out that the sequence of events shows a lack of concern for discrimination and retaliation law.  Martelli approved of Mondragon's decision to fire Miller only seventeen days after Miller testified at a Union

35

arbitration, at which Martelli was present.  During the arbitration hearing, Miller testified about

Martelli's use of disgusting racial epithets on March 11, 2009.  Miller testified at trial in this

case that on March 11, 2009, when he complained to Mondragon about the racial epithets used

by Martelli, Mondragon shrugged off the complaint by saying, "they will do what they want."

(Tr. 202:14-19.)  To support a finding that the stated reason for Miller's discharge was

pretextual, Miller presented evidence showing that other employees were involved in similar or

more serious accidents, but those employees were not discharged. (Tr. 602:5– 608:19

Mondragon testimony.)  Finally, Miller showed that FFP managers did not do a complete

investigation of Miller's accident, because they never talked to Miller to get his side of the story

and they did not get an estimate of damages, before firing Miller.  Miller testified he was fired

within two hours of the accident. (Tr. 211:11-17.)

Viewing this evidence and drawing all reasonable inferences in favor of Plaintiffs, the

Court concludes that Plaintiffs presented sufficient evidence to allow the jury to decide whether

to award punitive damages on Perkins' discriminatory discharge claim and on Miller's

retaliatory discharge claim.

E.  Perkins' Retaliation Claim Against Martelli: Perkins Established A Causal
Connection Between His Protected Activity And Martelli's Decision to Discharge
Perkins.

Defendants incorporate the arguments from their Motion for Reconsideration (Doc. No.

164) in which Defendants outline Perkins' testimony recanting several allegations made in his

EEOC charge particularly with respect to protected activity.  The Court has considered this

testimony here, but the Court will address Defendants' argument concerning exhaustion of

administrative remedies in its MEMORANDUM OPINION AND ORDER ON DEFENDANTS'

MOTION FOR RECONSIDERATION AND TO VACATE TRIAL AND JUDGMENT

36

AND/OR FOR A NEW TRIAL and not in this opinion.

In the alternative, Defendants argue that Perkins' retaliation verdict against Martelli cannot stand because Perkins did not prove that Martelli was aware of any of Perkins' protected activity prior to approving the termination of Perkins' employment.  At trial, there was evidence that Perkins engaged in four instances of protected activity: 1) Perkins' complaint of racial discrimination at the meeting with Mondragon on March 2, 2009; 2) Perkins' March 19, 2009 grievance stating that he had been racially discriminated against since becoming a Union steward; 3) Perkins' April 14, 2009 letter to Stan Kouba complaining about a pattern of racial discrimination; and 4) Perkins' missing March 11, 2009 grievance complaining about Martelli's use of a racial epithet.  At trial, the jury heard testimony from Union representative Medina and from Perkins that on March 11, 2009 Perkins prepared an additional grievance complaining about Martelli's use of the term "nigger" and that this grievance was filed with the Union but was lost.  The Court has considered this evidence in the context of Defendants' Motion for Reconsideration, and the Court has granted a new trial under Rule 60(b)(1) and (3) on Perkins' retaliation claim against Martelli due to Perkins' failure to inform Defendants that he would present testimony about this missing grievance.  Notably, the missing grievance was directed at Martelli's use of a racial epithet on March 11, 2009, and the jury could infer that Martelli knew about this grievance since it was directed at Martelli's conduct.  On that basis, the Court will deny the Motion for judgment as a matter of law because Perkins presented evidence of a causal connection between the missing grievance and Martelli's decision to fire Perkins.  However, the Court will grant in part the Motion for Reconsideration and will order this claim to be retried due to Perkins' failure to inform Defendants of the missing grievance and of Perkins' intention to offer testimony about the missing grievance.

37

F.  Miller's Retaliation Claims Against FFP and Martelli: Miller Proved Causal Connection Between His Protected Activity and the Decision to Terminate His Employment.

Miller presented evidence that he engaged in two protected activities.  First, Miller testified that on the morning of March 11, 2009, after the racial name-calling incident involving Moreno, Perkins and Martelli, Miller complained to Mondragon that Martelli's language was unacceptable. (Tr. 202:8-15.)  Second, Miller testified about Martelli's use of racial epithets at an arbitration hearing on Moreno's discharge, and both Martelli and Mondragon were present at the arbitration hearing. (Tr. 228:1-6.)  Defendants argue that not only must Miller prove that Martelli and Mondragon knew of the protected activities, but the evidence must also show that their motive for firing him was retaliatory.  If Miller's protected activity consisted only of his complaint to Mondragon about Martelli's language on March 11, 2009, the Court would need more evidence of causation because Miller's discharge in July 2010 was more than four months after March 11, 2009.  However, there was evidence that only seventeen days before their decision to fire Miller both Martelli and Mondragon heard Miller testify at Moreno's arbitration hearing about Martelli's use of racial epithets; therefore, Miller established causation by the close temporal proximity between the date of Miller's testimony and his discharge.

In addition, Miller presented evidence that other employees were involved in serious accidents but were not fired.  Defendants argue the accidents used as comparators were not sufficiently similar to Miller's accident to support Miller's argument that his accident was used as a pretext for retaliation.  However, even though the accidents used as comparators were not in FFP's parking lot, where Miller's accident occurred, the accidents were sufficiently similar and some were even more serious in terms of damages to FFP trucks.  Despite this, in several instances FFP management imposed less serious discipline on other employees. (Tr. 602:5-

38

608:19 Mondragon's testimony.)

Under Tenth Circuit case law, the jury could have reasonably inferred that Mondragon and Martelli had a retaliatory motive for firing Miller due to the close temporal proximity between Miller's testimony on June 23, 2009 and the decision seventeen days later to fire Miller. *See McGowan v. City of Eufala*, 472 F.3d 736, 744 (10th Cir. 2006) (holding that employee who was fired the day after testimony describing wrongful conduct sufficed to establish an inference of causation); and *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (stating that when protected activity occurs one and one half months prior to termination, plaintiff established the causation element of plaintiff's retaliation claim). And the jury could have reasonably inferred that the stated reason for firing Miller was a pretext for retaliation based on evidence about drivers involved in comparatively serious accidents who received less severe discipline.

Defendants assert that the close temporal proximity is broken by intervening events, namely Miller's accident in the FFP parking lot in which two FFP trucks were damaged. This "legitimate reason" for firing Miller broke the chain of causation, according to Defendants. Martelli testified that he agreed with Mondragon's recommendation to terminate Miller because Miller "wrecked two of [FFP's] trucks." (Tr. 293:23-294:2.) When ruling on a motion for judgment as a matter of law, however, the Court may not re-weigh the evidence. Since the jury found that both Martelli and FFP, through its management, retaliated against Miller, the jury must have drawn the inference that the stated reason for firing Miller, the accident, was a pretext for retaliation based on the jury's assessment of witness' credibility. In addition, Mondragon admitted in his trial testimony that several FFP drivers had been involved in serious accidents and were not fired. (Tr. 602:7:608:19.) Therefore, the Court will not disturb the jury's verdict on

the issue of liability for Miller's retaliatory discharge claim.  However, the Court partially

granted Defendants' Motion for Reconsideration and based on other reasons, the Court ordered a

new trial on the amount of compensatory and punitive damages for which FFP will be liable on

Miller's retaliation claims.  This ruling is in addition to the Court's ruling in the Judgment, as

clarified in this opinion, that a new trial must be held on the amount of compensatory and

punitive damages awardable on Miller's retaliation claim against Martelli because the

compensatory damages component was omitted from the Special Interrogatories.

     G.  <u>Defendants Are Not Entitled to Judgment As A Matter Of Law On Perkins'</u>
     <u>Retaliatory Discharge Claim Against FFP.</u>

     Defendants incorporate the material, set forth in their Motion for Reconsideration,

showing that Perkins recanted several allegations of his protected activity that were described in

Perkins' EEOC charge.  Despite this material, the Court will not set aside the verdict on Perkins'

retaliatory discharge claim against FFP for failure to exhaust administrative remedies.

Defendants argue that because Perkins recanted key protected activities, Perkins failed to prove

that FFP management knew about Perkins' protected activity that was not recanted.

Notwithstanding the differences between the EEOC charge and the evidence at trial, four

allegations of protected activity described in Perkins' EEOC charge were not recanted at trial: 1)

Perkins' collection of complaints about work conditions and race discrimination from other

employees; 2) Perkins' March 2, 2009 meeting with Mondragon in which Perkins' complained

about the February 28, 2009 write up of Perkins and Moore, both African-Americans; 3)

Perkins' April 14, 2009 letter to Stan Kouba complaining about racial discrimination; and 4)

Perkins' May 5, 2009 grievance that he had been retaliated against for his "discrimination

grievance." Furthermore, Perkins presented at trial an additional protected activity not mentioned

40

in his EEOC charge, a March 23, 2009 grievance stating he had been "[r]acially discriminated against since becoming steward violating Article 16 of contract agreement and Item C-7 of company policy." (Ex. D. FFP 00173.)  Perkins testified that at the March 2, 2009 meeting, Mondragon told Perkins that he wrote up Perkins and Moore on February 28, 2009 because they were black.  The jury could reasonably have determined that Perkins' testimony was credible. And Perkins testified that Stan Kouba said he was offended by Perkins' April 14, 2009 letter and accused Perkins of playing  the "race card."  Moreover, the jury could have reasonably inferred that Mondragon knew of Perkins' March 23, 2009 grievance regarding being racially discriminated against because Perkins testified that he presented this grievance to Mondragon for signature. (Tr. 1028:23-1029:1.)

Therefore, Perkins proved a causal connection between one or more of Perkins' protected activities and Mondragon's decision to terminate Perkins' employment.  Based on the evidence of record as a whole viewed in the light favorable to Perkins, the Court cannot set aside the jury's verdict on liability on Perkins' retaliation claim against FFP.

H. *Sua Sponte* Ruling On Duplicative Claims And Damages

In DEFENDANTS' MOTION FOR A REMITTITUR OF THE JURY VERDICT PURSUANT TO FED. R. CIV. P. 59(e) (Doc. No. 174) (Remittitur Motion), Defendants argued that Perkins' six claims[12] stem from the same underlying conduct, caused the same damage, and in essence, allowed Perkins to obtain triple recovery for the same injury.  In the alternative, Defendants contend that the damages awarded to Perkins for emotional distress on Perkins' discriminatory discharge and retaliatory discharge claims were duplicative. Although Defendants

---

[12] Perkins asserted claims of (1) disparate treatment, (2) discriminatory discharge, and (3) retaliatory discharge, against each Defendant, FFP and Martelli, for a total of six claims.

raised these arguments in their Remittitur Motion, the Court will *sua sponte* rule on the issue of duplication in this opinion. *See Mason*, 115 F.3d at 1459 (stating that a court may *sua sponte*, or on motion of a party, reduce a judgment by the amount of duplication).  The Court will otherwise deny the Remittitur Motion without prejudice as premature.  After the Court enters this opinion and its opinion on the DEFENDANTS' MOTION FOR RECONSIDERATION AND TO VACATE TRIAL AND JUDGMENT IN FAVOR OF PERKINS AND MILLER (1) BECAUSE OF  IRREGULARITIES; (2) FOR LACK OF JURISDICTION; (3) PURSUANT TO THE COURT'S INHERENT POWERS OR RULE 59 OR 60, AND/OR FOR A NEW TRIAL PURSUANT TO RULE 59 (Doc. No. 164), the Court will enter an Amended Judgment. Defendants may thereafter renew their Remittur Motion if they wish to argue that the remaining damages awards in the Amended Judgment are excessive and warrant either remittitur or, in the alternative, a new trial on damages.

### 1.  Perkins' Claims Were Not Duplicative

In the Remittitur Motion, Defendants first contend,"[i]t is clear that these six causes of action stem from the same underlying conduct, caused the same damage, and if allowed to recover on all three, would allow Perkins to obtain triple recovery for the same damage." (Rem. Mot. at 15.)  According to Defendants, in proving his retaliation and disparate treatment claims Perkins relied on the write-ups he received for opposing racial discrimination. (*Id.*)  Defendants allege that because all of Perkins' claims are based on the same incidents, "Perkins can only recover for one of his claims." (*Id.*) (citing *Clappier*, 605 F.2d 519 (10th Cir. 1979)). Defendants further believe that the jury awarded duplicative damages "[d]espite the jury instruction requiring the jury not to award more than once for any injury." (*Id.* at 16.)  Thus, Defendants argue Perkins's damages "must be reduced to account for the duplication." (*Id.*)

(citing *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1227 (10th Cir. 2000)).

Defendants seem to argue that the alleged duplication of claims stems from the wording of the Special Interrogatories.  In the Special Interrogatory for disparate treatment, the jury was told to rule in favor of Perkins if they found Perkins had been subjected to adverse employment actions and if race was a motivating factor that prompted FFP or Martelli to subject Perkins to the adverse employment actions. (*Id.*) (citing Doc. No. 143-12 at pp. 1-2.) [13]  "Adverse employment action" was defined for the jury as "a significant change in employment status, such as hiring, firing/termination, layoff, failure to promote, reassignment with significantly different responsibilities, disciplinary action which undermines an employee's position, or a decision causing a significant change in wages or benefits." (Doc. No. 143-6 at 7.)  Under this definition, adverse employment action could encompass the write ups Perkins received as "disciplinary action which undermines an employee's position."  Defendants then assert that Perkins' retaliation claim stems from opposing racial discrimination "by filing grievances and making reports to Defendant [FFP] and Martelli" and that all of Perkins' grievances and reports were in response to the write ups Perkins received. (Rem. Mot. at 8.)  Defendants maintain that Perkins presented evidence that he was discharged because he opposed racial discrimination, and Perkins opposed discrimination by filing grievances about write ups he received; therefore, the write ups provide the linchpin for both Perkins' retaliation and disparate treatment claims.  Defendants conclude that "without the write ups, Perkins had no disparate treatment claim, no retaliation

---

[13] In the Special Interrogatories on disparate treatment, the jury was asked whether ". . . Perkins' race was a motivating factor that prompted [FFP] to subject him to adverse employment actions?" (Doc. No. 143-12 at 1.)  Defendants correctly point out that the Special Interrogatory on Perkins' disparate treatment claim against Martelli used the same wording. (*Id.* at 2.)

claim, and no discharge [claim] related to his opposition to discrimination." (*Id.* at 9.)

As Plaintiffs point out, the Supreme Court has explained that Title VII and § 1981 claims are not identical or mutually exclusive. (*See* Resp. (Doc. No. 180 at 11 (quoting *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 461 (1975)). Plaintiffs believe that the jury's verdict was "consistent with the distinction between Mr. Perkin's [sic] claims under Title VII and § 1981." (*Id.* at 11.)

Although Defendants appear to argue that claim duplication is illustrated by the wording of the jury instructions and Special Interrogatories, Defendants did not preserve this argument since they failed to object to the wording of the jury instructions or to the wording of the Special Interrogatories. When a party fails to object at trial, "the party waives the right to object to a faulty instruction or verdict form in a motion for a new trial. . . ." *Ortega v. City of Kansas City, Kansas,* 659 F.Supp. 1201, 1215 (D. Kan. 1987) *rev'd on other grounds*, 875 F.2d 1497 (10th Cir. 1989) (citation omitted). Since Defendants did not object to the jury instructions or Special Interrogatories, the Court may review the ". . . [jury] instruction or verdict form only if it amounted to plain error." *Id.*; Fed. R. Civ. P. 51 (d)(2).

More importantly, the evidence at trial supported separate claims for disparate treatment, discriminatory discharge, and retaliatory discharge. The jury could have reasonably inferred that Perkins was disparately disciplined through the use of write ups, and that Perkins was discharged based on his race and not for the stated reason of "unknown whereabouts." Finally, the jury could have reasonably inferred that Perkins was also discharged because he complained about racial discrimination.

    2.  The Jury Awarded Duplicative Damages For A Single Injury: Perkins' Post-
    Discharge Emotional Distress

In the Remittitur Motion, Defendants next argue that even though Perkins was discharged

once, the jury awarded Perkins duplicative compensatory damages for emotional distress against

both FFP and Martelli on Perkins' discharge claims.  Defendants contend that "the $73,000 and

the $86,500 awarded against both Defendants must be reduced." (Rem. Mot. at 9.)[14]  According

to the Special Interrogatories, however, the jury awarded a total of $65,000 against FFP for

Perkins' emotional distress on three claims: disparate treatment, discriminatory discharge, and

retaliation. The jury awarded a total of $75,000 against Martelli for Perkins' emotional distress

on the same three claims.

The awards for emotional distress against FFP and Martelli are duplicative but only as to

the discharge claims because Perkins cannot be compensated more than once for his post-

discharge emotional distress.  In other words, Perkins cannot recover damages for the distress he

experienced after he was discharged under both discriminatory discharge and retaliatory

discharge theories.

The Court's analysis of duplicative damage awards is altered somewhat by the Court's

post-trial rulings.  In the MEMORANDUM OPINION AND ORDER ON DEFENDANTS'

---

[14] The Court will assume that Defendants committed a mathematical error in arriving at $73,000 in emotional distress damages awarded to Perkins against FFP.  Based on the answers to the Special Interrogatories, which the parties agreed would constitute the jury's verdict, the total emotional distress damages awarded to Perkins against FFP on all three claims equals $65,000 ($10,000 for disparate treatment, $5,000 for discriminatory discharge, and $50,000 for retaliation).  The Court will assume that a mathematical error also produced Defendants' contention that Perkins was awarded $86,500 in total emotional distress damages against Martelli.  The total emotional distress damages awarded to Perkins against Martelli equals $75,000 ($10,000 for disparate treatment, $15,000 for discriminatory discharge, and $50,000 for retaliation).

MOTION FOR RECONSIDERATION AND TO VACATE TRIAL AND JUDGMENT
AND/OR FOR A NEW TRIAL, the Court set aside the verdict and ordered a new trial on
Perkins' retaliatory discharge claim against Martelli.  As a result, only three awards of
compensatory damages for emotional distress related to Perkins' discharge remain: (1) the award
of $15,000 against Martelli for Perkins' emotional distress on his discriminatory discharge
claim; (2) the award of $5,000 against FFP for Perkins' emotional distress on his discriminatory
discharge claim; and (3) $50,000 against FFP for Perkins' emotional distress on his retaliatory
discharge claim.  Hence, the total remaining emotional distress damages awarded to Perkins
against FFP and Martelli for discriminatory and retaliatory discharge is now $70,000.[15]

Defendants contend that "it is impossible that Perkins suffered emotional pain and mental
anguish separately in response to his termination" on all claims related to Perkins' discharge.
(Rem. Mot. at 9)  The Court agrees.  In order for Perkins to recover against both FFP and
Martelli for emotional distress suffered from discharge, Perkins must show he is recovering for
distinct harms, and Perkins has failed to illustrate distinct harms stemming from his discharge.

First, the Court recognizes that compensatory damages are recoverable under § 1981 or
Title VII for emotional or mental harm.  *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091,
1114-15 (10th Cir. 2001) (§ 1981 case); *Atchley v. Nordam Group, Inc.*, 180 F.3d 1143, 1149-50
(10th Cir.1999) (Title VII case).  However, separate awards of damages may not be based on the
same set of operative facts or the same injury. *Cache La Poudre Feeds, LLC*, No. 04 cv 00329,

---

[15] The jury awarded a total of $ 120,000 in emotional distress damages on Perkins' claims
for discriminatory and retaliatory discharge: (1) $15,0000 against Martelli for discriminatory
discharge; (2) $5,000 against FFP for discriminatory discharge; (3) $50,000 against Martelli for
retaliatory discharge; and (4) $50,000 against FFP for retaliatory discharge.  With the verdict
against Martelli for retaliatory discharge set aside, the total is now $70,000.

2008 WL 269451, *3 (D. Colo. Jan. 29, 2008).  The damage awards against FFP and Martelli for discriminatory discharge and the award against FFP for retaliatory discharge were based on Mondragon's decision to fire Perkins and Martelli's approval of that decision.  More importantly, these damage awards compensate Perkins for a single injury, the emotional pain and mental anguish Perkins suffered after his employment at FFP was terminated, whether from discrimination or retaliation.  Hence, the three awards of compensatory damages for Perkins' emotional pain and mental anguish related to his discharge, both discriminatory and retaliatory, are duplicative.  The Court will uphold the largest damage award of $50,000 as the appropriate compensation for Perkins' emotional distress caused by the termination of his employment.  The Court further finds that it is appropriate to award these damages jointly and severally against FFP and Martelli because the evidence showed that the decision to discharge Perkins was made by Mondragon acting for FFP in collaboration with Martelli.

The decision in *Chellen v. John Pickle Co., Inc.*, 446 F. Supp. 2d 1247 (N.D. Okla. 2006) is instructive.  In *Chellen* several men were brought from India to the United States and employed by the John Pickle Company (JPC).  The men were required to give their passports to JPC for "safe keeping", they were paid substandard wages, they were subjected to humiliating racial slurs, and they were required to live in a company warehouse that had been converted into a dormitory. *Chellen*, 344 F. Supp. 2d at 1285-86 (*Chellen I*) (determining in phase one of a two-phase trial that plaintiffs were not "trainees" as alleged by the company to avoid FLSA wage requirements).  Fifty-two plaintiffs and the EEOC sued JPC for violations of the Fair Labor Standards Act (FLSA), Title VII, and for fraud, intentional infliction of emotional distress, and false imprisonment under state tort law. *Chellen*, 446 F. Supp. 1247, 1279 (*Chellen II*) (determining liability and damages for FLSA, federal employment discrimination claims, and

state tort claims).  The plaintiffs and the EEOC sued John Pickle, the company's owner, under §

1981 for his direct involvement in managing JPC and for his treatment of the plaintiffs. *Id.*  The

court found that compensatory damages should be awarded to the plaintiffs for emotional harm

suffered as a result of the actions of JPC and its owner. *Id.* at 1269.  However the court awarded

compensatory damages for emotional distress against JPC under Title VII and against John

Pickle under § 1981, jointly and severally. *Id.*  The court further determined that the plaintiffs'

disparate treatment claims under Title VII and § 1981 were based on the same evidence as their

state tort claim for intentional infliction of emotional distress. *Id.* at 1276.  The court concluded

that ". . . any damages awarded for intentional infliction of emotional distress experienced during

working hours are subsumed in and would be duplicative of any compensatory or punitive

damages awarded for defendants' disparate treatment of the Chellen plaintiffs[.]" *Id.*  The court

also found that "[a]ny damages for intentional infliction of emotional distress during

non-working hours are subsumed in and would be duplicative of any awarded for defendants'

false imprisonment of the Chellen plaintiffs . . ." which occurred during non-working hours. *Id.*

The court determined that the owner, John Pickle, was individually liable under § 1981 for his

disparate treatment of the plaintiffs;  however, the court imposed liability on John Pickle and

JPC jointly and severally. *Id.* at 1286, 1294 (finding that there was substantial evidence of John

Pickle's individual acts of discrimination).

      Similar to the ruling of the Court for the Northern District of Oklahoma, the Court here

finds that Perkins should be fully compensated for the emotional distress he experienced after he

was fired from FFP, but Perkins should not receive more than one recovery of damages for that

emotional distress. *Id.* at 1286, 1294.  In other words, the emotional distress damages awarded

for discriminatory discharge are subsumed in and duplicative of the emotional distress damages

awarded to Perkins on his retaliatory discharge claim. *See also Roberts v. Progressive Independence, Inc.*, 183 F.3d at 1224 (remanding a wrongful termination claim with instructions that the plaintiff "[was] not . . .entitled to any additional damages for pain and suffering on his wrongful termination claim" because his "damages from the failure to accommodate and the termination were inextricably linked. . . . . with respect to pain and suffering damages, . . . the jury award for the reasonable accommodations claim is coextensive with any award [the plaintiff] might receive for his wrongful termination claim."); and *Flitton v. Primary Residential Mortg., Inc.*,No. 03 CV 481, 2008 WL 850159, *1 (D. Utah Mar. 28, 2008) (unpublished decision) (finding that awards of emotional distress damages for both retaliatory and discriminatory discharge stemmed from the same adverse action--plaintiff's termination).

In *Flitton*, the plaintiff argued that damages for emotional distress caused by gender discrimination and retaliation would not be duplicative because they were based on different conduct. *Id.* at *1. The plaintiff argued that her retaliatory discharge claim was based on the termination from employment and the discriminatory discharge claim was based on the defendant's discriminatory conduct prior to her termination from employment. *Id.* The court rejected the argument and found that both of the claims involved the same "adverse employment action"-- the termination of the plaintiff's employment. *Id.* The court held that the plaintiff's discriminatory discharge claim ". . . was not a hostile environment claim that may compensate her for ongoing violations over a period of time. . . . Flitton's discrimination claim depends entirely on whether PRMI terminated her employment based on her gender. If Flitton proves her gender discrimination claim, she is entitled to damages that were directly caused by the adverse employment action, which in this case is her termination." *Id.* By the same token, Perkins' damages directly caused by his discharge are recoverable, but only once.

49

Because Perkins' damages for post-discharge emotional distress are duplicative as a matter of law, the Court will not separately set forth in the Amended Judgment the $15,000 and $5,000 damage awards against Martelli and FFP on Perkins' discriminatory discharge claims. The Court will uphold the award of $50,000 in compensatory damages for Perkins post-discharge emotional distress, which the jury awarded on Perkins' retaliatory discharge claim against FFP. This amount is a reasonable award for Perkins' injury that resulted from the discriminatory and retaliatory discharge. The $50,000 award should be against FFP with Martelli jointly and severally liable, at this time, for $15,000–the amount the jury awarded on Perkins' discriminatory discharge claim against Martelli. Any compensatory damages awarded to Perkins on his retaliatory discharge claim against Martelli at a retrial of that claim, that does not exceed $50,000, will be subsumed into and duplicative of the $50,000 joint and several award against FFP and Martelli will be jointly and severally liable for the amount awarded by a jury at the retrial. Thus, the Amended Judgment will reflect only one award of $50,000 for emotional distress on all of Perkins' discharge claims.

### 3. Perkins' Punitive Damages Are Not Duplicative

Although the Court has determined that Perkins' damage awards for post-discharge emotional distress are duplicative and the remaining award must be imposed against FFP and Martelli jointly and severally, the Court will uphold the separate punitive damage awards against FFP and Martelli on Perkins' discriminatory and retaliatory discharge claims. *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1261 (10th Cir. 1988) (holding that liability for punitive damages is several and independent) *implied overruling on other grounds as recognized by Anixter v. Home–Stake Prod. Co.*, 77 F.3d 1215, 1231 (10th Cir. 1996)). The separate awards of punitive damages are not duplicative as they are based on malice or reckless disregard for

50

Perkins' federal rights by FFP supervisor, Mondragon and by owner, Stan Kouba, apart from the malice or reckless disregard for Perkins' rights exhibited by Martelli. *Id.* Moreover, punitive damages are not awarded to compensate for a loss but are awarded to punish and deter. *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (noting that compensatory damages are intended to redress a plaintiff's concrete loss, while punitive damages are aimed at deterrence); *Mason,* 115 F.3d at 1460 (stating "multiple punitive damage award on overlapping theories of recovery may not be duplicative at all, but may instead represent the jury's proper effort to punish and deter all the improper conduct underlying the verdict."). Hence, the Court finds that the separate awards of punitive damages on Perkins' discriminatory discharge claims against Martelli for $65,000 and against FFP for $65,000 are not duplicative. Furthermore, the $350,000 in punitive damages awarded on Perkins' retaliatory discharge claim against FFP is not duplicative of the awards that were intended to punish racially discriminatory conduct. The $350,000 in punitive damages represents the jury's effort to separately punish and deter FFP management's retaliatory actions in terminating Perkins employment.

> 4.  Perkins' Awards For Emotional Distress On Disparate Treatment Claims Are Not Duplicative

As to Perkins' award of $10,000 against Martelli and $10,000 against FFP for emotional distress on Perkins' disparate treatment claims, these damage awards are not duplicative. Perkins showed that he experienced emotional distress immediately after the March 11, 2009 incident when on March 11, 2009, Martelli angrily called him a nigger while ordering Mondragon to write up Perkins. Perkins showed that he continued to experience distress at FFP, based on his treatment by Mondragon both prior to and after the March 11, 2009 incident as a result of Mondragon's disparate disciplinary actions. Hence, the Court will uphold Perkins' total

damage award of $70,000 in compensatory damages for emotional distress, which is made up of three components: (1) $50,000 for the emotional distress Perkins experienced after his discharge; (2) $10,000 against FFP for Perkins' emotional distress caused by FFP prior to discharge; and (3) $10,000 against Martelli for Perkins' emotional distress separately caused by Martelli prior to discharge.

IT IS ORDERED that

1.  DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(b) (Doc. No. 163) is denied.

2.  The Court *sua sponte*

> a.  will subsume the jury's award of $15,000 for emotional distress on Perkins' discriminatory discharge claim against Martelli and the jury's award of $5,000 for emotional distress on Perkins' discriminatory discharge claim against FFP into a total award of $50,000 for emotional distress resulting from Perkins discharge, based on the jury's highest award, which was on Perkins' retaliatory discharge claim against FFP;
>
> b.  will make the $50,000 award against FFP with Martelli jointly and severally liable for $15,000 of the $50,000 award;
>
> c.  will uphold the award of $10,000 in favor of Perkins against FFP for Perkins' emotional distress on his disparate treatment claim; and

d.  will uphold the award of $10,000 in favor of Perkins against Martelli for

Perkins' emotional distress on his disparate treatment claim.

_____

SENIOR UNITED STATES DISTRICT JUDGE

Entered this 14th day of May, 2013.