**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge James A. Parker, sitting by designation**

Civil Case No. 11-cv-00542-JAP-KLM

**RICHARD PERKINS, and**
**RICHARD MILLER,**

      **Plaintiffs,**

v.

**FEDERAL FRUIT & PRODUCE COMPANY, INC.,**
**a Colorado corporation, and**
**MICHAEL MARTELLI, individually,**

      **Defendants.**

**MEMORANDUM OPINION AND ORDER**
**ON DEFENDANTS' MOTION FOR RECONSIDERATION AND TO**
**VACATE TRIAL AND JUDGMENT AND/OR FOR A NEW TRIAL**

In DEFENDANTS' MOTION FOR RECONSIDERATION AND TO VACATE TRIAL

AND JUDGMENT IN FAVOR OF PERKINS AND MILLER (1) BECAUSE OF

IRREGULARITIES; (2) FOR LACK OF JURISDICTION; (3) PURSUANT TO THE

COURT'S INHERENT POWERS OR RULE 59 OR 60, AND/OR FOR A NEW TRIAL

PURSUANT TO RULE 59 (Doc. No. 164) (Motion), Defendants Federal Fruit and Produce

Company, Inc. (FFP) and Defendant Michael Martelli (Martelli) ask the Court to vacate the

Judgment[1] in favor of Plaintiffs Richard Perkins (Perkins) and Richard Miller (Miller) entered

---

[1] *See* JUDGMENT IN FAVOR OF RICHARD PERKINS AND RICHARD MILLER
(Doc. No. 146) (Judgment) and MEMORANDUM OPINION AND ORDER (Doc. No. 145)
(explaining Judgment) (Order). A judgment was entered on all but one claim, Miller's claim of
retaliation.  Due to a missing portion of the Special Interrogatory given to the jury on Miller's
retaliation claim against Martelli, the Court granted a new trial on the amount of compensatory
and punitive damages that should be awarded on this claim. *Id.*

after a jury trial and verdict.[2]  Alternatively, Defendants ask the Court to order a new trial.  The

Court will grant the Motion in part and will deny the Motion in part.

The Court concludes that even though Perkins produced an additional page of notes from

a meeting with his supervisor after discovery closed, the late production of the document was not

sufficiently prejudicial to Defendants to enable the Court to set aside the verdict or order a new

trial on Perkins' disparate treatment and discriminatory discharge claims against FFP.  Perkins'

failure to disclose prior to trial that Perkins had been arrested and had been involved in

additional legal proceedings was not sufficiently prejudicial to Defendants to grant their

requested relief because the evidence would not have been admissible, and the Court will not set

aside the verdict or order a new trial on that basis.  Perkins' contradictory testimony about the

date he began post discharge employment with GT Express affected Perkins' expert's

calculation of Perkins net loss of wages and benefits related to Perkins retaliation claims.  Thus,

the jury's determination of lost wages and benefits was based on speculation.  The Court will

grant a new trial on damages for lost  wages and benefits awarded to Perkins on his retaliation

claim against FFP.  At trial, Defendants were surprised and unfairly prejudiced by testimony that

Perkins prepared an additional Union grievance but the grievance was then misplaced by the

Union.  This missing grievance was important evidence of Perkins' protected activity supporting

his retaliation claim against Martelli.  Thus, the Court will grant a new trial on liability and

compensatory and punitive damages related to Perkins' retaliation claim against Martelli.

---

[2] On September 10, 2012, Plaintiffs filed PLAINTIFFS' RESPONSE IN OPPOSITION
TO MOTION FOR RECONSIDERATION AND TO VACATE TRIAL AND JUDGMENT,
ETC. (Doc. No. 179).  On September 24, 2012, Defendants filed the DEFENDANTS' REPLY
IN SUPPORT OF MOTION FOR RECONSIDERATION (DKT NO. 164) (Reply) (Doc. No.
183).  Oral argument was held on November 19, 2012.  *See* Transcript Motion Hearing filed
November 27, 2012 (Doc. No. 187).

Prior to trial, Miller failed to reveal that he had been convicted for a crime involving fraud.  Miller also failed to inform FFP that Miller knew that his CDL was suspended three days after Miller began working for FFP.  And, Miller failed to explain his testimony that he had been married for 27 years while at the same time Miller owed child support to his wife.  These three areas of evidence would have been admissible primarily to prove that Miller did not suffer emotional distress due to his discharge from FFP.  The evidence would also have been admissible to attack Miller's credibility.  Because this evidence is of most importance regarding the amount of compensatory and punitive damages that should be awarded for Miller's retaliation claim against FFP, the Court will grant a new trial on damages related to this claim. The Court had earlier determined that a new trial is necessary on the amount of compensatory and punitive damages that should be awarded for Miller's retaliation claim against Martelli. Because evidence other than Miller's testimony strongly supported FFP's and Martelli's liability for retaliation, the Court will not grant a new trial on FFP's and Martelli's liability to Miller for retaliatory discharge.

In a separate MEMORANDUM OPINION AND ORDER, the Court has denied DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(b) (Doc. No. 163).

I.  Procedural Background

From May 16-25, 2012, a jury trial was held on Perkins' claims for disparate treatment, discriminatory discharge, and retaliation under Title VII and § 1981 against FFP and Martelli and on Miller's retaliation claims under Title VII and § 1981 against FFP and Martelli.  The jury returned a verdict in favor of Plaintiffs on all claims and awarded compensatory and punitive

damages.[3]

II.  Standard of Review

Rule 59 provides several grounds for a new trial:

New Trial; Altering or Amending a Judgment

(a) In General.
(1) after a jury trial on all or some of the issues–and to any party–as follows:
(A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]
. . .
(e) Motion to Alter or Amend a Judgment. A motion to alter or amend a judgment must be filed no later than 28 days after the entry of a judgment.

Fed. R. Civ. P. 59(a), (e).

Under Rule 59, a district court may reconsider a ruling when the district court has

_____

[3] On Perkins' claim against FFP for disparate treatment, the Court entered judgment on the jury's verdict and awarded to Perkins $10,000 in compensatory damages for emotional pain and mental anguish and $65,000 in punitive damages.  On Perkins' claim for disparate treatment against Martelli, the Court entered judgment on the jury's verdict and awarded Perkins $10,000 in compensatory damages for emotional pain and mental anguish and $65,000 in punitive damages.
On Perkins' claim against FFP for discriminatory discharge, the Court entered judgment on the jury's verdict and awarded Perkins $5,000 in compensatory damages for emotional pain and mental anguish and $65,000 in punitive damages. On Perkins' claim against Martelli for discriminatory discharge, the Court entered judgment on the jury's verdict and awarded Perkins $15,000 in compensatory damages for emotional pain and mental anguish and $65,000 in punitive damages. On Perkins' retaliation claim against FFP, the Court entered judgment on the jury's verdict and awarded Perkins $50,000 in compensatory damages for emotional pain and mental anguish and $350,000 in punitive damages.  On Perkins' retaliation claim against Martelli, the Court entered judgment on the jury's verdict and awarded Perkins $50,000 in compensatory damages for emotional pain and mental anguish and $150,000 in punitive damages.
For Perkins' retaliation claims against both FFP and Martelli, the jury awarded to Perkins $26,697 in lost wages and benefits against both FFP and Martelli, and the Court entered judgment against FFP and Martelli jointly and severally for these damages because Perkins can recover only once for his lost wages and benefits.
On Miller's retaliation claim against FFP, the Court entered judgment on the jury's verdict and awarded to Miller $50,000 in compensatory damages for emotional distress and $50,000 in punitive damages.

"misapprehended the facts, a party's position, or the controlling law." *Barber ex rel. Barber v.*

*Colo. Dep't of Revenue,* 562 F.3d 1222, 1228 (10th Cir. 2009). "Grounds warranting a motion to

reconsider include (1) an intervening change in the controlling law, (2) new evidence previously

unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servants of*

*Paraclete v. Does,* 204 F.3d 1005, 1012 (10th Cir. 2000).

Under Rule 60(b) a district court may order relief from a judgment based on several

grounds:

> (b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just
> terms, the court may relieve a party or its legal representative from a final judgment,
> order, or proceeding for the following reasons:
>
>> (1) mistake, inadvertence, surprise, or excusable neglect;
>> (2) newly discovered evidence that, with reasonable diligence, could not have
>> been discovered in time to move for a new trial under Rule 59(b);
>> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or
>> misconduct by an opposing party;
>> (4) the judgment is void;
>> . . . or
>> (6) any other reason that justifies relief.
>
> . . .
> (c) Timing and Effect of the Motion.
>
>> (1) *Timing*. A motion under Rule 60(b) must be made within a reasonable
>> time–and for reasons (1), (2), and (3) no more than a year after the entry of the
>> judgment or order or the date of the proceeding.

Fed. R. Civ. P. 60(b) (1)-(6), and (c).

According to Defendants, the entire Judgment is interlocutory because the Court granted

a new trial on damages as to Miller's retaliation claim against Martelli. If the Judgment is

interlocutory, the Court may, in its discretion, amend the Judgment at any time before the filing

of the final judgment without adhering to the standards of Rules 59 and 60. *See Raytheon*

*Constructors Inc. v. Asarco Inc.,* 368 F.3d 1214, 1217 (10th Cir. 2003). However, the Court may

follow the standards of Rules 59 and 60 to determine whether to alter or vacate an interlocutory order and whether to order a new trial. *See Fye v. Okla. Corp. Comm'n,* 516 F.3d 1217, 1224 n.2 (10th Cir.2008) (stating, "[t]he District Court's partial summary judgment ruling was not a final judgment. Thus, [plaintiff's] motion for reconsideration is considered an interlocutory motion invoking the district court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment. . . . In such a case, the district court is not bound by the strict standards for altering or amending a judgment encompassed in Federal Rules of Civil Procedure 59(e) and 60(b).") (quotations and citations omitted).  Hence, the Court will use the standards set forth in Rules 59 and 60, particularly the standards of Rule 60, as a guide to determine whether to set aside all or part of the Judgment.

III.  Factual Background [4]

A.  Perkins' Employment at FFP.

FFP is a produce distributing company offering same-day delivery of produce to restaurants, grocery stores, military bases, and nursing homes. (Doc. No. 184-2.)  FFP's warehouse is a fast-paced working environment that is operated seven days a week. (*Id.*)  FFP employs a day shift and a night shift of warehouse and trucking employees. (*Id.*)  In 2010, FFP employed 90 people at its Denver facility and maintained a fleet of approximately 40 trucks. (*Id.*)

Perkins began working for FFP on October 3, 2008 as a Class B truck driver. (Tr. 964:14-15.)  Perkins was a member of Teamsters Local Union No. 455 (Union).  During the period of Perkins' and Miller's employment at FFP, Jesse Medina (Medina) was the Union's

---

[4] These background facts are primarily based on the evidence at trial, viewed in the light most favorable to Plaintiffs.

business representative at FFP.  A Collective Bargaining Agreement (CBA), effective from

October 1, 2007 to October 1, 2011, governed the terms and conditions of employment at FFP

with respect to its truck drivers. (Tr. 348:22-24; Ex. G.)

Article 13 of the CBA describes FFP's Progressive Discipline Policy:

1st offense– Written "verbal" warning
2nd offense–Written warning
3rd offense– 2nd Written warning and suspension
4th offense– Termination.

(Ex. G at 9.)  Article 16 of the CBA prohibits discrimination on the basis of race. (Ex. G at 12.)

Under the CBA, all employees were to receive a copy of FFP's work rules and were required to

sign an agreement to abide by the rules. (*Id.* at 8; Ex. O FFP 00861-00863.)

In response to an employee's unsatisfactory job performance, FFP management could

issue a "warning notice" according to the CBA's progressive discipline policy. (*Id.*)  Warning

notices, known as write ups, were considered "current" for 15 months after issuance. (*Id.* at 9.)

When issuing a write up, an FFP supervisor or manager would first present the write up to the

employee to sign, but if the employee refused to sign the write up, the supervisor or manager

would note "refused to sign" on the signature line.  The Union received a copy of all write ups

within 7 days, and all write ups were kept in an employee's "permanent file" at FFP. (*Id.*)

On February 10, 2009, Perkins and three other FFP employees became union stewards to

"manage certain issues between management and the CBA members." (Tr. 969:20-21 Perkins

testimony; Tr. 355:15 Medina testimony.)  During his employment at FFP, Perkins received

several disciplinary write ups.  All but one of Perkins' write ups were for first level offenses

under the CBA. (Trial Ex. D.)  During his employment at FFP, Perkins filed several union

grievances about working conditions and some in response to write ups Perkins received that

Perkins claimed were unjust. (*Id.*) (Tr. 1028:12-21.)  When an employee prepares a Union

grievance, the grievance is presented to an FFP supervisor or manager, who can sign the

grievance.  If the supervisor or manager refuses to sign, a notation "refused to sign" is written in

place of a signature. (Ex. D.)  The grievance is then filed with the Union, and the Union can

initiate arbitration proceedings to resolve a grievance.

    B.  Perkins Initial Write Ups And Grievances: February 28, 2009 Through Initial March
    11, 2009 Write Up And Grievance

    On February 28, 2009, Mondragon issued the first write up to Perkins stating that Perkins

and another African-American truck driver, Gary Moore (Moore), were sitting in a truck while

paperwork was prepared for their routes. (Tr. Ex. D FFP 00167.)  Mondragon wrote up Perkins

and Moore because under FFP policy, after drivers inspect their trucks and wait for their delivery

paperwork, drivers are expected to help load produce into trucks in the warehouse.  On February

28, 2009, Perkins filed a union grievance challenging this write up as "unfounded and unjust."

(Ex. D FFP 00166.)

    On March 2, 2009, Perkins asked Mondragon to meet with him to discuss Union issues.

Mondragon agreed and asked Chris Salazar, another FFP supervisor, to attend the meeting with

him.  Perkins, Moore and Jorge Morales, all Union stewards, attended the meeting. (Tr. 589:9-

12.)  Mondragon testified that racial discrimination was not discussed during this meeting. (Tr.

589:9-12.)  However, Perkins testified that at the March 2, 2009 meeting, he complained to

Mondragon that on February 28, 2009, Perkins and Moore, who are African-American, were

written up, but other employees, who were Latinos, were not written up for the same conduct.

Perkins testified that in response, Mondragon told Perkins and Moore they were written up

because "they were black." (Tr. 983:2-6 .)  Moore also testified that he heard Mondragon say

that Moore and Perkins were written up because "they were black." (Tr. 163:21-23.)  Mondragon

denied that he said this. (Tr. 589:9-12.)

On March 4, 2009, Perkins filed a grievance stating that on February 28, 2009, Perkins

observed FFP owner Martelli doing union work in violation of the CBA. (Tr. 975:19- 976:14.)

On March 5, 2009, Union representative Medina sent a letter to FFP complaining that

management was "conducting bargaining unit work," and that management was "disrespecting

employees." (Ex. NN FFP 0047.)  FFP did not respond to this letter. (Tr. 361:2-10 Medina

testimony; Tr. 496:22-25 520: 23-521:6; 523:2-8 Stan Kouba testimony.)  Perkins' March 4,

2009 grievance and Medina's March 5, 2009 letter contained no allegations of race

discrimination. (*Id.*)

On March 11, 2009, Perkins received a second write up.  On that day at approximately

5:30 am, Perkins and another truck driver, Roberto Villa-Moreno (Moreno), were outside talking

while doing the daily pre trip inspection of their trucks. (Tr. 1010:1-14 Perkins testimony.)  After

observing Perkins and Moreno, Martelli drove up to Perkins and Moreno and told them to "stop

the bull-shit and get back to work." (Tr. 272:22-25 Martelli testimony.)  Perkins and Moreno

testified that after a verbal altercation with Moreno, Martelli yelled racial epithets at Perkins and

Moreno. (Tr. 1011:14-16; 1013:23-25 Perkins testimony; Tr. 147:19-149:16 Moreno testimony.)

Perkins, who had walked into the warehouse, and Miller, who was already inside the warehouse,

testified that as Martelli walked into the office area of the FFP warehouse, Martelli yelled to

Mondragon, "I am fucking tired of that nigger and Mexican[,]" and Martelli ordered  Mondragon

to "write up the nigger and fire the spick." (Tr. 1014:16-20; Tr. 147:19-149:16; Tr. 201:1-8.)

Both Mondragon and Martelli testified that although Martelli was angry and was yelling,

Martelli did not say the racial epithets. (Tr. 573:4-9 Mondragon testimony; Tr. 284:24-285:8

9

Martelli testimony.)  Martelli had not instructed what level write up he wanted Perkins to receive.  Mondragon issued to Perkins a first offense level write up.

Perkins filed a grievance about the write up he received on March 11, 2009.  This grievance mentioned Article 13, the progressive discipline policy of the CBA, but in this grievance, Perkins did not describe Martelli's use of racial epithets, particularly the term "nigger." (*See* Ex. D FFP 00171.)

C.  The Second March 11, 2009 Grievance

Perkins and Union representative Medina testified that on March 11, 2009 Perkins prepared a second, additional written grievance that was presented to Mondragon, who refused to sign it.  Perkins testified that he gave the additional March 11, 2009 grievance to Medina and did not see the grievance thereafter.  Medina testified that he usually faxed grievances to FFP, but that the Union misplaced the additional March 11, 2009 grievance. (*See* Tr. 1088:9-17 Perkins testimony; Tr. 376:1-379:4 Medina testimony.)  Defendants assert that they learned about this "missing" additional grievance for the first time at trial.

D.  Perkins' Write ups and Grievances From March 23, 2009 Through May 4, 2009

On March 19, 2009, Perkins was written up for delivering the wrong type of lettuce, but Perkins claimed another warehouse employee was responsible for the mistake. (Ex. D FFP 00174.)  On March 23, 2009, Perkins, believing that he was unjustly disciplined for another employee's mistake, filed a grievance concerning this write up. (Ex. D FFP 00173.)  This grievance complained that Perkins had been, "Racially discriminated against since becoming steward violating Article 16 of contract agreement and Item C-7 of company policy." (*Id.*) Article 16 of the CBA prohibited racial discrimination, and Item C-7 of FFP's Work Rules prohibited employees from discriminating against fellow employees. (Ex. G FFP 0012 and Ex. O

10

FFP 00862.)

On March 24, 2009, Perkins received a write up for loading the wrong kind of bananas into his truck. (Ex. D FFP 00169.)  Perkins testified that while his truck was still in the warehouse, Moore noticed the mistake, Perkins unloaded the wrong bananas, loaded the correct bananas, and delivered the correct bananas. (Tr. 1030:5-1031:5.)  This write up was recorded as a "2nd Offense written warning." (Ex. D FFP 00169.)  Perkins grieved this write up. (Ex. D FFP 00170.)

On March 31, 2009, Perkins was written up for not wearing his FFP badge. (Ex. D. FFP 00178.)  Perkins grieved this write up stating that his FFP badge was in his truck, but Perkins was not allowed to  retrieve it. (Ex. D FFP 00177.)

On April 9, 2009, Perkins was written up for wearing tennis shoes in the warehouse, instead of the required work boots. (Ex. D FFP 00179.)  On April 10, 2009, Perkins grieved the write up as unjust and stated that CBA "Article 13 and any other that may apply" were violated. (Ex. D FFP 00180.)

On April 10, 2009, Perkins was written up for not checking in at the warehouse at the end of his shift. (Ex. D FFP 00181.)  April 10, 2009 was Good Friday, and Perkins had twelve deliveries on that day.  At 5:30 pm, Perkins returned to the warehouse after the deliveries and put his truck keys and paperwork in the outside mailbox at FFP.  On April 21, 2009, Perkins grieved the write up. (Ex. D FFP 00182.)  Perkins testified that he had been previously instructed, "if [he] got back and no one was at the warehouse," Perkins was to park his truck, lock his truck, and put the truck keys and his paperwork in the mailbox to be retrieved by the night shift supervisor. (Tr. 1038:24-1039:17.)  Mondragon testified that on April 10, 2009, Perkins did not follow instructions correctly because Perkins had been instructed to leave his keys and

11

paperwork with the night crew, not in the mailbox. (Tr. 583:19-584:14.)  Mondragon and Angela

Vigil, an FFP office employee, testified that employees were instructed to leave truck keys and

paperwork in the mailbox only if no one was at the warehouse. (Tr. 585:5-9; 530:24-531:3.)

Mondragon testified that on April 10, 2009, the night crew supervisor called him from an FFP

phone to report that he saw Perkins park his truck, and leave the truck keys and delivery

paperwork in the mailbox. (Tr. 585:1-16.)  Mondragon testified that this call indicated that the

night crew supervisor was at the warehouse when Perkins arrived at 5:30 pm. (*Id.*)  Mondragon

wrote up Perkins for failing to leave the truck keys and paperwork with the night crew

supervisor. (*Id.*)

On April 21, 2009, Perkins was written up for lack of attendance. (Ex. D FFP 00183.)

Perkins grieved this write up and claimed his absence on April 21 was excused. (Ex. D FFP

00184.)  Perkins and Mondragon testified that Perkins called Mondragon on Monday evening,

April 20 and told Mondragon he had to attend a court hearing on Tuesday, April 21 and would

miss work. (Tr. 1051:14-25 Perkins testimony; Tr. 586:3-21 Mondragon testimony.)  Mondragon

recorded on the write up that he was disciplining Perkins not just for Perkins' April 21st absence,

but also for a pattern of absences that averaged about one per week. (Ex. D. FFP 00183.)

Perkins testified that in his telephone conversation with Mondragon on Monday, April 20,

Perkins asked Mondragon if he could switch his scheduled day off, Wednesday, April 22 to

Tuesday, April 21, so Perkins could attend court and would not have to miss an extra day of

work for which he would not receive pay.  The evidence showed that for his absence on April

21, 2009, Perkins followed FFP policy by giving at least one hour's advance notice to

Mondragon the previous night. (Ex. D FFP 00184; Tr. 1051:16-1052:13.)  Perkins testified that

Mondragon approved Perkins' request to switch his day off and work on Wednesday, but when

Perkins arrived at work Wednesday, Mondragon had not assigned a route to Perkins.  Perkins

incurred one additional day of unpaid leave as a result. (Tr. 1053:22-1054:24.)  Perkins testified

that employees, who were Latinos, had missed work without giving the required one hour's

advance notice, but had not been written up:

> Q. Now the second page of this April 21st entry, you made notes, particularly right here.
> What's -- please discuss with the jury what was the relevance of these two note entries.
> A. I found out that Carlos Cornelius and another driver had missed work on Wednesday
> and Thursday. He was not written up, and he was also allowed to work that Saturday.
> Carlos worked Monday through Friday.  He was also allowed to work that Saturday to
> make up for missing one of those days.
>      The other note I made was concerning Enrique. Because I was not allowed to
> work on that Wednesday, that Wednesday was Enrique's day off, he was allowed to
> work.

(Tr. 1055:6-16.)

On April 23, 2009, Perkins was written up by Supervisor Dennis Nakashima

(Nakashima) for not responding to a page. (Ex. D FFP 00185.)  In the write up, Nakashima

stated that he tried to page Perkins several times while Perkins was out on a delivery, but Perkins

did not call back. (*Id.*)  Nakashima wrote that supervisor Alfonso Diera (Diera) had also tried to

call Perkins who did not respond. (*Id.*)  Perkins testified that he checked his radio, and

determined he had received only one page "at 12:45 for about 14 seconds." (Tr. 1056:11.)

Perkins reiterated, "[t]he only page I received that day came from Dennis, 12:45, and it lasted for

14 seconds.  I was still written up for not answering a page." (Tr. 1056:23-25.)  Perkins further

testified that he had the windows open in the truck, which lacked air conditioning, and could not

hear the page. (Tr. 1056:16-22.)  Additionally, Perkins testified that he later determined

Nakashima and Diera were calling the wrong number.  (*Id.*)

On May 4, 2009,  Perkins filed two grievances: one stating that he experienced

"harassment since becoming a union steward," and one stating as an ongoing violation,

"Retaliation for Discrimination grievance." (Ex. D FFP 00186-00187.)  Perkins explained the

second grievance at trial, "I filed it because I felt, once again, because I complained of racial

discrimination I was being retaliated against." (Tr. 1057:13-15.)

    E.  Termination of Perkins' Employment

    On May 10, 2009, Mondragon issued the tenth and final write up to Perkins for

"unknown whereabouts for 3+ hours." (Ex. D  FFP 00189.)  This write up was labeled as a 4th

Offense write up, and Perkins' employment was terminated two days later on May 12, 2009.

(*Id.*)  On May 10, 2009, Perkins was assigned a delivery to Rancho Liborio # 7, located at 6440

East 64th Street in Commerce City, about six to eight miles from the FFP warehouse. (*Id.*; Doc.

No. 182-4)  Perkins left the warehouse at 7:30 am but did not return until 12:06 pm. (*Id.*)  On the

write up, Mondragon stated that Mondragon spoke to and got a written statement from the

receiver at Rancho Liborio # 7, Miguel Angel Montenegro (Montenegro), who reported that

Perkins had arrived at Rancho Liborio # 7 at 8:00 am and had left at 8:30 am. (*Id.*; Ex. D. FFP

00192.)  Mondragon also received from FFP employee Oliver Macias and his wife Lorene

Macias a written statement, in which they wrote that they saw an FFP truck near 64th Street and

Quebec in Commerce City at 8:50 am that morning. (Ex. D FFP 00196.)  The Macias' statement

indicated that seeing an FFP truck "grabbed [their] attention, since we knew there wasn't (sic)

any stops on that side of town." (*Id.*)  Mondragon, who was not working that day, submitted his

own written statement that as he was driving westbound on I-70, he saw Perkins driving

eastbound on I-70 about 5 miles from Rancho Liborio # 7, at around 10:30 am. (Tr. 542:10-17;

593:24-25.)

    Perkins testified that on May 10, 2009 at about 7:45 am, he arrived at Rancho Liborio #

7, he had to wait for two trucks to be unloaded, and he left Rancho Liborio # 7 sometime

between 10:30 am and 11:00 am. (Tr. 592:10-18; 594:5-7.)  On Perkins' trip ticket, the

document that Perkins prepared after completing a delivery, Perkins recorded that he arrived at

Rancho Liborio # 7 at 7:45 am and left Rancho Liborio # 7 at 11:00 am because there were "2

Trucks b 4 me." (Ex. D FFP 00191; Tr. 1075:8-16.)  Perkins explained that after leaving Rancho

Liborio # 7 at about 10:30 or 11:00 am, he drove to Church's Chicken, located at 64th Street and

Quebec in Commerce City, to buy lunch before returning to the FFP warehouse. (Tr. 1066:1-25.)

After arriving at Church's Chicken, Perkins discovered he had left his wallet at his apartment.

Perkins then drove 30 to 35 minutes to his apartment in Aurora, located in the area of Peoria and

Iliff, to retrieve the wallet. (Tr. 1067:1-7.)  Perkins testified that he felt he had to immediately

retrieve his wallet because it contained his commercial driver's license (CDL), which he needed

to drive. (Tr. 1067:11-19.)  After getting his wallet, Perkins drove back to Church's Chicken to

pick up his lunch, and returned to FFP just after noon. (Tr. 1071:4-11.)

     Defendants claim that Perkins was discharged for "unknown whereabouts" and also for

dishonesty because Mondragon believed Perkins misrepresented on his trip ticket that he left

Rancho Liborio # 7 at 11:00 am, whereas the Rancho Liborio # 7 receiver Montenegro reported

Perkins left Rancho Liborio # 7 at 8:30 am. (Tr. 591-19-20 Mondragon testimony.)  Perkins' trip

ticket also conflicted with Mr. and Mrs. Macias' statement that they saw an FFP truck at 64th

and Quebec at 8:50 am, and the trip ticket did not match Mondragon's belief that he saw Perkins

on I-70 at 10:30 am. (Tr. 712:1-714:11.)  Dishonesty and being "off-route" are causes for

immediate discharge under the CBA.  (Ex. O at 8.)  The termination write up, however, stated

that Perkins was discharged for "unknown whereabouts" and did not specifically mention

dishonesty as a reason for discharge. (Ex. D FFP 00189.)

     Perkins presented evidence that several Latino and Caucasian drivers, who committed

similar offenses, were not fired. (Tr. 595:19-600:15; Ex. T.)  For example, Mondragon testified

one employee pulled over his truck and slept without informing FFP:

> Q. . . . On January 23, 2009, Mr. Frank DaPaepe, who is a Class A driver at Federal
> Fruit, was written up by you for an unauthorized stop. Do you see that?
> A. Yes, I do.
> Q. Okay. In your description here, supervisor comments, you indicate that Mr. DaPaepe
> had pulled over and slept in his vehicle for about two and a half hours; is that right?
> A. Yes.
> Q. Later that same day Mr. DaPaepe pulled over again and slept for 33 minutes; is that
> right?
> A. Yes.
> Q. And that's totally unacceptable, isn't it?
> A. Yes.
> Q. And Mr. DaPaepe only got a written warning; isn't that true?
> A. Yes.
> Q. And Mr. DaPaepe, once again -- let's see, two months later you wrote you him up a
> second time for unauthorized stop, on March 26, 2009; is that right?
> A. Yes.
> Q. Okay. On this particular date, Mr. DaPaepe pulled his vehicle over and slept for
> approximately six hours; is that right?
> A. Yes.
> Q. And as it relates to Mr. DaPaepe, because the whereabouts were unknown, you had to
> actually use GPS to find Mr. DaPaepe, didn't you?
> A. Yes.
> Q. And Mr. DaPaepe, . . . only received a written warning; isn't that right?
> A. Yes.
> Q. Is Mr. DaPaepe an African American?
> A. He is not.

(Tr. 600:22-602:4.)

Perkins grieved his termination of employment. (Ex. D FFP 00188.)  An unemployment

hearing was held regarding Perkins' discharge.  On November 5, 2009, Perkins filed a CHARGE

OF DISCRIMINATION (Ex. E) with the Equal Employment Opportunity Commission (EEOC)

alleging race discrimination, discriminatory discharge, and retaliation by FFP and Martelli.  On

January 10, 2010, Perkins received a right to sue letter from the EEOC. (Am. Compl. Ex. A.)

On August 26, 2010, Perkins entered into a SETTLEMENT AGREEMENT with the

Union and FFP resolving several of Perkins' union grievances. (Ex. P.)  Perkins received

$54,523.76 in the settlement, but the settlement did not resolve Perkins' Title VII and § 1981

claims.  This case was initiated on March 4, 2011, and an Amended Complaint was filed on

March 24, 2011. (Doc. Nos. 1 and 7.)

      F.  Miller's Employment at FFP

      Miller began working for FFP as a Class A truck driver on November 19, 2008. (Tr.

198:4-5.)  On March 5, 2009, Miller received a write up for not wearing his FFP ID badge.  On

that day, Miller also received a write up stating that Miller, while driving an FFP truck on a

delivery, "accidentally hit a building at Buckley Air Force Base," causing minimal damage. (Tr.

198:11-200:7.)

      Miller testified that on the morning of March 11, 2009, he was standing about 25 to 30

feet away from the office area of the warehouse and heard Martelli yelling to Mondragon "fire

the spick and write up the nigger" in reference to Moreno and Perkins. (Tr. 200:24-201:22.)

Miller testified that in his thirty-year employment history he had never heard a manager use

these types of racial slurs. (Tr. 201:24-202:1.)  Miller further testified that he spoke to

Mondragon at about 9:00 am that day and complained that the language Martelli used was

"inappropriate and unacceptable"; and Mondragon responded, "[t]hey'll do what they want." (Tr.

202: 7-19.)  Miller did not talk to Martelli about Martelli's use of racial epithets because Miller

"was afraid he would lash out at me." (Tr. 203:8-12.)

      On June 23, 2009, Miller was called as a witness in Moreno's Union arbitration hearing

held in connection with Moreno's discharge. (Tr. 204-21-25.)  Miller testified specifically about

Martelli's use of  racial epithets on March 11, 2009. (Tr. 205:8-10.)  Martelli and another FFP

owner, Stan Kouba, were present at the arbitration hearing during Miller's testimony. (Tr. 228:1-

6.) Miller's employment was terminated on July 10, 2009, seventeen days after his testimony at Moreno's arbitration, for the stated reason that Miller had an accident in the FFP parking lot that damaged two FFP trucks. (Tr. 206:3-5.)

Miller testified about the events leading to his termination on the morning of July 10, 2009:

> A.  I went out where we park the trucks at night and to retrieve a truck.  I was coming around to hook up to a trailer.  I was looking out my right side for the trailer number that I needed to hook onto.  And I had to swing out to the left while I was still watching to the right of me, and I collided with another truck.

(Tr. 208:16-21.)  In Miller's notes, written after the accident, Miller accepted 100% responsibility for the accident, but at trial, Miller testified that he believed he was 50% at fault for the accident. (Tr. 209:5-17.)  The other driver involved in the accident, who was Latino, was not written up or disciplined after the accident. (Tr. 209:21-25; 301:25-302:1.)  Mondragon fired Miller within a few hours of the accident, but no one from FFP interviewed Miller in connection with the accident and no estimate of the damage costs was obtained prior to firing Miller. (Tr. 211:5-13; 300:16-18.)  Miller testified he believed he was fired "[b]ecause I testified at [Moreno's] arbitration. They were just out to get rid of me." (Tr. 211:17-18.)

Defendants presented evidence that in response to accidents involving FFP drivers, FFP management approached each circumstance differently.  Some drivers who were in accidents were fired, some drivers were suspended, some drivers were written up, and some drivers were put on a probationary period. (Tr. 693:7-14 Mondragon testimony; Ex. Y.)  Mondragon testified that Miller was fired because of the particular circumstances of his accident:

> Q. . . . Why did you terminate [Miller]?
> A.  I think it was because of the severity of the accident and that it was in our parking lot.  To have that severe of an accident in a parking lot, that's–I mean, it's not enclosed, . . . I mean it's a big area, but to have that kind of an accident in our parking lot just floored

me. . . . I really don't believe that type of accident should have happened in our parking lot.

(Tr. 701:21-702:8.)

Miller presented evidence that some FFP drivers were involved in serious accidents, but were not fired. (Tr. 229:16-25 Miller testimony; Tr. 602:7:608:19 Mondragon testimony.)  For example, Mondragon testified about accidents involving other FFP employees:

Q. Okay. And so even after three accidents, Mr. Savacoll is not terminated, right?
A. Right.
. . .
Q. You would agree that Mr. Pennegar was only terminated after his fourth accident?
A. Yes.
 . . .
Q. Do you recall Mr. Alverez having a major accident involving flipping a truck?
A. I believe so.
. . .
Q. Do you recall whether or not he was terminated?
A. No, he wasn't.

(Tr. 608:10-19.)

On November 5, 2009, Miller filed a CHARGE OF DISCRIMINATION with the EEOC complaining he was discharged in retaliation for his "complaint of race discrimination, [his] testimony against an owner of Federal in a legal proceeding and due to [his] association with former Federal African-American employee Richard Perkins, . . ."  (Ex. F.)  On January 10, 2010, Miller received a right to sue letter from the EEOC.  (Am. Compl. Ex. A.)

On March 30, 2010, FFP settled with the Union and Miller, reinstated Miller's employment, and  paid Miller $26,615.40 in lost wages.  Miller resigned from employment at FFP on June 2, 2010. (Tr. 242:25-243:12.)  Evidence was presented at trial that Miller's CDL was suspended on September 21, 2009, three days after Miller was initially hired by FFP, and Miller's CDL was reinstated on February 2, 2010. (Tr. 256:15-257:1.)

IV.  Discussion

    A.  Trial Irregularities: Trial Judge's Absence During Jury Deliberations

Defendants contend that the Court should set aside the jury's verdict or order a new trial on all claims because the presiding trial judge, Senior United States District Court Judge James A. Parker sitting by designation from the District of New Mexico, was absent from the bench during jury deliberations.  When the jury was about to begin deliberating, after Judge Parker had instructed the jury, and counsel had made their closing arguments, Judge Parker informed the jury, the parties, and counsel for Plaintiffs and Defendants that he was leaving Denver to return to New Mexico. (Tr. 1379:5-10.)  Judge Parker also told the attorneys that United States District Judge R. Brooke Jackson from the District of Colorado would preside over all proceedings that day, and if necessary, Chief United States District Judge Wiley Y. Daniel from the District of Colorado would preside the next day.  Neither counsel for Plaintiffs nor counsel for Defendants objected to Judge Parker's departure, and neither side objected to the substitution of Judge Jackson and Chief Judge Daniel for the remainder of the trial proceedings. (*See* Tr. 1379:5-1383:3.)

In the Motion, however, Defendants allege that Judge Parker's absence during jury deliberations was a structural error requiring the Court to set aside the verdict or order a new trial.  Defendants point to a fatal error in the jury's Special Interrogatories: the lack of a compensatory damage interrogatory on Miller's retaliation claim against Martelli.  This first came to light while Judge Parker was absent.  When reading the jury's verdict, Judge Jackson noted that the question regarding compensatory damages on Miller's retaliation claim against Martelli was missing. (Tr. 1413:15-16.)  According to Defendants, Judge Jackson was not familiar with the case, and thus, Judge Jackson did not correct the error.  However, at the time

20

Judge Jackson read the verdict, neither Plaintiffs' counsel nor Defendants' counsel objected to the missing interrogatory.  On Miller's retaliation claim, the jury returned a verdict in favor of Miller and against Martelli in the amount of $200,000, for punitive damages, without awarding compensatory damages for emotional pain and mental anguish.  In the Judgment, the Court noted that the omission of the Special Interrogatory on compensatory damages was a "fatal error" that warranted a new trial on compensatory and punitive damages on Miller's retaliation claim against Martelli.  Defendants point to the missing Special Interrogatory, deemed a fatal error by the Court only as to the amount of damages on this claim, and argue that Judge Parker's absence should be considered a structural error that requires the Court to set aside the entire verdict.

Courts have found that the absence of the trial judge during a "critical stage" of a trial can constitute structural error sufficient to nullify a verdict if the judge's absence affects the integrity of the trial. *See, e.g., United States v. Mortimer*, 161 F.3d 240, 241 (6th Cir. 1998) (finding that trial judge's unexplained absence from the bench without warning prejudiced the defendant and that a new trial was warranted).  In this analysis, the Tenth Circuit employs a fact-specific inquiry and has not established a bright-line rule regarding a trial judge's absence during a trial. *United States v. Solon*, 596 F.3d 1206, 1212 (10th Cir. 2010) (stating, "[w]e do not decide today whether a judge's absence from the bench might constitute structural error in a case [other than the one presently under review].").  The Tenth Circuit noted, "[a]lthough most constitutional errors can be harmless, some are so offensive to our judicial system that they require automatic reversal." *Id.* at 1211 (citing *Arizona v. Fulminante*, 499 U.S. 279, 306-09 (1991)). "These violations, termed 'structural errors,' involve defects in the 'trial mechanism' and affect 'the framework within which the trial process proceeds' from beginning to end." *Id.*

21

(quoting *United States v. Lott*, 433 F.3d 718, 722 (10th Cir. 2006); and *Fulminante* , 499 U.S. at 309-10). "A defining feature of structural error is that the resulting unfairness or prejudice is necessarily unquantifiable and indeterminate, such that any inquiry into its effect on the outcome of the case would be purely speculative." *Id.* (internal quotations omitted).

In *Solon*, the Tenth Circuit concluded there was no structural error even though the trial judge was absent for six minutes in the middle of defense counsel's closing argument because, "nothing occurred during his absence," 596 F.3d at 1212.  Defendants distinguish this case from *Solon*.  Defendants maintain that unlike the harmless error in *Solon*, the omission of the Special Interrogatory for compensatory damages on Miller's retaliation claim against Martelli, already deemed a fatal error by the Court, cannot be considered harmless.  According to Defendants, this fatal error would not have occurred without Judge Parker's absence.  However, this assertion is based on speculation of what might have occurred had Judge Parker, instead of Judge Jackson, presided over the jury deliberations.

Although this Court found the omission of the Special Interrogatory a fatal error as to the amount of damages awardable on Miller's retaliation claim against Martelli, the omission did not undermine the entire trial process and does not warrant a declaration that the whole verdict is "a nullity." *Mortimer*, 161 F.3d  at 241 (citing, *Gomez v. United States*, 490 U.S. 858, 873 (1989)). Plaintiffs correctly point out that the cases cited by Defendants involved more egregious errors and a complete absence of a presiding judge.  For example, in *Mortimer*, at the end of a criminal trial, the presiding judge, who had been present during the prosecutor's final argument, disappeared during the final argument for the defense without notice to counsel or to the jury. 161 F.3d at 241.  The Sixth Circuit noted that the judge gave no reason for his disappearance, but the judge was "back on the bench in time to thank defense counsel for her speech and call on the

prosecutor for her rebuttal." *Id.*  The Sixth Circuit ruled that the judge's unexplained absence

was a structural error, and concluded, "[w]hen the judge is absent at a 'critical stage' the forum

is destroyed. . . . [and] [t]he verdict is a nullity." *Id.*  Importantly, the Court in *Mortimer*

concluded that the jury "could have inferred from the judge's absence that the defense was not

worth listening to . . ." *Id.* at 242.

What distinguishes this case from *Mortimer* and *Solon* is that Judge Parker's departure

did not leave a judicial void.  Judge Jackson presided after Judge Parker left Denver.  Judge

Parker clearly explained to both the jury and to counsel that he would be returning home, and

counsel did not object at that time. *See Mortimer*, 161 F.3d at 241 (noting that a trial's "structure

normally stands if the parties consent to excuse the presence of a judge.").  Judge Jackson ably

presided during jury deliberations and helped counsel for Plaintiffs and Defendants craft an

answer to questions from the jury. (*E.g.* Tr. 1386:2-1394:19.)

The Court concludes that no judicial absence occurred during jury deliberations.

Furthermore, Judge Parker's departure and the substitution of Judge Jackson were not structural

errors requiring the Court to set aside the jury's verdict.

B.  Federal Rule of Civil Procedure 63

Rule 63 governs the substitution of judges:

> If a judge conducting a hearing or trial is unable to proceed, any other judge may proceed
> upon certifying familiarity with the record and determining that the case may be
> completed without prejudice to the parties.

Fed. R. Civ. P. 63.  Defendants correctly assert that Judge Jackson did not certify he was familiar

with the record when he stepped in as substitute judge during jury deliberations.  However, this

failure does not require the Court to set aside the jury's verdict because Defendants did not

object to the substitution of Judge Jackson in place of Judge Parker. *See Higginbotham v. Corner*

23

*Stone Bank (In re Higginbotham)*, 917 F.2d 1130, 1132–33 (8th Cir. 1990) (concluding that a litigant waived the right to new trial under Rule 63 because he failed to object to the procedure that the successor judge employed and stating that a litigant "'has no right to sit back and await a decision of the case before objecting to the procedure.'") (*quoting Townsend v. Gray Line Bus Co.*, 767 F.2d 11, 18 (1st Cir. 1985)); *Milbrew, Inc. v. Commissioner*, 710 F.2d 1302, 1308 (7th Cir. 1983) (concluding that litigant waived right to object to successor judge deciding case on the existing record by agreeing to reassignment).  Therefore, any violation of Rule 63 was waived by Defendants.

    C.  Administrative Exhaustion of Perkins' Retaliation Claim

    In Perkins' EEOC charge (Ex. E), Perkins alleged he engaged in several protected activities:

    1) In early 2009, Perkins gathered complaints from employees regarding race discrimination and complaints about general working conditions (Ex. E ¶ B);

    2) Perkins complained to Mondragon in a meeting (no date given) that the February 28, 2009 write up was a form of harassment due to Perkins' race but Mondragon angrily left the meeting (Ex. E ¶ E);

    3) Perkins filed a grievance on or about March 5, 2009[5] regarding race discrimination (Ex. E ¶ F);

    4) Perkins asked Mondragon to discuss the March 11, 2009 incident but Mondragon refused to discuss it (Ex. E ¶ I);

    5) Perkins complained to Mondragon about being called a "nigger" by Martelli on March 11, 2009 (Ex. E ¶ J);

---

    [5] Perkins testified that he filed this grievance on March 4, 2009 and that the grievance did not complain of race discrimination. (Tr. 975:19- 976:8.)

6) On April 14, 2009, Perkins wrote and hand-delivered a letter to FFP owner Stan Kouba complaining generally that the write ups he received "display a pattern of discriminatory retaliation based upon my race." (Ex. E ¶ L); and

7) Perkins filed a grievance (no date given) with the Union for retaliation based on Perkins' complaints of race discrimination (Ex. E. ¶ L).

On direct examination at trial, Perkins was questioned extensively about each paragraph in his EEOC charge. The four protected activities from Perkins' EEOC charge summarized above in paragraphs 1), 2), 6), and 7) were either affirmed by Perkins' testimony or affirmed through documentary evidence. As for paragraph 1), Perkins testified that he collected complaints from FFP employees about general working conditions and about race discrimination.[6] In regard to paragraph 2), Perkins testified that at the March 2, 2009 meeting with Mondragon and Supervisor Chris Salazar, Perkins complained to Mondragon about the February 28, 2009 write up given to Perkins and Moore as being racially discriminatory because

---

[6] Perkins testified about the allegation in the EEOC charge that he and Miller gathered employee complaints on racial discrimination:

Q. Now let's look at paragraph B. "In early 2009, I began to work closely with several other Federal drivers, including Richard Miller, in order to make working conditions better for employees." Do you believe that statement is true?
A. Yes, that would be true.
. . .
Q. Now next: "Myself, Mr. Miller, and other employees, gathered complaints from employees regarding different treatment in terms and conditions of employment due to race by asking employees whether they had experienced discrimination or witnessed discrimination." Do you believe that statement is true?
A. It was not just about discrimination; it was just about anything that they thought needed to be changed in the facility.
Q. Next it says: "Federal management witnessed me and Mr. Miller gathering information regarding race discrimination and heard from other employees that we were gathering the information." Now do you believe that statement to be accurate?
A. I would say it's somewhat accurate. Once again, it wasn't just race discrimination. The information that was gathered was a number of different issues.

(Tr. 1082:24-1084:1.)

employees, who were Latinos, were not written up for the same behavior.  Perkins testified that

at the March 2, 2009  meeting, Mondragon told Perkins and Moore they were written up because

they were black.  With respect to paragraph 6), Perkins testified that he wrote and hand-delivered

an April 14, 2009 letter to Stan Kouba complaining of race discrimination, and Perkins offered

and the Court admitted Trial Exhibit I, a copy of the letter.[7]  With regard to paragraph 7), Perkins

offered and the court admitted a copy of a grievance dated May 5, 2009, in which Perkins

complained as an ongoing violation, "Retaliation for Discrimination grievance." (Tr. Ex. D FFP

00187.)

At trial, however, Perkins denied that he engaged in the protected activity set forth in

Perkins' EEOC charge that is summarized above in paragraphs 3), 4), and 5).  Concerning

paragraph 3), Perkins testified that on March 4, 2009, he filed a grievance about being written up

on February 28, 2009, but admitted that the grievance did not mention racial discrimination. (Ex.

D FFP00166.)  As for paragraphs 4) and 5), Perkins testified that he did not complain to

Mondragon about Martelli's use of racial epithets on March 11, 2009.[8]  In sum, Perkins affirmed

---

[7] Tr. 1046:14-1047:7 (Perkins' direct testimony describing his delivery of the letter to and discussion with Stan Kouba about the letter).

[8] Perkins testified:

Q. Again, for brevity, looking at paragraph I, do you believe paragraph I [of the EEOC charge] is accurate?
A. I don't recall telling him that Mr. Miller witnessed Martelli calling me a nigger.
Q. Okay. But did you have that conversation with Mr. Mondragon regarding the events on that day?
A. Yes.
Q. When did you have that conversation with Mr. Mondragon?
A. Actually, I don't recall when I had that conversation with Mr. Mondragon. I don't recall having that conversation with Mr. Mondragon about Mr. Martelli calling me a nigger. When I asked Mr. Mondragon to come outside after that incident, he refused to come outside. So I don't think myself and Mr. Mondragon ever had that conversation

or proved the protected activity outlined in Perkins' EEOC charge described in paragraphs 1), 2), 6), and 7) above, but Perkins recanted the protected activity outlined in Perkins' EEOC charge described in paragraphs 3), 4), and 5) above.

In addition, two of Perkins' protected activities proven at trial were not mentioned in Perkins' EEOC charge.  First, Perkins' EEOC charge failed to mention the March 23, 2009 grievance (Ex. D FFP 00176) complaining about race discrimination that allegedly occurred on March 19, 2009.  The grievance specifically cited Article 16 of the CBD and Item C-7 of the FFP work rules, both of which prohibit race discrimination.  Second, Perkins' EEOC charge failed to mention the controversial grievance brought up for the first time at trial in which Perkins specifically complained about Martelli's use of the term "nigger" on March 11, 2009. According to Perkins' and Medina's testimony, the Union misplaced this grievance.  To explain the discrepancies between his EEOC charge and the trial evidence, Perkins testified that his attorney, Paula Greisen, drafted the EEOC charge, and Perkins signed it without reading it.[9]

Defendants contend that since Perkins' EEOC charge contained allegations of protected activity that were so significantly different from the evidence of protected activity presented at

about what occurred on March 11th.

(Tr. 1087:14-1088:3.)

[9] Perkins testified:

Q. Now, Mr. Perkins, I think you testified -- you didn't draft this document, though, is that right, or these documents?
A. I didn't. I did not draft this document, no.
Q. Other than what you articulated just now and these corrections, you believe everything else within these documents are true and accurate?
A. Yes, I do.

(Tr. 1097:1-7.)

trial, the Court should dismiss Perkins' retaliation claims against FFP and Martelli for failure to exhaust administrative remedies.[10]

To bring a claim under Title VII or § 1981, a claimant must exhaust his administrative remedies as to each claim of discrimination or retaliation. *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005) (noting that exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII).  The first step to exhaustion is the filing of a charge of discrimination with the EEOC. *See Jones v. Runyon*, 91 F.3d 1398, 1399 n.1 (10th Cir.1996) (noting that the EEOC filing is a jurisdictional requirement).  The purposes of the administrative exhaustion requirement are: "1) to give notice of the alleged violation to the charged party; and 2) to give the EEOC an opportunity to conciliate the claim." *Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 (10th Cir. 1994), *abrogated on other grounds, Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003).  An EEOC charge must contain facts that would prompt an investigation into the claim at issue.  *Jones v. UPS*, 502 F.3d 1176, 1183-86 (10th Cir. 2007).  Facts supporting each element of a *prima facie* case of retaliation must be alleged in a charge in order for a retaliation claim to be exhausted. *Id.* at 1186.  "A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *MacKenzie v. City and County of Denver, CO*, 414 F.3d 1266 (10th Cir. 2005).

---

[10] On April 16, 2013, Defendants filed DEFENDANTS' SUPPLEMENTAL AUTHORITY IN SUPPORT OF MOTION FOR RECONSIDERATION AND TO VACATE TRIAL AND JUDGMENT IN FAVOR OF PERKINS AND MILLER (1) BECAUSE OF IRREGULARITIES; (2) FOR LACK OF JURISDICTION; (3) PURSUANT TO THE COURT'S INHERENT POWERS OR RULE 59 OR 60, AND/OR FOR A NEW TRIAL PURSUANT TO RULE 59 (Dkt. No. 164); and on April 19, 2013, Plaintiffs filed PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL AUTHORITY (DOC. 191).

In determining administrative exhaustion, however, courts liberally construe EEOC

charges. *See id*. (construing liberally a plaintiff's charge of discrimination based on the ADA);

and *Foster v. Ruhrpumpen, Inc*., 365 F.3d 1191, 1195 (10th Cir. 2004) (noting that courts

liberally construe charges based on the ADEA).  The Court may consider allegations not

expressly included in an EEOC charge if the conduct alleged would fall within the scope of the

EEOC investigation which reasonably would have grown out of the allegations that a plaintiff

actually made. *Martin v. State of KS*, 978 F. Supp. 992, 998 (D. Kan. 1997) (quoting *Martin v.*

*Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1416 n.7 (10th Cir. 1993) *overruled in part on*

*other grounds as recognized by Davidson v. America Online, Inc.*, 337 F.3d 1179, 1183 (10th

Cir. 2003)).

In *MacKenzie*, the Tenth Circuit affirmed a district court's grant of summary judgment in

favor of the employer. 414 F.3d 1266. The plaintiff had filed an EEOC charge alleging that her

employer discriminated against her on the basis of her disability, which she indicated on her

EEOC charge as coronary disease. *Id*. at 1274.  For the first time on appeal, however, the

plaintiff asserted she had a second disability: depression. *Id*.  The Court refused to consider this

as an actionable disability under the ADA because "[plaintiff's] second alleged disability plainly

exceed[ed] the scope of her EEOC charge" and because the second disability was raised for the

first time on appeal. *Id*.  The Tenth Circuit further noted that the plaintiff raised for the first time

in her summary judgment response that her employer failed to accommodate her disability;

however, the Tenth Circuit dismissed this claim on appeal because the plaintiff, ". . . failed to

exhaust her administrative remedies as to this claim. . . ." *Id*. n.13.  Hence, the court in

*MacKenzie* determined that a plaintiff may not sue her employer for discrimination based on an

additional disability not mentioned in the plaintiff's EEOC charge, and a plaintiff may not sue

her employer for failure to accommodate her disability when this claim was not mentioned in the plaintiff's EEOC charge. *Id.*

As set forth in the supplemental briefing, in *Manning v. Blue Cross and Blue Shield of Kansas City*, No. 12-3190, 2013 WL 1490803 (10th Cir. Apr. 12, 2013) (unpublished opinion), the Tenth Circuit affirmed the dismissal of discrimination and retaliation claims for failure to exhaust because the EEOC charges at issue were "too vague to give defendants notice of the challenged conduct." *Id.* at *7.  Three former employees had filed charges against Epoch Group, L.C., a subsidiary of Blue Cross and Blue Shield of Kansas City, for race discrimination and retaliation and for disability discrimination and retaliation.  One plaintiff's charge, which was similar to the other two employees' charges, stated that she was treated "unequally and was denied employment opportunities due to her race, retaliated against in violation of her rights, and was not offered reasonable accommodation for her diabetes, carpal tunnel and blood clots." *Id.* at *6.[11]  The court rejected plaintiffs' argument that the factual basis for their claims would have been discoverable upon investigation: "There is nothing in any of the plaintiffs' EEOC charges that would have put the defendants on notice that [plaintiffs] were alleging that their **non-hire for the job openings in October and November 2009** was based on race discrimination or in retaliation for any protected opposition to discrimination." *Id.* *8 (emphasis added).

In contrast, the Tenth Circuit in *Anderson v. Clovis Mun. Schools*, reversed a district court's determination that the plaintiff had failed to exhaust a hostile work environment claim

---

[11] The other two employees filed EEOC charges that were similarly vague.  The second employee's charge stated that "he was retaliated against and denied employment opportunities because of disabling conditions" and the third employee's charge stated that "she was subjected to an unwanted working environment because of her race and was retaliated against in violation of her rights." *Id.* at *6.

and a constructive discharge claim. 265 Fed. Appx. 699 (10th Cir. 2008) (unpublished opinion). The Tenth Circuit concluded that the factual allegations in the plaintiff's EEOC charge would have led to an investigation of those claims:

> Specifically, Anderson stated that "[b]eginning in February 2005 and continuing on a continuous basis I have been subjected to adverse terms and conditions unlike my peers." He also checked the box indicating that the discrimination was based on his race. Like the court in *Jones*, we think these two claims [for hostile work environment and constructive discharge] can reasonably be expected to follow the charge of discrimination, . . . and thus conclude that Anderson's charge was sufficient to exhaust his administrative remedies and thereby confer jurisdiction.

*Id.* at 703 (citing *Jones v. UPS, Inc.*, 502 F.3d at 1187)).

Unlike the charges analyzed in *MacKenzie* and *Manning*, Perkins' EEOC charge sufficiently described Perkins' allegations that FFP and Martelli retaliated against him for opposing racial discrimination through a series of verbal and written complaints, plus union grievances, that occurred during a particular time period, from February 28, 2009 through May 10, 2009. Also, despite its omissions and inaccuracies, Perkins' charge, as the charge in *Anderson*, contained factual allegations that would have triggered an investigation into all of Perkins' alleged protected activity during the relevant time period.

Defendants do not, nor could they, assert that Perkins' EEOC charge failed to notify them that Perkins was claiming retaliation for opposing racial discrimination. Instead, Defendants argue that the protected activity described by Perkins at trial is too different from the protected activity described in Perkins' EEOC charge. The Court recognizes that Perkins' EEOC charge fails to allege all protected activity in which Perkins engaged and that Perkins' EEOC charge outlined some protected activity that Perkins denied at trial. However, the allegations in Perkins' EEOC charge provided a sufficient starting point for an investigation into discrimination or retaliation claims. The differences between Perkins' EEOC charge and the

31

trial evidence do not show that the administrative process related to Perkins' EEOC charge was insufficient.  The Court does not agree that the differences were so prejudicial that Defendants were unable to investigate the truth of Perkins' assertions.  *See Jones*, 502 F.3d at 1187 (affirming district court's conclusion that the plaintiff's allegations at the administrative level "should have triggered an inquiry into whether UPS viewed Mr. Jones as disabled.").  The Court concludes that Perkins' claims against FFP and Martelli for retaliation were administratively exhausted despite the differences between the protected activity alleged in the EEOC charge and the evidence of protected activity adduced at trial.

D.  Motion For New Trial Based On Surprise At Trial; New Evidence; and Misconduct

Defendants assert that during pre-trial discovery, Plaintiffs provided incomplete or untruthful information that hindered Defendants' ability to defend against Plaintiffs' claims at trial.  Defendants further contend that they were surprised and unfairly prejudiced at trial by Perkins' testimony that he had engaged in protected activity at FFP that Perkins had not disclosed to Defendants prior to trial.  Defendants maintain that the cumulative effect of the new information at trial and the misleading or incomplete information given to Defendants prior to trial placed Defendants at an unfair disadvantage.  Defendants ask the Court to vacate the Judgment or grant a new trial under the Court's inherent power to alter interlocutory judgments or under Fed. R. Civ. P. 59 or 60.

1.  Perkins' Notes About the March 2, 2009 Meeting With Mondragon

At Perkins' pretrial deposition, he testified that he had written down notes or "minutes" of the March 2, 2009 meeting with Mondragon.  Perkins testified that at the meeting Perkins complained about the write up that Perkins and Moore received on February 28, 2009, and Perkins informed Mondragon that two drivers, who were Latinos, were not written up for the

32

same conduct.  Perkins alleged he recorded in his notes that Mondragon told Perkins and Moore they were written up "because they were black."  At trial, Perkins testified that on the morning of his deposition, he discovered that he had not given copies of his notes about the March 2, 2009 meeting to Defendants.  During a break, Perkins and his attorneys went to the attorneys' office and retrieved two pages of notes, and Perkins' deposition continued:

> Q.  You testified earlier this morning that your notes from that 3/2/09 meeting were on two pages.  Are these the two pages you were referring to?
> A.  Yes, ma'am, it appears that they are.
> Q.  Are these all of the notes that you have that you took on March 2, '09, at that meeting?
> A.  Yes, this would be all of the notes.

(Mot. Ex. A-1 Tr. Dep. of Richard Perkins Sept. 29, 2011 at 109:21-110:2.)  However, Mondragon's statement that Perkins and Moore were written up "because they were black" was not recorded on the two pages of notes provided to Defendants at Perkins' deposition.  Despite Perkins' statement at his deposition that he had produced all of his notes from the March 2, 2009 meeting, Perkins found a third page of notes sometime after Perkins' deposition and gave the third page to his counsel.  On the third page of notes, Perkins recorded that Mondragon had told Perkins that Perkins and Moore were written up "because they were black."  Plaintiffs' counsel delivered the third page of notes to Defendants' counsel on November 7, 2009, the day after discovery closed. (*See* Doc. No. 187 Tr. of Hearing held on Nov.  19, 2012 at 7:16-10:12.) Defendants did not move to reopen discovery.

At trial, because the notes contained hearsay, the Court did not allow Plaintiffs to admit the three pages of notes as documentary evidence.  However, Perkins referred to his notes during his testimony, and Perkins and Moore both testified that they heard Mondragon say that Perkins and Moore were written up "because they were black." (Tr. 983:1-13, 163:18-164:2.)  Perkins

was then questioned about producing the notes at his deposition:

> Q. . . . [I]n your deposition were you asked what notes you took regarding the March 2nd, 2009, meeting?
>
> A. I was.
>
> Q. Okay. At the time of your deposition, did you believe that you produced all your notes?
>
> A. I did.
>
> Q. Okay. . . . [I]n your deposition, did you, in fact, produce all three of these pages of documents?
>
> A. The first two pages were presented at the time of deposition.
>
> Q. Okay. After your deposition, did you find other notes?
>
> A. I did.
>
> . . .
>
> Q. And please describe how you found those notes.
>
> A. In my deposition, I was asked about the comments about Mr. Mondragon writing us up because we are black. To the best of my knowledge, I thought I had submitted all those notes to my counsel. In that deposition, these notes appeared, and the first two pages were there, but the last page was not there. I was questioned why it wasn't there by Ms. Keimig, and I couldn't recall why it wasn't there[.] . . . So after that deposition, . . . I went home to search for that particular document, and I did find it.
>
> Q. And the document you found, was that the one that you identified the statement by Mr. Mondragon where he said, I am writing you up because you are black?
>
> A. Yes, that was the document along with the alleged dates of CBA violations.

(Tr. 985:11-986:23.)

Defendants contend that Perkins' late production of the third page of notes was one of

several violations of the discovery rules, which cumulatively warrant a new trial.[12]  Defendants

assert that the third page of notes was important evidence supporting Perkins' race

discrimination claim against FFP because Mondragon was Perkins' immediate supervisor, and

Mondragon made the initial decision to fire Perkins.  Plaintiffs correctly assert, however, that

Defendants received the third page of notes several months prior to trial, and Defendants did not

_____

[12] Rule 26(b)(1) requires a party to inform the opposing party of the existence of all documents relevant to the party's claim:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense--including the **existence,** description, nature, custody, condition, and location **of any documents** or other tangible things and the identity and location of persons who know of any discoverable matter.

Fed. R. Civ. P. 26(b)(1) (emphasis added).

> Rule 26 requires a party to supplement incomplete disclosures:

> A party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production, or request for admission--must supplement or correct its disclosure or response. . . (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]

Fed. R. Civ. P. 26(e)(1).

> Rule 33 requires parties to give complete answers to interrogatories:
> Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath.

Fed. R. Civ. P. 33(b)(3).

> Under Rule 37, an evasive or incomplete answer may be treated as a failure to answer:
> For purposes of this subdivision (a), an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond.

Fed. R. Civ. P. 37(a)(4).

35

move to reopen discovery to investigate the additional page of notes.  Defendants recognize that

they received the third page of notes prior to trial and that the circumstances are not as egregious

as a failure to disclose relevant evidence. The Court agrees. The information on the third page of

notes depicting Mondragon's statement was relevant to Perkins' claims against FFP of disparate

treatment and discriminatory discharge.   However, the third page of notes containing

Mondragon's statement was not the only evidence that management at FFP treated Perkins with

disparity or that Perkins was fired for racially discriminatory reasons.  Other documentary and

testimonial evidence showed that Perkins was written up more often than non-African-American

employees and for infractions for which other employees, who were not African-American, were

not written up.  In addition, documentary and testimonial evidence showed that Perkins was fired

for unknown whereabouts, but other employees, who were non-African-American, were not

fired for similar and equally serious infractions.  Because Perkins' late production of notes was

minimally prejudicial to Defendants, the event itself is insufficient to grant a new trial on

Perkins' claims of disparate treatment and discriminatory discharge against FFP.[13]

2. Perkins' Additional, But Missing, March 11, 2009 Grievance

In Perkins' answers to Defendants' interrogatories and requests for production, Perkins

represented that "**no written or recorded statements were taken** other than those identified in

Plaintiff's 26(a)(1) Disclosures, which have been provided previously, **including the grievances**

**filed** . . . and the Arbitration Transcript . . . ." PLAINTIFF RICHARD PERKIN'S [sic]

ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES AND

---

[13] Defendants ask the Court to consider not just the late production of Perkins' notes but
also the other alleged discovery and trial misconduct, including the surprise evidence admitted at
trial, to determine whether Defendants were unfairly prejudiced at trial.  The Court has
considered both the individual and cumulative effect of the misconduct alleged by Defendants.

DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION (Doc. No. 165, Ex. A-3 at 6) (emphasis added).  Among the documents produced were several grievances that Perkins filed with the Union complaining primarily about write ups Perkins received.  These grievances were important documentary evidence, and both Plaintiffs and Defendants spent much time at trial eliciting testimony about the grievances.  Perkins' grievance (Ex. D FFP 00171) complaining about the write up Perkins received on March 11, 2009, was very important to Defendants not for what it stated but for what it did not state.  In that grievance, Perkins did not specifically complain about Martelli's use of the epithet "nigger," arguably the most significant event supporting Perkins' claims.

Defendants contend that at trial, they were surprised when Union representative Medina and Perkins testified that on March 11, 2009, in addition to the grievance produced during discovery and admitted into evidence, Perkins prepared another grievance specifically complaining about Martelli's use of the term "nigger."  Medina testified that this additional grievance was filed but misplaced:

> Q. . . . Are you aware as to whether or not Mr. Perkins, in fact, filed another grievance on March 11th regarding Mr. Martelli's use of the word "nigger" on that day?
> A. I believe he did.
> . . .
> Q. Did you see that written grievance?
> A. I believe I did.
> Q. Okay. What happened with that grievance? Do you know?
> A. There were some grievances that we withdrew, and I don't recall if that was one of them or not, I really don't.
> . . .
> Q. . . . Now regarding the grievance where Mr. Perkins discussed the fact that Mr. Martelli called him a nigger, do you know whether the company, in fact, received that grievance?
> . . . [objection overruled] . . .
> A. They should have. They should have. Because I believe --I believe Mr. Perkins presented it to the company, but we had also faxed grievances before to the company, so I am sure they did.

(Tr. 375:19-379:4.)

On cross examination, Medina admitted that the Union misplaced the additional

grievance:

> Q. I would like to direct your attention to page 6 of Exhibit D. This is the grievance that
> Mr. Perkins and you filed in response to Mr. Perkins having been written up on March
> 11, '09, correct?
> A. Yes, ma'am.
> Q. And there is nowhere on this document mention of that most vile of racial epithets, is
> there?
> A. No, ma'am.
> Q. And, in fact, the union never filed any grievance of any sort with mention of that most
> vile of racial epithets, did it?
> A. You don't have to, but, no, ma'am.
> Q. In fact, the union didn't even file a grievance saying that someone at Federal Fruit &
> Produce had used a racial slur; it wasn't even that general, right?
> A. No. That -- this here, this grievance here, we never try to put as much information. We
> just do the article and what the discipline is. . . .

(Tr. 418:18-419:17.)

On direct examination, Perkins described the grievance:

> Q. With respect to this incident, did you ever file a grievance regarding the March 11,
> 2009, incident stating -- or at least articulating the fact that Mr. Martelli used the word
> "nigger" on March 11, 2009?
> A. Yes, I did.
> Q. Okay. What happened to that document?
> A. I don't know. I don't know what happened to it. Like I stated earlier, when I write a
> grievance, I present it to Mr. Mondragon to be signed. After he refuses to sign, which he
> has done pretty much on all the grievances that I filed, I then give the grievance to Jesse
> Medina to be filed.
> Q. All right. Now with respect to this grievance where you allege or articulate the issue
> regarding what happened on March 11, 2009, did you present that to Mr. Mondragon?
> A. I did.
> Q. Okay. When did that happen?
> A. That happened at the end of the workday on that particular day.
> Q. Okay.
> A. So it was at the end of the workday on March the 11th.
> Q. Now with respect to your grievance on March 11, 2009, why wasn't that grievance
> arbitrated, if you know?
> A. I do not know.

(Tr. 1019:15-25.)

Perkins testified on cross examination about the existing grievance and the missing

grievance:

> Q. Okay. . . . . You filed a grievance on March 11th because you received disciplinary
> action for your actions on that day, correct? . . .
> A. Yes, I did.
> Q. I would like to direct your attention to Exhibit D, page 6, please.
> A. I have it.
> . . .
> Q. Okay. So the grievance that occurred on March 11th, 2009 . . . is the disciplinary
> warning that's referenced toward the bottom of this page, correct?
> A. Yes.
> Q. That's the only grievance you filed with respect to the events of March 11, 2009,
> correct?
> A. No, ma'am, that's not correct.
> Q. You filed another grievance?
> A. Yes.
> Q. Did you draft that grievance?
> A. I did, yes.
> Q. Did you handle that grievance in the same manner that you testified yesterday you
> handled grievances in, which is to provide them first to Mr. Mondragon for his signature
> and then to give them to the union?
> A. Yes.
> Q. Is this the grievance that allegedly cites the word "nigger" in it?
> A. That would be the grievance that is not present, yes.
> . . .
> Q. When did you present that grievance to Mr. Mondragon?
> . . .
> A. March the 11th.
> Q. Was anyone else present?
> A. I don't recall.
> Q. Do you recall whether Mr. Mondragon signed it?
> A. I don't recall if he signed it.
> Q. Did you have any discussion with him when you gave it to him?
> A. No, I did not.
> Q. Then after that you, as is your normal course, provided that grievance to Mr. Medina?
> A. That would be correct, yes.
> Q. And you haven't seen it since?
> A. Once I turned the grievance in to Mr. Medina, it becomes the property of the union at
> that point. The next time I may see that [grievance] . . . may be at an arbitration.
> Q. So my question was, you haven't seen it since you gave it to Mr. Medina, have you?
> A. No, ma'am, I have not seen it since I gave it to Mr. Medina.

(Tr. 1173:24-1175:18.)  Defendants' counsel continued cross-examining Perkins about other

written grievances that Perkins had settled prior to trial:

> Q. And you understand those to be the grievance numbers that were settled in your
> settlement agreement, correct?
> A. Specifically, yes.
> . . .
> Q. The grievance that you say allegedly set forth the term "nigger" is not among any of
> the grievances that were either withdrawn or settled in this document, correct?
> A. That's correct.
> Q. Wasn't it important to you, Mr. Perkins, if you were resolving grievances, to
> understand what happened to that particular grievance alleging the most awful racial slur
> in our language?
> A. It was, yes.
> Q. So what did you do to follow up about that?
> A. I had a conversation with Mr. Medina, yes, I did.
> . . .
> A. The explanation that I eventually got from Mr. Medina was it became a[n] . . .
> arbitration timeliness issue. Obviously the union dropped the ball in getting this
> particular  grievance to the arbitration process in a timely fashion. That's the explanation
> I got from Mr. Medina eventually about that particular grievance.
> Q. But you didn't actually see the document? . . . The grievance document.
> A. I wrote the grievance.
> Q. Okay. But you testified earlier that after you gave it to Mr. Medina, which was
> immediately following March 11, 2009, that you never saw the document again, right?
> A. Yes.

(Tr. 1196:12-1198:1.)

In an effort to impeach Medina's and Perkins' testimony about the missing grievance,

Defendants offered the testimony of Ted Kouba, FFP's Corporate Financial Officer:

40

Q. . . . Did you ever receive a grievance from the union that included a racial epithet?
A. No.
Q. Did you ever receive a grievance from the union that included the allegation that a racial epithet had been used without identifying that specific racial epithet?
A. No.
Q. Did you ever receive a letter from the union or from Mr. Perkins or Mr. Miller with a racial epithet in it?
A. No. . . .
Q. You heard Mr. Medina testify earlier in this case, . . . that he thought that there was a grievance with a racial epithet in it?
A. Yes.
Q. And you know that that [grievance] was never received by Federal Fruit & Produce?
A. It was never received by Federal Fruit & Produce. I've never seen it produced by anyone in this case.

(Tr. 915:4-916:8.)

### 3.  New Trial On Perkins' Retaliation Claim Against Martelli

Under Rule 60(b), the Court may order relief from a judgment based on "mistake, inadvertence, surprise, or excusable neglect . . . [due to] newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b) . . . [or] . . . [because of] fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party . . . [or] any other reason that justifies relief." Fed. R. Civ. P. 60(b)(1), (2), (3), and (6).  A party who is surprised ". . . during trial, by major variance in theory or defense, undisclosed until after the trial is underway," can obtain a new trial under Rule 60(b)(1). *Senters v. Black & Decker,* 123 Fed. Appx. 354, 360 (10th Cir. 2005) (stating that surprise is a "long-established ground for granting a new trial motion.") (citation omitted).  "When a party requests a new trial on the basis of surprise testimony [the party] must be able to show (1) surprise, (2) prejudice, and (3) an attempt to cure the prejudice[.]" *Senters,* 123 Fed. Appx. at 359.

Defendants contend that they have met the three requirements under Rule 60(b)(1).

Defendants assert that Perkins does not even dispute Defendants' allegation that they received no information about the missing grievance prior to trial. Defendants further assert that they have shown prejudice by illustrating the importance of the missing grievance to Perkins' claim that Martelli retaliated against Perkins because of the grievance. Defendants maintain that they attempted to cure the prejudice by cross-examining Perkins and Medina and by offering Ted Kouba's testimony that FFP did not receive the grievance. Defendants ask the Court to remedy this unfair use of surprise evidence by either vacating the judgment on the jury's verdict or ordering order a new trial.

Perkins denies any misconduct related to the testimony about the missing March 11, 2009 grievance. Perkins contends that once he submitted the additional March 11, 2009 grievance to Medina, the Union controlled the grievance and the document was no longer within Perkins' control. However, Perkins, did not explain in his response to Defendants' Motion or at the November 19, 2012 oral argument on the Motion why he failed to inform Defendants that Perkins would offer testimony about an additional, missing grievance at trial. Perkins further argues that the jury was entitled to believe Perkins' testimony, despite Defendants' cross examination, that he prepared the additional March 11, 2009 grievance but did not see it after he gave it to Medina. Perkins also asserts that the jury was entitled to believe Medina's testimony that he faxed the grievance to the company before the grievance was misplaced. However, the fact that the jury may have believed Perkins' and Medina's testimony about the grievance's existence actually supports Defendants' argument that they were prejudiced by this evidence.

Perkins failed to inform Defendants that he prepared an additional March 11, 2009 grievance complaining about Martelli's use of a racial epithet on March 11, 2009, and that Perkins and Union representative Medina would testify that Perkins prepared the grievance and

the Union misplaced it.  This evidence should have been disclosed prior to trial.  Perkins' sworn

statement that "no written or recorded statements were taken other than those identified in

Plaintiff's 26(a)(1) Disclosures, which have been provided previously, including the grievances

filed . . ." was inaccurate and incomplete.  Hence, Defendants have shown surprise.

At trial, testimony about the "missing" grievance was important evidence of protected

activity that supported Perkins' retaliation claim against Martelli.  The testimony about the

grievance also bolstered Perkins' version of events that occurred on March 11, 2009, which were

vigorously contested by Defendants.  To illustrate the importance of this evidence, it is useful to

analyze what evidence is required to prove a claim of retaliation against Martelli as an

individual.

Under 42 U.S.C. § 1981, Martelli's individual liability must be based on his individual

discriminatory or retaliatory actions.  *Hull v. Colorado Bd. of Governors of Colorado State*

*University System*, 805 F. Supp. 2d 1094, 1104-05 (D. Colo. 2011) (stating, "[p]ersonal

participation is an essential element of any individual liability claim under [§ 1981] claim.").

The evidence at trial showed that Martelli was directly involved in two important events with

respect to Perkins' employment at FFP: 1) the March 11, 2009 incident in which Martelli

ordered Mondragon to write up the "nigger," and 2) Martelli's approval of Mondragon's May

10, 2009 decision to fire Perkins.  Perkins' retaliation claims against FFP and Martelli were

supported overall by evidence that Perkins engaged in these protected activities: 1) Perkins'

gathering of complaints from employees about racial discrimination and work conditions; 2)

Perkins' complaint to Mondragon during the March 2, 2009 meeting about disparate write ups;

3) Perkins' March 11, 2009 grievance about Martelli's use of racial epithets, which is now

missing; 4) Perkins' March 23, 2009 grievance stating he had been discriminated against since

becoming a union steward and citing Article 16 and FFP work rule C-7, both of which prohibit racial discrimination; 5) Perkins' April 14, 2009 letter to Stan Kouba complaining about a "pattern of racial discrimination"; and 6) Perkins' May 4, 2009 grievance stating as an ongoing violation, "Retaliation for Discrimination grievance."  Significantly, only one of Perkins' protected activities was specifically directed at Martelli: the missing March 11, 2009 grievance complaining about Martelli's use of a racial epithet on March 11, 2009.

To prove that Martelli fired Perkins in retaliation for Perkins' complaints about racial discrimination, Perkins had to prove Martelli knew of and fired Perkins in reaction to one or more of Perkins' protected activities.  The grievance complaining about Martelli's use of a racial epithet would naturally stand out as evidence supporting Perkins' retaliation claim against Martelli.  Recognizing its importance, Plaintiffs' counsel highlighted the missing grievance as protected activity supporting Perkins' retaliation claim against Martelli in counsel's legal argument opposing Defendants' motion for directed verdict on that claim.  In denying the

motion, the Court commented that it was a close issue.[14]

It is reasonable to infer that the jury found that Martelli agreed with Mondragon's

decision to fire Perkins in retaliation for Perkins' additional grievance about Martelli's use of

racial epithets.  Compared to Perkins' other protected activities, the jury could have reasonably

viewed the grievance complaining about Martelli's use of a racial epithet as a prominent reason

that Martelli approved of Mondragon's decision to fire Perkins, especially in light of Perkins'

---

[14] In the motion for directed verdict, Defendants argued that there was insufficient evidence of causation i.e., that Martelli knew of Perkins' protected activity.  Plaintiffs' counsel argued in response:

> MS. COLAIZZI: . . . So with respect to just Mr. Martelli's knowledge of the protected activity, there's insufficient evidence of that element to send the retaliation claim to the jury.
> THE COURT: Let me ask Mr. Elkus to respond to that at this point then.
> MR. ELKUS: . . . So based upon the racial animus that was created, there is evidence indicating that Mr. Perkins had then grieved the March 11, 2009, incident, and specifically as it relates to -- that there was two grievances, one of the grievances was the one that is currently in evidence as Exhibit D, the other evidence is that Mr. Perkins provided that to Mr. Mondragon, that somehow through the process -- that it was given to the company, whatever, that grievance was since -- was not resolved. But of note, of note, is the fact that the company certainly was aware of this. And there is some testimony that Mr. Martelli knew that Mr. Perkins was alleging, at least after March 11, 2009, before he was terminated, that Mr. Martelli was the individual that started calling him "nigger," and that my client presented these grievances of race discrimination.
> . . .
> At the least, your Honor, this individual who was certainly aware that there were racial grievances being filed against him, that on the date he was terminated, the same individual that called him a nigger on March 11, 2009, was the individual that ultimately terminated him on May 10th, 2009.  Based upon these facts, your Honor, we believe that there is a causal connection between the claims of race discrimination, as well as the ensuing termination as by Mr. Martelli.
> THE COURT: I think it's a close question, but I think there is sufficient evidence that the jury could draw a reasonable inference that Mr. Martelli was aware of this. So I am going to deny the Rule 50 motion.

(Tr. 1250:6-1253:13.)

testimony that he did not speak directly with Mondragon or Martelli about the March 11, 2009 incident.  Because the grievance was directed at Martelli, the jury could have relied on this evidence to find that Martelli approved of firing Perkins because Perkins "opposed racially discriminatory treatment." (Special Interrogatories Doc. No. 143-12.)[15]

     Under Rule 60(b)(1), "when a party requests a new trial on the basis of surprise testimony it must be able to show surprise, prejudice, and an attempt to cure the prejudice such as a motion for a continuance." *Marino v. Otis Eng'g Corp.*, 839 F.2d 1404, 1411 (10th Cir. 1988) (Timbers, J. dissenting).  Perkins contends that Defendants have advanced only "naked assertions" that they were surprised by this evidence. However, Defendants have persuasively asserted that they did not know that Perkins and Medina would testify about the additional grievance; therefore, Defendants have shown surprise.

     In addition, Defendants argue that they were materially prejudiced by this evidence and that Defendants' lack of knowledge about this evidence put Defendants at a disadvantage both prior to trial and at trial.  Prior to trial, Defendants were unable to investigate the circumstances surrounding the grievance, and why the Union lost it.  And Defendants were prejudiced at trial as illustrated by Defendants' attempt to counter the testimony with Ted Kouba's testimony that FFP

---

     [15] In answering the Special Interrogatories for Perkins' Retaliation claim against Martelli, the jury answered "yes" to the interrogatory: "[d]o you find from a preponderance of the evidence: . . . [t]hat Plaintiff Richard Perkins opposed racially discriminatory treatment by filing grievances and making reports to Defendant Michael Martelli?" The jury answered "yes" to the interrogatory asking whether "Defendant Michael Martelli discharged Plaintiff Richard Perkins from his employment because he opposed racially discriminatory treatment?"  The first quoted interrogatory pointed the jury to Perkins' protected activity of filing grievances and making reports to Martelli, and the latter interrogatory directed the jury to base its answer on grievances and reports.  Among the evidence of Perkins' grievances, the missing grievance about Martelli's use of racial epithets would have been an obvious basis for answering "yes" to the latter interrogatory.

never received this grievance, which actually may have supported Perkins' explanation that the grievance existed but was now missing.  Thus, the Court concludes that Perkins' failure to inform Defendants about this significant piece of evidence caused Defendants to be unfairly prejudiced in their defense of Perkins' retaliation claim against Martelli.

Perkins further contends that Defendants failed to attempt to cure the prejudice because Defendants did not object to or move to strike the testimony about the grievance, and Defendants did not move for a continuance of the trial.  The Court finds that Defendants sufficiently attempted to cure the prejudice during cross examination of Perkins and Medina and by offering the testimony of Ted Kouba.  Ted Kouba's testimony that FFP received no grievance about racial epithets was an attempt to refute Medina's testimony that FFP must have known about the grievance because Medina faxed grievances to FFP as a matter of course.  The Court finds that under Rule 60(b)(1), Defendants have shown that they were surprised, that they were prejudiced, and that they attempted, albeit unsuccessfully, to cure the prejudice caused by the  testimony about the grievance.

Perkins asserts that he committed no discovery violation because he had no obligation to produce the grievance, since the document was not in Perkins' custody or control.  However, Perkins misinterprets Defendants argument.  Defendants contend they were not informed that the grievance existed.  Perkins had a duty to inform Defendants that Perkins and Medina would testify that Perkins prepared the grievance and the Union lost it.  Defendants were entitled to rely on Perkins' statement that "**no written or recorded statements were taken** other than those identified in Plaintiff's 26(a)(1) Disclosures, . . ." (Mot. Ex. A-3 at 6) (emphasis added).  With that statement, Perkins represented to Defendants that there would be no evidence at trial about written grievances other than those provided to Defendants prior to trial.  Defendants should

have been informed about Perkins' intention to offer testimony about a missing grievance because it was a "written or recorded statement[] taken," and it was a grievance "filed" with the Union, even though the Union did not move the grievance through the arbitration process.  By failing to inform Defendants that Perkins would offer testimony that he prepared a grievance complaining about racial epithets, but that grievance is missing, Perkins prejudiced Martelli in his defense against Perkins' retaliation claim.  Thus, under Rule 60(b)(1), the Court will vacate the Judgment in part and will grant a new trial on Perkins' retaliation claim against Martelli.

Defendants also assert that the Court should grant a new trial under Rule 60(b)(3) for "misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3).  Defendants cite *Madere v. Compass Bank*, Case No. A-10-CV-812, 2012 WL 5208538 (W.D. Tex. Oct. 22, 2012), in which the court granted a new trial under Rule 60(b)(3) in an employment discrimination case.  At the trial in *Madere*, the plaintiff alleged that Compass Bank terminated and failed to rehire her because she took leave under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. (FMLA). *Id.* at *1.  After the jury found in favor of the defendant on both claims, the plaintiff in a post trial motion, cited two instances of misconduct by Compass Bank that warranted a new trial under Rule 60(b)(3).  First, after discovery had closed, Compass Bank disclosed the identity of its primary witness, human resources employee Bianca Ramos, who testified that Compass Bank did not rehire the plaintiff because she lacked the qualifications for branch manager.  The plaintiff contended that Compass Bank prevented the plaintiff from contradicting Ramos' testimony by not disclosing Ramos as a witness until after discovery ended.  Second and more importantly, the plaintiff contended that Compass Bank violated a discovery order by failing to inform the plaintiff until the day before trial about a person, named Dennis, who Compass Bank had hired as a branch manager.  And it was not until after trial, that the plaintiff obtained records

48

related to Dennis's qualifications, which should have been produced by Compass Bank. Through those records, the plaintiff learned that Dennis was less qualified than plaintiff for the position. *Id.* The court held that Compass Bank's misconduct prevented the plaintiff from having a fair trial, and the court granted a new trial. *Id.* at *3.  The court noted that a party who contends that she has been a victim of misconduct justifying a new trial under Rule 60(b)(3) need not demonstrate prejudice in a traditional sense, but rather must show she was prevented from fairly presenting her case:

> Although Rule 60(b)(3) applies to misconduct in withholding information called for in discovery . . . it does not require that the information withheld be of such a nature as to alter the result in the case. . . . This subsection of the rule is aimed at judgments which were unfairly obtained, not at those which are factually incorrect.

*Id.* at *4 (citing *Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1339 (5th Cir.1978) (citations omitted)).

> Madere contends that, without Dennis' personnel file, she was significantly hamstrung in attacking Ramos. . . . She asserts that without Dennis' file she was denied the most effective impeachment evidence there could be-evidence of someone hired by Ramos who had less impressive qualifications than Madere. The Court agrees. . . . While the undersigned is loathe to ever set aside a jury's hard work and deliberate decision, Rule 60(b)(3) exists to protect the integrity of the trial process and that integrity was undermined here.

*Id.* at *5 (footnote omitted).  The court vacated its judgment and granted a new trial on the plaintiff's failure to rehire claim. *Id.*

Perkins argues that Defendants failed to meet the standard in this circuit for a new trial based on a party's misconduct.  In *Zurich North America v. Matrix Service, Inc.*, the Tenth Circuit affirmed the denial of a Rule 60(b)(3) motion and discussed the standard required to set aside a judgment for "fraud, . . . misrepresentation, or other misconduct of an adverse party." 426 F.3d 1281, 1290 (10th Cir. 2005).  "[T]he party relying on Rule 60(b)(3) must, by adequate

proof, clearly substantiate the claim of fraud, misconduct or misrepresentation." *Id.*  Moreover,

"the challenged behavior must *substantially* have interfered with the aggrieved party's ability

fully and fairly to prepare for and proceed to trial." *Id.* (quoting *Woodworker's Supply, Inc. v.

Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (emphasis in original)).

Applying this standard, the Tenth Circuit found that Zurich had failed to establish fraud by clear

and convincing evidence because its proof of misconduct consisted only of the opposing party's

"failure to produce documents." *Id.* at 1292.  The Tenth Circuit explained that even though "a

failure to disclose requested information during discovery may constitute misconduct under Rule

60(b)(3)[,]" this type of violation "usually requires the violation of a specific discovery request

or order." *Id.* The Tenth Circuit agreed with the district court's conclusion that the defendant's

obligation to disclose the documents at issue, was "less than clear[,]" and the "proper remedy for

any perceived violation of discovery is to seek redress under Rule 37(a)(2), not to wait until after

summary judgment and file a Rule 60(b)(3) motion." *Id.*  Finally, the Tenth Circuit expressed

doubt as to whether the defendant's failure to produce the documents at issue "truly impaired

Zurich's ability to present its case. . . ." *Id.*  The Tenth Circuit concluded that the discovery

abuses in that case did not rise to the level of fraud between the parties. *Id.*

    The situation presented here is more similar to the situation in *Madere* and less like the

situation *Zurich*.  Perkins did not merely fail to produce a document, he failed to inform

Defendants of the existence of a critical document about which he intended to present testimony.

Moreover, since the document existed but is now missing, Defendants' only recourse would

have been to impeach the circumstances surrounding the Union's loss of the document, which

Defendants were unable to attempt without knowledge of the document's existence.  Unlike the

situation in *Zurich*, Defendants could not have sought redress prior to trial under Rule 37

50

because before trial Defendants lacked knowledge that the missing grievance existed.  Finally, as in *Madere*, the grievance was significant proof of Perkins' protected activity, and as such, the evidence was relevant to a pivotal issue: that Martelli agreed with Mondragon's decision to fire Perkins because Perkins reported racially offensive conduct by Martelli.

The Court concludes that Defendants were prejudiced by Perkins' failure to inform them about the missing grievance, and this failure resulted in a judgment "unfairly obtained." *Madere*, 2012 WL 5208538 at *4.  Perkins' failure to disclose his intent to offer testimony about a missing grievance substantially interfered with Defendants ability to prepare for and proceed to trial. *Zurich*, 426 F.3d at 1290-92; *Madere*, 2012 WL 5208538 at *5.  Defendants were prejudiced by Perkins' failure to inform Defendants that Medina and Perkins would testify about a missing grievance that complained about Martelli's use of a racial epithet, which was important protected activity supporting Perkins' retaliation claim against Martelli.  Hence, the Court will vacate the judgment against Martelli on Perkins' retaliation claim and will grant a new trial on that claim under Rule 60(b)(1) and Rule 60(b)(3).

### 4. Perkins' Arrests and Legal Proceedings

In Defendants' interrogatories and requests for production, Defendants asked Plaintiffs to describe "for the last ten (10) years each and every civil and criminal case, charge, and proceeding to which you have been a party, including but not limited to administrative proceedings, judicial proceedings, and bankruptcy proceedings." (Mot. Ex. A-3.)  At Perkins' deposition, Defendants' counsel asked Perkins whether he had ever been arrested without mentioning the ten-year time limitation.  Perkins informed Defendants in written answers to interrogatories, in responses to requests for production, and at his deposition that he had been arrested twice: 1) in 2004 on a charge of criminal damage to property, which was later

51

dismissed; and 2) in 2008 for "misdemeanor charge in relation to a domestic dispute . . ." (Mot. Exs. A-1, A-3.)

Following trial, Defendants discovered that Perkins had been arrested more than twice: 1) in 1997, Perkins was arrested for domestic battery, and after Perkins pleaded guilty, he was ordered to participate in a treatment program (Mot. Ex. D)[16]; 2) in 2000, Perkins was arrested for violating an order of protection (*Id.*); 3) in 2001,Perkins was arrested for domestic battery in response to a complaint by Christina Mannon, and Perkins pleaded guilty (Mot. Ex. D-3); 4) in 2004, Perkins was arrested and charged with criminal damage to property and disorderly conduct (Mot. Ex. D-5); and 5) in 2008 Perkins was arrested for assault and harassment, and Perkins pleaded guilty (Mot. Ex. D-9).

Also following trial, Defendants discovered that Perkins was involved in other legal proceedings: 1) between March 1984 and October 2005, Perkins was involved in several paternity suits (Mot. Ex. E); 2) in 2000, Perkins was in divorce proceedings (Mot. Ex. D); 3) in October 2003, Perkins was sued in small claims court (*Id.*); 4) in December 2003, a complaint for forcible entry and detainer was filed against Perkins, and Perkins was ordered to pay damages (*Id.*)[17]; and 5) in January 2004, a domestic protective order was entered against Perkins (*Id.*).

Perkins responds that on the date of his deposition, September 29, 2011, he properly disclosed his arrests and legal proceedings for the previous ten years, which would not have included the 1997 arrest and the 2000 arrest.  Perkins further contends that even if he had

---

[16] Exhibit D attached to the Motion is different from Exhibit D admitted at trial.

[17] In his deposition, Perkins testified that the charge of criminal damage to property stemmed from this forcible entry and detainer proceeding. (Mot. Ex. A-1 at 12:7-18.)

disclosed the additional information about criminal activity that Defendants discovered post trial, the evidence would not have been admissible because it is irrelevant under Fed. R. Evid. 401,[18] but if relevant, the evidence would have been inadmissible under Rule 403 as overly prejudicial or confusing to the jury.[19]  Perkins further argues that the evidence about his arrests and convictions would have been inadmissible under Rule 609 as impeachment evidence.

Under Fed. R. Evid. 609, evidence that a witness has been convicted of a crime is admissible if the crime is a felony or if the crime involved dishonesty or fraud, and the Court must perform the Rule 403 analysis if the conviction occurred more than ten years prior to the date the information is requested:

---

[18] Evidence is relevant if:

> (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
> (b) the fact is of consequence in determining the action.

Fed. R. Evid. 401.

[19] "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Fed. R. Evid. 403.

(a) In General. The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction:

> (1) for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence:

>> (A) must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant; and
>> (B) must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant; and

> (2) for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving--or the witness's admitting--a dishonest act or false statement.

(b) Limit on Using the Evidence After 10 Years. This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:

> (1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and

> (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

Fed. R. Evid. 609.

Because Perkins' convictions did not involve crimes of fraud or dishonesty, and the convictions were not for felonies, the Court would not have allowed Defendants to present evidence of the convictions under Rule 609(a). But even if the crimes were felonies or crimes involving fraud or dishonesty, the Court would not have admitted them as evidence under Rule 403. All but one of the crimes for which Perkins was convicted involved domestic violence, a reprehensible subject that might evoke an overly emotional response among jurors. This evidence may also have caused the jury to consider Perkins a person of questionable character, and this type of character evidence has no relevance to the issues before the jury: discrimination and retaliation. More importantly, even though this evidence would have been technically

54

relevant to Perkins' credibility by showing prior inconsistent testimony, the Court would have excluded it because its relevance is far outweighed by the danger of unfair prejudice.  With regard to the civil proceedings, especially the paternity suits, these have no relevance to any of the claims in this case, but even if minimally relevant to Perkins' credibility as prior inconsistent testimony, the Court would have excluded this evidence under Rule 403.

5.  Perkins' Children and Personal Matters

At his pretrial deposition, Perkins testified that he had four children. (Ex. A-1 at 13:9-12.)  Before beginning cross examination of Perkins at trial, Defendants requested a side-bar conference and asked the Court to allow them to present evidence that Perkins' FFP wages were garnished for eight children to rebut Perkins' contention that after he was fired from FFP he suffered emotional distress due to financial hardship. (Tr. 1103:4-25.)  Defendants wanted to present evidence that during Perkins' employment with FFP, his paychecks, which were subject to the garnishment orders, were significantly lower than his post discharge take-home pay from GT Express, which was not garnished.  The Court allowed Defendants to question Perkins about mandatory deductions from his paychecks at FFP, but the Court did not allow Defendants to

identify those deductions as child support payments.[20]  At the same side-bar conference,

Defendants stated that they were going to point out Perkins' deposition testimony, which was

inconsistent with the garnishment orders for eight children, to attack Perkins' credibility.  In

response, Perkins' counsel argued that the evidence was inadmissible as impeachment evidence

---

[20] At trial, after the jury was excused, the Court ruled on the Defendants' request to ask about Perkins' child support obligations:

> THE COURT: Okay. I should explain the ruling. The mention of garnishments for child support I think would be unfairly prejudicial to Mr. Perkins. Your ultimate point here, as I understand it, is that when he was last working for Federal Fruit & Produce, because of deductions for taxes and garnishments for child support, he had a very small net take-home pay.
> MS. KEIMIG: Correct.
> THE COURT: Then when he started working on contract in 2010, there were no deductions and his take-home pay was essentially what his gross pay was; is that correct?
> MS. KEIMIG: Correct.
> THE COURT: I think you can make that point without getting into garnishments for child support. So that's the reason for my ruling under 403.

(Tr. 1104:17-1105:6.)

because Perkins had contested and prevailed in paternity disputes as to the additional children.[21]

In the Motion, Defendants assert that after trial they discovered that, contrary to Perkins' counsel's statements, Perkins had been legally determined to be the father of the additional children in paternity cases. (Mot. Ex. E.)  However, Perkins submitted an affidavit attached to Plaintiffs' Response to the Motion, in which he testifies that he believed he was not the father of the additional children based on information from the children's mothers. (Resp. Ex. 2.)

Defendants also assert that prior to trial Perkins made misrepresentations as to other

---

[21]

THE COURT:  Well, I guess there's a question as to whether he truthfully answered at the deposition because some of these children have been determined not to be his; is that correct?

MR. ELKUS: That is correct, your Honor.

MS. KEIMIG: Three children by three different women he contested paternity on?

MR. ELKUS: I am sorry that counsel doesn't like that answer, but the reality is it's true, and he's going to go into -- now he's going to go into testimony and say, Hey, by the way, ladies and  gentlemen of the jury, **it was determined in a court of law that these aren't my kids.** I am sorry that counsel may not like that answer, but that's true. **It's not impeachable, because he didn't lie.**

. . .

THE COURT: I think this is an issue that is unfairly prejudicial under Rule 403, and I'm going to instruct you not to inquire about the number of children that he has, **because of the confusing aspect of whether some of these children for whom he was ordered to pay child support, I guess, were eventually determined not to be his children**. And that's the representation made by counsel for the plaintiff. . . .

. . .

THE COURT: Again, I think the area is extremely confusing, and inquiry into the number of children that Mr. Perkins has and his obligations for child support of those children, **whether they may or may not be his natural children,** would tend to introduce an issue that is quite confusing and would tend to confuse the jury, as it has already tended to confuse me. Moreover, I think it is highly prejudicial to bring to the attention of the jury the fact that Mr. Perkins may have been obligated to pay child support for multiple children. **It may have some probative value in terms of impeachment, but I think that probative value is significantly outweighed by the risk of unfair prejudice and confusion of the jury.**

(Tr. 1106:22-1109:21) (emphasis added).

personal information.  At his deposition, Perkins testified that Christina Mannon, the person who accused Perkins of domestic abuse in 2001, was unrelated to Dorothy Mannon, the mother of one of Perkins' children, Linda Mannon. (Mot. Ex A-1 at 14: 9-13.)  Defendants determined after trial that Christina Mannon is Linda Mannon's aunt, and Christina Mannon was granted custody of Linda in 1998. (Ex. F.)  Defendants claim that Perkins' misrepresentations about his relationship to the Mannons and about his children would have been relevant to impeach Perkins' credibility.  Defendants maintain that without this information, Defendants' were unable to adequately impeach Perkins' veracity, an issue vital to their defense.

As the Court ruled at trial, Perkins' paternity issues and Perkins' statements about the Mannons are inadmissible, and the Court would exclude this new evidence even as impeachment evidence.  The inaccuracy of Perkins' deposition testimony about the Mannons and the number of children he has might be minimally relevant to Perkins' credibility; however, the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or confusing the issues for the jury.  Thus, under Rule 403 this evidence of Perkins' incomplete disclosures would not be admissible.

At oral argument on the Motion, Defendants' counsel contended that if a person will lie about his children, he will lie about anything. (Tr. Hrg. Nov. 19, 2012 at 51:2-4.)  This argument is purely speculative.  Perkins testified by affidavit attached to his Response to the Motion that he had a good faith belief that he was not the father of the additional children, but that he had not sought to overturn child support orders because he could not afford the cost of paternity testing. (Resp. Ex. 2.)  The information, even as explained by Perkins, would have been confusing to the jury and would have turned the trial about discrimination and retaliation at FFP into a mini trial concerning Perkins' paternity issues.  In sum, despite Defendants' post trial discovery of

58

information about Perkins' paternity suits and the Mannons that is inconsistent with Perkins'

deposition testimony, this evidence is inadmissible even as impeachment evidence.  Thus, no

new trial can be ordered on the basis of this new evidence.

6.  Perkins' Damages For Lost Wages And Benefits Must Be Retried.

The jury awarded Perkins $26,697 in net lost wages and benefits against both FFP and

Martelli on Perkins' retaliation claims.[22]  In the Judgment, to avoid a double recovery of these

damages, the Court imposed on FFP and Martelli joint and several liability for the $26,697

award.  Defendants contend that at trial they were surprised by Perkins' new and shifting

allegations regarding his post discharge employment and ability to work. (Mot. at 19.)

Defendants also refer the Court to DEFENDANTS' MOTION FOR REMITTITUR OF THE

JURY VERDICT PURSUANT TO FED. R. CIV. P. 59(e) (Doc. No. 174) (Motion for

Remittitur), in which Defendants argue that Perkins' expert on economic damages, Dr. Patricia

Pacey, determined Perkins' lost wages and benefits based on "mere speculation" since Dr. Pacey

did not review any employment compensation documents such as check stubs or tax forms but

relied only on information from Perkins and his counsel.  In this ruling, the Court considered

those arguments as well.

---

[22] The jury was instructed how to determine the amount of Perkins' lost wages and benefits:

> wages and/or fringe benefits you find Plaintiff Richard Perkins would have earned in his employment with Federal Fruit and Produce if Plaintiff Richard Perkins had not been fired, minus the amount of income received by Plaintiff Richard Perkins from the date of the termination to the present date.  You must not calculate and award wages for any period of time during which Plaintiff Richard Perkins was unable to work due to illness, injury, or other cause.

(Jury Instructions Doc. No. 143-6 at p. 30.)

At trial, Perkins, through Dr. Pacey, asked the jury to award $67,894 in lost wages and benefits. (Tr. 853:20-21.)  The date Perkins began employment after he was fired by FFP and the amount of wages he earned from that later employment were crucial facts for determining whether Perkins should be awarded this amount.  Defendants argue that, as indicated by her testimony, Dr. Pacey arrived at $67,894 based on materially inaccurate information.  Defendants also point out that Perkins' testimony at trial conflicted with his pre-trial disclosures about when he started his post discharge employment and how much he earned.  Defendants maintain that when viewed in conjunction with the other discovery violations and surprise evidence at trial, this conflicting evidence requires an order setting aside the verdict and Judgment in favor of Perkins or in the alternative, a new trial.

In Perkins' supplemental answers to Defendants' interrogatories, Perkins stated that after he was fired from FFP, he started driving as an independent contractor for GT Express in May 2011. (Mot. Ex. A-7 at 3.)  At Perkins' deposition, he testified that in May 2011 he began working full time for GT Express and received $500 per week.[23]  However, Dr. Pacey testified

---

[23] At his deposition on September 29, 2011, Perkins testified,
Q.  Are you currently working?
A.  Yes, you could say I'm working, yes.
Q.  Where?
A.  GT Express.
. . .
Q.  What's your compensation there?
A.  It's 500 a week.  So that comes out to, I don't know, $14 an hour of something like that.  I'm not sure.
Q.  When did you start there?
A.  Probably in May, probably.
Q.  How many hours a week are you working?
A.  Oh, wow.  the hours are long.  the days are long because my route is – it's a pretty big route.  I would say at least 10 hours a day, at least.
(Perkins Dep. 40:19-41:21 Mot. Ex. A-1.)

that prior to trial Perkins told her he began working only intermittently for GT Express in May 2011 and he did not work full time until the latter months of 2011.[24]  Dr. Pacey testified she determined Perkins' actual earnings on the assumption that for the last couple of months in 2011, Perkins began to earn full time pay from GT Express:

> Q. Did Mr. Perkins actually tell you the month in which he allegedly went from part-time work to full-time work, or was that just part of the assumptions that you made?
> A. My recollection is that he had said it was very intermittent in the earlier months, and that on or about the time we were issuing the report, I believe we talked to the attorneys, and we thought he had gone close to $500 a week on a regular basis in the latter couple of months in 2011, and that's how we came up with that estimate.

(Tr. 874:6-14.)  Dr. Pacey testified that she estimated Perkins' actual earnings for 2011 from information she received from Perkins and his counsel because Perkins provided her no documentation to support his earnings. (Tr. 872:6-873:16.)

At trial, Perkins contradicted both Dr. Pacey and his own discovery responses and

---

[24]  At trial, Dr. Pacey testified,

Q. Now you learned in your interview with Mr. Perkins . . . in September 2011 that he had begun working at that time with GT Express, correct?
A. I did understand that, yes.
Q. And he told you that he began working for GT Express in May 25 of 2011, correct?
A. I think -- I don't see it offhand, but it was around that time frame. Initially it was more part-time, but I think it was -- let me see if I can find it.
Q. Well, would it help refresh your recollection to look at your original report?
A. I am looking at it.
Q. Page 2, second full paragraph.
A. Yes. He began part-time in May, and then I think he moved up to a little bit better than part-time later in the year.

(Tr. 868:20-869:9.)

testified that he began working part time for GT Express in October 2010.[25]   Defendants then

cross examined Perkins about traffic tickets Perkins received in January and June 2010 while

driving a GT Express vehicle as indicating Perkins worked for GT Express earlier than October

_____

[25] At trial, Perkins testified:

Q. Are you telling us now that you started part-time before that [May 2011]?
A. I wouldn't even call it part-time. In October of 2010, I started to do just -- they would call me whenever they needed someone to cover for a guy that would be off. I can't recall how often it was, but it wasn't very often.
. . .
Q. So between October 2010 and May 2011, on a monthly basis how often would you estimate you worked for GT Express?
A. Maybe twice a month, because there were some months when they didn't call me. I would say maybe twice a month on average.
. . .
Q. Okay. So if you had to make a guess for those eight months, what would your guess be?
A. I would say ten, 12 maybe -- ten.
Q. And . . .  how much did you get paid?
A. It would vary. . . . I got paid by the day. At that time with GT if I worked a Tuesday or a Thursday, I think the compensation -- it might have been around, like, 90 bucks or something like that, and if it was a Monday, Wednesday or Friday, it was, like, $110. . . .
Q. Okay. Just so we're both clear on the timing here, October 2010, which is the first time you would have ever driven a van for GT Express, was a little over a month after your settlement with Federal Fruit & Produce, correct?
A. That's correct.

(Tr. 1135:1-1137:1.)

2010.  Perkins explained he was borrowing a GT Express vehicle at those times.[26]

Defendants attached to the Motion an affidavit of Richard Carroll, a hearing officer for the State of Colorado Department of Motor Vehicles, that Defendants acquired after trial. (Mot. Ex. C.)  Mr. Carroll stated that he held a hearing on the issue of Perkins' CDL suspension and at the hearing, Mr. Carroll determined Perkins incurred 12 points against his driver's license during the period between October 27, 2010 and August 24, 2011.  Under Colorado law, if a person incurs 12 points against his driver's license, his license can be suspended. (Aff. of Richard T. Carroll, ¶ 4.)  Mr. Carroll stated that Perkins informed him at the hearing that Perkins incurred the infractions or points "as a delivery driver to King Soopers Pharmacies." (*Id.* at ¶ 8.)  Therefore, Perkins was able to keep his license under a "chauffeurs" exception under Colorado

---

[26] Perkins testified at trial:

Q. Well, Mr. Perkins, it's true, is it not, that you were working for GT Express as far back as far back as June 2010, weren't you?
A.  No, ma'am, I don't think I was, no.
Q. Well, in fact, you were ticketed for speeding in a GT Express vehicle in Arapahoe County on June 14th, 2010, weren't you?
A. I wasn't working for GT Express at that time, no.
Q. Oh, you just happened to be in their vehicle?
A. I was using the van to move some furniture, and I got a speeding ticket.
. . .
Q. Well, isn't it true, Mr. Perkins, that you were working for GT Express even as far back as January 2010?
A. No, ma'am.
Q. Well, you were ticketed in a GT Express vehicle in Jefferson County in January 2010, weren't you? . . .
. . .
A. That is incorrect.
Q. Were you moving again?
A. No, ma'am, I was not moving.

(Tr. 1225:5-1227:12.)

law.[27] (*Id.*)  This evidence supports Perkins' trial testimony that he began working part time for

GT Express in October 2010, and that he delivered to King Soopers Pharmacies. (Tr. 1132:18-

19.)  However, this evidence is contrary to Perkins' pretrial disclosure to Defendants that he

began full time for GT Express in May 2011, and this evidence reveals that the information

given to Dr. Pacey, that Perkins began working part time in May 2011, was incorrect.

Importantly, the discrepancies in evidence at trial left the jury with no solid basis on which to

award lost wages and benefits because the jury had no way to calculate the amount of Perkins'

actual wages that would be subtracted from the amount of wages that Perkins would have earned

at FFP if he had not been fired.[28]

Defendants raise another problem related to Dr. Pacey's calculation of Perkins' lost

wages and benefits.  As mentioned above, on August 26, 2010, Perkins entered into a settlement

agreement with FFP and the Union concerning some of Perkins' grievances, other than Perkins'

grievances about racial discrimination and retaliation.  According to the settlement agreement,

Perkins was to receive $54,523.76 for lost wages and benefits from the date he was fired, May

12, 2009 to August 26, 2010. (Ex. P.)  In other words, the amount of $54,523.76 represented

Perkins' lost wages and benefits that he would have earned working at FFP from May 12, 2009

to August 26, 2010.  Dr. Pacey testified that she was informed of the settlement agreement and

the settlement amount.  However, Dr. Pacey was apparently given the wrong date of the

settlement because Dr. Pacey testified that her calculation of Perkins' lost wages and benefits

---

[27] *See* Colo. Rev. Stat. Ann. § 42-2-127 (1)(a) (2012).

[28] The jury asked for and was given a calculator. (Tr. 1400:1-14.) It appears that the jury
attempted to award lost wages and benefits to Perkins as accurately as they could based on
contradictory evidence presented at trial.

assumed Perkins had been compensated from the date he was fired to June 7, 2010. Consequently, Dr. Pacey's calculation of Perkins' total lost wages and benefits included wages and benefits for one and one half months for which Perkins had already been compensated under the settlement agreement.

At trial, Dr. Pacey gave confusing testimony that she calculated lost wages and benefits from June 7, 2010 forward, but she also determined the total amount of wages and benefits lost from the date Perkins was fired, May 12, 2009, to the date of trial, and from that total, she subtracted most, but not all, of the settlement agreement amount of $54,523.76.  Dr. Pacey explained that she removed from her calculation $10,000 to $12,000 of the settlement amount because she did not want to count monies that Perkins received for "out-of-pocket medical expenses because of [Perkins] motorcycle accident . . ." (Tr. 855:2-9.)  Dr. Pacey was also under the impression that the settlement agreement ". . . covered the loss or the value of [Perkins'] automobile for reasons that were related to the grievances in that settlement." (Tr. 855:10-12.) In sum, Dr. Pacey concluded that the settlement agreement amount of $54,523.76 included $10,000 to $12,000 that should not be subtracted from the calculation of Perkins' total lost wages and benefits: "So all that difference, it's about 10- or $12,000, is related to those . . . items. " (Tr. 855:13-15.)

There was no evidence that any part of the settlement agreement covered the loss of a vehicle.  And, Perkins' motorcycle accident occurred after the settlement agreement.  Hence, Dr. Pacey incorrectly deducted $10,000 to $12,000 from the settlement agreement amount.  Instead, Dr. Pacey should have subtracted the entire amount of the settlement, $54,523.76, from the amount Perkins' would have earned from FFP had he not been fired.

In Perkins' July 1, 2011 discovery responses, Perkins stated that he had been unable to

work because he had broken his femur in a motorcycle accident on March 12, 2011, he was in a

"full cast." (Mot. Ex. A-3 at 5.)  At trial, Perkins testified that he had broken his "shin" bone, and

he had been in a cast covering only his lower leg for five weeks after he had surgery to repair the

break.[29]  At trial, Perkins admitted that Dr. Pacey incorrectly subtracted medical expenses for the

---

[29] Perkins testified on cross examination:

Q. And you had your motorcycle accident on March 12, 2011?
A. It happened on March the 12th, yes.
. . .
Q. Did you break a bone?
A. Yes, I broke the bone in my lower left leg.
. . .
Q. Well, let me ask you this -- I want to talk about your discovery responses signed on July 1st of 2011.
. . .
Q. After that initial information you provide with respect to other employment or independent contractor work, you wrote: "Furthermore, I was involved in an accident on March 12th, 2011, while on my motorcycle," paren, "a vehicle clipped me and proceeded to leave the scene of the accident," close paren, "I fractured my femur in the accident and have not been able to work since, as I am still in a full cast and undergoing physical therapy." Do you see that?
. . .
Q. Okay. Did you not fracture your femur?
A. It was not my femur.
. . .
Q. When you swore on July 1st, 2011, that the accident had prevented you from working for some period of time, was that true?
A. Um, I was in a cast for approximately -- approximately five weeks.

(Tr. 1202:25-1206:5.)

accident from her calculation.[30]  In addition Dr. Pacey concluded that after the accident, Perkins would have missed three months of work so she deducted three months' worth of Perkins' wages and benefits from her calculation.  However, Perkins testified he was unable to work only five weeks after his accident.[31]

In Dr. Pacey's calculation of the total amount of wages Perkins would have earned from FFP, Dr. Pacey mistakenly assumed Perkins would have earned 5-10 hours of overtime pay per week.  However, the evidence showed that Perkins worked no overtime while he was at FFP. Dr. Pacey stated she was not given Perkins' actual pay stubs from FFP but relied on information from Perkins and his counsel:

─────────────────

[30] Perkins testified at trial:

Q. Do you recall [Dr. Pacey's] testimony that she determined with respect to the settlement proceeds that part of it -- part of those monies were attributable to compensating you for medical issues that  resulted because of your motorcycle accident?
A. I remember that was her testimony, yes.
Q. Okay. But I mean, your motorcycle accident happened after the settlement, right?
A. That's correct.
Q. Okay. So she was just mistaken about that, right?
A. Yeah, I think her dates were mistaken, yes.

(Tr. 1202:12-21.)

[31] Dr. Pacey testified at trial:

A. Now in 2011, . . .  I took out about three months of wages for that year because my understanding is Mr. Perkins was in a motorcycle accident, a hit and run, and he was hurt and was likely not able to work for a couple of months anyway. . . . I took out approximately three months of that salary and saying he probably wouldn't have been able to work. That's not related to the termination. He probably even if he was still working [at FFP] . . . would have to take that time off and likely not take it off paid. . . .

> Q. You didn't look at any of Mr. Perkins' paychecks from Federal Fruit & Produce, correct?
> A. I don't believe I have those.
> Q. That would have reflected his true overtime, correct?
> A. It could have, yes.

(Tr. 883:13-17.)

Defendants contend that the Court should set aside the jury's entire verdict under Rule 60(b)(1) because Defendants were unfairly surprised and prejudiced at trial by Perkins' new allegations about his post discharge employment and ability to work. The new allegations at trial also revealed that Dr. Pacey's calculation was based on incorrect assumptions. In addition to receiving wrong information about the date on which Perkins began post discharge employment, Dr. Pacey was given inaccurate information, (1) that Perkins worked 5-10 hours of overtime every week at FFP, (2) that Perkins' medical expenses and the value of a vehicle were included in the settlement agreement, and (3) that Perkins was unable to work for three months after the accident.

Perkins argues that his employment with GT Express was thoroughly explored at trial by Defendants; therefore, the jury was able to account for the conflicting evidence and calculate the amount of lost wages and benefits. Perkins further contends that since the jury awarded, $26,697, much less than the $67,894 requested by Perkins, the jury ably determined the correct award despite the conflicting evidence at trial. However, Perkins' argument fails to address the Defendants' contention that they were surprised and prejudiced at trial on this issue when the new allegations surfaced at trial. Defendants further argue that Perkins' lack of pretrial disclosure on this issue must be considered with the other surprise evidence, particularly the additional March 11, 2009 grievance, that in combination left Defendants at an unfair disadvantage at trial. In addition, despite its efforts, the jury was not able to accurately account

for the discrepancies.  The award simply seems to have been the jury's best guess based on the evidence at trial. *Schwab v. Martino*, No. 05-cv-1456, 2007 WL , *7-9 (D. Colo. Dec. 17, 2007) (granting motion for new trial and setting aside award of future medical expenses as economic damages because the plaintiff failed to give the jury an estimate for the cost of future medical expenses beyond a general description ) (unpublished decision).

The inaccurate information given to Defendants prior to trial, on which Dr. Pacey based her calculations, justifies setting aside not only the jury's award of damages for Perkins' lost wages and benefits but also the Court's Judgment imposing joint and several liability on FFP and Martelli for those damages.  The Court has set aside the jury's verdict on Perkins' retaliation claim against Martelli, and the Court has ordered a new trial on that claim.  Therefore, due to the surprise evidence and incorrect information incorporated into Dr. Pacey's opinion, the Court will require Perkins to prove his lost wages and benefits at the retrial of Perkins' retaliation claim against Martelli.  Although it appears that the jury attempted to determine the correct amount of Perkins' lost wages and benefits, the Court finds that the jury could not have accurately decided how much to award Perkins for lost wages and benefits, and the Defendants could not defend against allegations as to lost wages that changed at trial.[32]

7.  Miller's Arrests, Legal Proceedings and Marriage

In Defendants' interrogatories and requests for production, Defendants asked Miller to

---

[32]  The Court recognizes that this ruling is similar to a remittitur ruling; however, the Court is not asking the parties to either agree to a lower amount of damages for lost wages and benefits or agree to a new trial.  Instead, the Court is granting a new trial on the amount of these damages due to the conflicting information given to Defendants prior to trial.  Perkins failed to supplement his discovery responses in which he told Defendants he began working for GT Express full time in May 2011, whereas at trial, Perkins claimed for the first time that he began working part time for GT Express in October 2010.  This ruling recognizes Perkins' lack of candor in discovery on this and other subjects as the basis on which to order a new trial.

identify all civil and criminal proceedings in which he had been a party during the previous ten years. At his deposition, Defendants asked Miller if he had ever been arrested, without mentioning the ten-year time limitation. Miller stated he had been arrested once in the 1990s, he could not remember on what charge, and the charge was dismissed. Miller testified he had been involved in no other legal proceedings. (*See* Mot. Ex. A-2 at 8:5-10:2.) In Miller's supplemental answers to Defendants' interrogatories dated March 2, 2012, Miller added that in 2011 an arrest warrant had been issued against him, and Miller explained this happened because his employer had failed to pay a fine for a license plate infraction Miller received while driving the employer's truck. (Mot. Ex. A-8 at 3-4.)

Miller testified at his deposition that his wife is Debra Healey. (Mot. Ex. A-2 5:25-8:2; 36:15-37:16.) He testified that he and Ms. Healey have three children together and that they adopted two additional children. (*Id.*) In Miller's answer to Defendants' interrogatory asking about documents relating to his marriage to Debra Healey, Miller stated that he and Debra Healey had been together for approximately 28 years; however, they had "never co-mingled funds, joint bank accounts or any other type of account, agreement, or contract together; therefore, Mr. Miller has no such documentation." (Mot. Ex. A-9 at 5.) At trial, Miller testified that he had been married for 27 years. (Tr. 196:10-13.)

To prove his claim that he was entitled to compensatory damages for emotional distress and mental anguish, Miller testified that he experienced emotional distress after being discharged from FFP because for the first time he could not provide for his wife and children and he had financial difficulties that led to fights between him and his wife:

Q. Okay. Can you describe for this jury the emotional distress you felt as a result of the actions of Federal Fruit and Mr. Martelli?

A. It's pretty stressful when you've got to rely on your child to help you pay your bills, because of somebody else not liking you. Fights with my wife, my children, you know. It's just – it's really hard to get into detail – . . . because you don't know the proper words to use, I guess.

Q. Did you have sleepless nights?

A. Many sleepless nights. Many days without sleep.

Q. Has this caused you a lot of stress?

A. Yes. As I stated, you know, fighting with my wife, arguments with my children.

Q. Has this impacted your self-esteem in any way?

A. Yeah, very badly. I don't feel good about myself anymore. I don't even hardly want to even get up in the mornings.

(Tr. 244:4-20.)

Q. Okay. Do you recall your deposition, Mr. Miller, your telling Ms. Keimig that you also suffered emotional distress due to your financial situation?

A. Yes.

Q. Okay.

A. As I stated, you know, I have to rely on other people to help me pay my bills. That's not the type of person I am. I pretty much stand on my own two feet. I want to be able to take care of my family. I want to be able to take care of my grandkids. I have to have my daughter go apply for grants and money to go to school, continue her education, when I could be paying for that myself.

Q. Are you requesting that this Court -- are you asking this jury to award you damages for your pain and suffering?

A. Yes.

(Tr. 245:15-246:4.)

In the Motion, Defendants assert that after trial, Defendants learned that Miller represented himself as single in 1995-96 court records, and these records are important for two reasons: Miller's representation as to his marital status and Miller's failure to inform Defendants about the criminal cases associated with these records.  Miller was arrested in 1995 for failure to appear in court on a shoplifting charge, and on the Custody Report prepared in that case Miller's marital status is listed as "single" indicating that Miller told the officer filling out the Custody Report that he was not married. (Mot. Ex. H.)  This representation was made during the 27-year

71

period that Miller claimed he was married according to his deposition and trial testimony.  After

trial, Defendants also discovered that in 1996, Miller was arrested and charged with two counts

of felony criminal impersonation because Miller had used his brother's identity during two

traffic stops. (*Id.*)  Miller pleaded guilty to two counts of misdemeanor criminal simulation. (*Id.*)

On the Custody Report dated March 2, 1996, in connection with Miller's 1996 arrest, Miller's

marital status is listed as "single" indicating that Miller told the officer filling out the Custody

Report that he was not married. (*Id.*)  This representation was made during the 27-year period

that Miller claimed he was married according to his deposition and trial testimony. (*Id.*)

In response to the Motion, Miller argues that he was not required to disclose the

information about his 1995 arrest and 1996 conviction because these cases occurred more than

ten years ago.  However, in response to Defendants' question at Miller's deposition regarding

whether Miller had even been arrested, without the ten-year limitation, Miller should have

informed Defendants about these cases.  Miller further responds that his representations

regarding his marital status and information related to his marriage would not have been

admissible under Rule 403 as impeachment evidence or as rebuttal evidence concerning Miller's

claim of emotional distress.

At trial, Miller's testimony that he experienced emotional distress after he was fired from

FFP was the only evidence offered supporting Miller's claim for compensatory damages.  Miller

testified that his emotional distress stemmed primarily from the stress on Miller's marriage and

stress due to Miller's inability to support his children.  However, Miller also testified that he

suffered from low self-esteem. (Tr. 244:21-245:3)

At trial, Defendants sought to admit evidence, that Miller's CDL was suspended three

days after he began working for FFP because Miller had failed to pay child support obligations,

to rebut Miller's testimony about the stress on his marriage and that he had always supported his

children prior to his discharge.  This caused some confusion during a side-bar conference at trial

because Miller would owe child support only if he were not married:

> MS. COLAIZZI: Your Honor, in light of Mr. Miller's testimony with respect to the financial hardships that allegedly came out of his termination and his statements about how he allegedly cannot take care of his family, I believe that we have the right to go into the information about his license being suspended and about the fact that that is because of a financial obligation that he owed to his wife.
> THE COURT: Well, you can go into the business about his license being suspended and his ability to work, maybe, because of that, but I am still confused. **The testimony is he has been married for 27 years. How do you owe child support?**
> MS. COLAIZZI: I have no idea.
> MR. SISSON: He actually does not. He never owed his **wife** child support, your Honor. What happened was he -- his wife applied for government assistance, and the state advanced monies for the government assistance for the children. It's classified as child support.
> THE COURT: So he owes it to the state?
> MR. SISSON: **To the state. He doesn't owe anything to his wife**.
> THE COURT: You know, I am going to rule **under Rule 403 the issue of child support should not be gone into in front of the jury**. It's too confusing and prejudicial. So you can ask about whether he has been unable to work because he doesn't have a commercial driver's license.
> MS. COLAIZZI: We can bring out the fact it was suspended as long as we don't identify the reason?
> THE COURT: Yes.

(Tr. 247:3-248:5) (emphasis added).  Defendants point out that the statement by Miller's

counsel, that Miller did not owe child support to his wife, contradicts Miller's deposition

testimony that he owed child support obligations to his wife, Debra.[33]  Miller's child support

obligations, whether owed to his wife or to the state, are also confusing in light of Miller's claim

that he had been married for 27 years.[34]

At trial, Defendants were allowed to ask Miller about specific dates that his CDL was

suspended, but Defendants were not allowed to disclose that the suspension was due to unpaid

child support obligations.  During Miller's testimony, Defendants showed Exhibit HH, a copy of

---

[33] At Miller's deposition, Miller was asked about his employment after he resigned from
FFP:

> Q.  What were the dates of your employment with Knight Transportation following June
> of 2010?
> A.  I went to work for them in June of 2010 and left in February of 2011.
> Q.  What were the circumstances of your separating employment in February of 2011?
> . . .
> A.  My license was suspended.
> . . .
> Q.  What was it suspended for?
> A.  Child support.
> Q.   For nonpayment of child support?
> A.  Yes.
> Q.  For what child were you supposed to be paying support?
> A.  My three, my three children.
> . . .
> Q.  To whom were you supposed to be paying that?
> A.  Debra. . . .

(Reply Ex. B at 36:2-37:3.)

[34] In Miller's Response to the Motion, Miller seems to characterize his marriage as a
common law marriage presumably to explain why Miller represented that he had been married
for 27 years yet still owed child support obligations to his wife. (*See* Resp. at 10, 21, 22).
However, Colorado recognizes the legality of a common law marriage; therefore, even if Miller
were in a common law marriage, he could not owe his wife child support. *See In re Marriage of
J.M.H. and Rouse*, 143 P.3d 1116, 1117 (Colo. App. 2006) (stating, "Colorado is also one of
several states, along with the District of Columbia, that still recognize common law marriages.").
And, the fact that Miller had been married, even at common law, for 27 years (since 1985)
directly conflicts with Miller's representations in 1995 and 1996 that he was single.  However,
Miller's representation that he was single would explain how Miller could owe child support
obligations.

Miller's Colorado Motor Vehicle Record, to Miller to refresh his memory.  Defendants further

sought to admit Exhibit HH as an exhibit and offered a redacted version of Exhibit HH that

omitted references to child support.  Exhibit HH indicated that on November 22, 2008, three

days after Miller was hired by FFP, Miller's CDL was suspended until July 22, 2009, for

nonpayment of child support. (Ex. HH at 2.)  Exhibit HH also indicated that after Miller was

fired from FFP on July 10, 2009, Miller's CDL was suspended between September 21, 2009 to

February 2, 2010. (*Id.*)  Plaintiffs' counsel objected to the admission of Exhibit HH because the

evidence was not admissible as after-acquired evidence since Miller withdrew his claim for lost

wages.[35]  At a side-bar conference, Defendants argued that they were proffering redacted Exhibit

HH to rebut Miller's testimony that after he was fired from FFP on July 10, 2009, Miller

suffered financial hardship and emotional distress by showing that Miller's financial hardship

was due to his CDL suspension.  Second, Defendants argued that Exhibit HH should be admitted

as evidence that Miller's license was suspended three days after he was hired at FFP to generally

attack Miller's credibility because he failed to inform FFP that his CDL had been suspended.

The Court ruled that Defendants could elicit testimony about the dates that Miller's CDL was

suspended, but Defendants could not reveal that the suspension resulted from Miller's failure to

pay child support, and Defendants could not admit Exhibit HH into evidence as an exhibit even

---

[35] Prior to trial, Defendants originally sought to introduce evidence of Miller's CDL suspension for unpaid child support obligations as after- acquired evidence relevant to Miller's economic damages for lost wages.  Prior to trial, the Court ruled that evidence of Miller's CDL suspension could be admitted at trial as relevant to Miller's claim for lost wages, but that evidence showing that Miller's CDL was suspended for failure to pay child support was not admissible under Rule 403. (*See* ORDER CONCERNING PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE EVIDENCE RELATING TO SUSPENSION OF RICHARD MILLER'S CDL AND CHILD SUPPORT PAYMENTS, Doc. No. 112.)  Just before trial, Miller withdrew his claim for lost wages, and Defendants agreed not to offer evidence of Miller's CDL suspensions as after-acquired evidence.

if redacted.  Miller testified briefly about his license suspension:

> Q. . . . So Mr. Miller from September 21st, 2009, and February 2nd, 2010, you were not
> legally able to work as a truck driver in the State of Colorado, correct?
> A.  It appears that.

(Tr. 256:23-257:1.)

After Miller's testimony, Defendants again sought to offer, through the testimony of Ted

Kouba, the evidence that Miller's license was suspended soon after he began working at FFP to

impeach Miller's credibility.  The Court excused the jury and held another bench conference

during which Miller's attorney represented that when Miller worked for FFP, Miller was

unaware that his license had been suspended:

> THE COURT: . . . I understood that the defendants have withdrawn their intent to offer
> the after-acquired evidence about Mr. Miller's lack of a commercial  driver's license
> once Mr. Miller agreed not to pursue any claims for economic damages. . . .
> MS. KEIMIG: . . . **This testimony goes to Mr. Miller's veracity. His license was
> suspended literally days after he began working for Federal Fruit & Produce, but
> he declined to tell Federal Fruit & Produce that.** In fact, Federal Fruit & Produce did
> not discover that his license was suspended during virtually the entire period of
> employment with Federal Fruit & Produce, with the exception of literally the first four
> days. Mr. Miller declined to tell Federal Fruit & Produce . . . so this testimony goes to
> Mr. Miller's veracity.
> THE COURT: Did he misrepresent that on some forms?
> MS. KEIMIG: When he was hired, he presented a motor vehicle report that reflected his
> license as valid.
> THE COURT: Was it at the time he was hired?
> MS. KEIMIG: Yes. It was invalid four days later.
> THE COURT: Okay. Now after that -- after it became invalid, was he required to file –
> sign some form that indicated that he had a current license? . . . What I am getting at,
> when did he misrepresent, in your view, that he had a valid license?
> MS. KEIMIG: **It's an act of omission, not an act of commission, your Honor.**
> . . .
> THE COURT: Did this come up during Mr. Miller's testimony? Or cross-examination?
> MR. ELKUS: It did not, your Honor.
> THE COURT: Why did it not come up then?
> MR. SISSON: Because we had several sidebars and you ruled that they couldn't get into
> it. **Further, just for the Court's edification, he had no idea that his license was
> suspended, your Honor.  He found out, and got it switched two or three days before
> it was actually renewed in June, so it wasn't an act of omission or commission.  He**

76

**had no idea about it.**
THE COURT: How long was it suspended?
. . .
MR. SISSON: . . . Miss Keimig is right, I think it was three or four days after his hire, . . . November 22nd all the way through . . . June of 2009.
MR. ELKUS: . . . Your Honor, it's highly prejudicial, and it's just a way just to smear his name. It's -- the probative value -- it would certainly be probative for purposes of an after-acquired evidence issue, and that's all.
THE COURT: **It may have some probative value in terms of impeachment, but I think it's unfairly prejudicial, and the unfair prejudice outweighs its probative value. So since he did not, as I understand it, make an affirmative misrepresentation -- am I correct in saying that?**
MS. KEIMIG: You are correct, your Honor. What he did was fail to tell his employer that he wasn't supposed to be driving.
THE COURT: I understand. Well, I am going to rule that it's inadmissible under Rule 403.

(Tr. 814:9-818:18) (emphasis added).

Following trial, Defendants discovered evidence showing that, contrary to Miller's counsel's representation, one month prior to each suspension of his CDL, Miller was warned by correspondence from the Colorado Department of Revenue's Division of Motor Vehicles that his CDL would be suspended unless he paid the outstanding child support obligation. (Mot. Ex. G.) Defendants attach the three such letters to their Motion: one dated August 20, 2007, one dated October 20, 2008, and one dated August 19, 2009. (*Id.*) The letter dated October 20, 2008 addressed to Miller warned that if Miller did not pay an outstanding child support obligation, his CDL would be suspended on November 22, 2008. The October 20, 2008 letter shows that when Miller began work as a truck driver for FFP on November 19, 2008, Miller was aware that his CDL would be suspended on November 22, 2008 unless he paid the outstanding child support obligation. (*Id.* at 2.)

Defendants maintain that the Court would have allowed the admission of the evidence that Miller's license was suspended on November 22, 2008 as impeachment evidence and to

rebut Miller's claim of emotional distress if the Court had been informed that Miller had been given a month's notice of the suspension.  Defendants maintain they also should have been able to ask Miller about the warning letters and the CDL suspension as evidence that Miller presented a false job application to FFP and that Miller worked for FFP under the false pretense that he was legally able to drive FFP delivery trucks.  According to Defendants, if this strong evidence of Miller's lack of credibility had been presented to the jury, the jury may have disregarded or disbelieved Miller's testimony about his emotional distress, and the jury may not have awarded $50,000 in compensatory damages on Miller's retaliation claim against FFP.

Plaintiffs respond that all of the information regarding Miller's marriage, child support obligations, CDL suspension, and Miller's convictions would have been inadmissible at trial because the information is irrelevant under Fed. R. Evid. 401, but even if relevant, the Court would have excluded the evidence as overly prejudicial or confusing to the jury under Fed. R. Evid. 403.

> 8.  New Trial On Compensatory and Punitive Damages For Miller's Retaliation Claim Against FFP

In *Murray v. Cars Collision Center of Colorado*, after a jury verdict in favor of the plaintiff on his claims under Title VII and § 1981 for a hostile work environment, the plaintiff filed a document disclosing to the court that some of his deposition testimony was "factually inaccurate." Case No. 04 CV 1456, 2007 WL 685843, *3 (D. Colo. Feb. 2, 2007) (unpublished decision).  At a pre-trial deposition, the plaintiff testified that he had been convicted of only one crime, driving with a suspended driver's license in 2000. *Id.* In his post trial disclosure, the plaintiff admitted that in the previous ten years he had been convicted of seven crimes in Oklahoma including illegal distribution of narcotics, driving with a suspended license, driving

without a license, resisting arrest and speeding, driving under the influence, and check fraud. The defendant moved to vacate the judgment and to dismiss the claims or order a new trial under Rule 60(b)(2), (3) or (6) based on the plaintiff's failure to divulge his criminal history.

The court first analyzed five factors to determine whether to grant a new trial under Rule 60(b)(2): 1) the evidence was newly discovered; 2) diligence in discovering the evidence; 3) the evidence is not merely cumulative or impeaching; 4) the evidence is material; and 5) admitting the evidence would produce a different result. *Id.* The court emphasized that the plaintiff relied primarily on testimony to support his claims; therefore, witness credibility was very important to the plaintiff's claims of racial discrimination and hostile work environment. *Id.* at *6. The court further determined that the plaintiff's conviction for check fraud would have been admitted as relevant to the plaintiff's credibility. *Id.* The court found that even though the plaintiff's criminal history was available prior to trial, the evidence was "newly discovered evidence," and the defendant did not lack diligence because the information was not disclosed by the plaintiff: "[w]hile Defendant would have been wise to perform a criminal background check, Defendant was not obligated by law or circumstances to do so." *Id.* at *3. However, the court found that the evidence was not directly relevant to the plaintiff's harassment or hostile work environment claims, but ". . . a witness's credibility is always material." *Id.* at *7. The court determined that the defendant was prejudiced because the evidence would have "undercut" the plaintiff's credibility, "which was a pivotal issue in this case." *Id.* Despite these findings, the court determined that the evidence was merely offered for impeachment, so the third factor under Rule 60(b)(2), prohibiting a new trial based on new evidence that is merely cumulative or impeaching, was not met. *Id.* at *6.

The court then analyzed the motion under Rule 60(b)(3) and found that the defendant had

failed to meet the Tenth Circuit's heightened standard, which required, ". . . clear and convincing evidence to substantiate the claim of Plaintiff's fraud, misconduct, or misrepresentation . . . that Plaintiff acted with 'an intent to deceive or defraud the court,' by means of a 'deliberately planned and carefully executed scheme.'" *Id.* at \*7 (quoting *Yapp v. Excel Corp.*, 186 F.3d 1222, 1231 (10th Cir. 1999)). [36]  Instead, the court granted a new trial under Rule 60(b)(6). *Id.*

Under Rule 60(b)(6), the defendant argued that the plaintiff unfairly obtained a favorable judgment by "intentionally withholding material evidence," and it was not in the interest of justice to allow the judgment to stand. *Id.* at \*8.  The court concluded that the plaintiff's omission "unfairly hindered [d]efendant from being able to develop and mount its defense." *Id.* "To allow the judgment to stand offends justice and strikes this court as unequivocally inequitable." *Id.* The court ordered a new trial to rectify the inequity, and to provide the defendant the opportunity to use the evidence ". . . while preserving Plaintiff's opportunity to have his case resolved on the merits." *Id.* at \*9.

For newly discovered evidence to provide a basis for a new trial, the moving party must show: (1) the evidence was newly discovered since the trial; (2) the moving party was diligent in

---

[36] Courts in the Tenth Circuit have applied the heightened standard requiring a showing of "intent to deceive or defraud the court by means of a deliberately planned and carefully executed scheme" only when a movant claims that there has been fraud on the court.  In *Zia Hospice, Inc. v. Sebelius*, Case No. CV 09–0055 C, 2010 WL 3984741 (D. N.M. August 20, 2010), the court stated that fraud on the court has the heightened standard of proof while fraud or misconduct by an opposing party requires a showing by clear and convincing evidence that the opposing party misrepresented a material fact and that the misrepresentation substantially interfered with the movant's ability to prepare for trial. *Id.* at \*5.  "Because fraud by an opposing party and fraud on the court at times may overlap and because recently both were addressed by Rule 60(b), the two can be confusing.  Each, however, is distinct, and *the standard for showing fraud by an opposing party is lower than for showing fraud on the court.*"*Id.* (citing *Zurich*, 426 F.3d at 1290–91) (emphasis added).  This Court applied the lower standard required for fraud or misconduct by an opposing party in its earlier discussion of 60(b)(3). *See supra* at pp. 49-50.

discovering the new evidence; (3) the newly discovered evidence is not merely cumulative or impeaching; (4) the newly discovered evidence is material; and (5) a new trial with the newly discovered evidence would probably produce a different result. Fed. R. Civ. P. 60(b)(2). *See also*, *Zurich*, 426 F.3d at 1289-90 (finding that evidence did not meet the second requirement because Zurich's counsel knew the documentation was missing almost a year prior to the start of trial).

The Court finds that under Rule 60(b)(2), the new evidence regarding Miller's criminal history and about Miller's knowledge that his CDL was suspended four days after he began work for FFP warrants a new trial on damages with respect to Miller's retaliation claim against FFP. First, the evidence about Miller's notice that his license would be suspended and about Miller's criminal convictions was not discovered until after trial.  And although the evidence was technically available to Defendants, the Court finds that Defendants did not lack diligence because they relied on Miller's pretrial representations. *See Murray*, 2007 WL 685843, at * 3. The new evidence about Miller's conviction for criminal simulation is also sufficient to meet the requirements for a new trial under Rule 60(b)(2) because the evidence is not only relevant to Miller's credibility but the evidence is also relevant to rebut Miller's evidence that he suffered emotional distress as a result of being fired by FFP.

Under Rule 607, "[a]ny party, including the party that called the witness, may attack the witness's credibility." Fed. R. Evid. 607.  Under Rule 608, a party may impeach a witness "by cross-examining him about specific instances of conduct . . . if such conduct is probative of the witness' character for truthfulness or untruthfulness.  Such inquiry is within the discretion of the trial court subject to Rule 403." *United States v. Morales-Quinones*, 812 F.2d 604, 613 (10th Cir. 1987).  Defendants should  have been able to question Miller on cross examination about the

October 2008 letter he received from the Colorado Division of Motor Vehicles warning Miller about his CDL suspension scheduled for November 22, 2008, and Miller's failure to inform FFP that his CDL was scheduled to be suspended.  This evidence is relevant to Miller's overall credibility and specifically relevant to Miller's testimony that he was entitled to damages for emotional distress.  Significantly, Miller was the sole witness on his compensatory damages for emotional distress.

The Court would also have allowed Defendants to present evidence about Miller's conviction for criminal simulation, because it is relevant to Miller's credibility.  Under Fed. R. Evid. 609, evidence that a witness has been convicted of a crime is admissible if the crime involved dishonesty or false statement. Fed. R. Evid. 609(a).  Miller's 1996 conviction for criminal simulation involved a crime of dishonesty.  The Court would not have excluded under Rule 403 the evidence about Miller's 1996 conviction even though the conviction is more than ten years old .  The probative value of this evidence is bolstered by the fact that it involved misrepresentations made about Miller's identity to avoid tickets for driving infractions and to avoid having his license suspended.  The relevance and probative value of this evidence to Miller's credibility would have outweighed the danger of unfair prejudice.

In conclusion, the jury was given an incomplete picture on which to find that Miller suffered emotional distress damages.  The evidence about Miller's conviction for criminal simulation and the evidence that Miller received a warning letter prior to his employment with FFP that his CDL was scheduled to be suspended could have affected the jury's award of compensatory damages for emotional pain and mental anguish.  Evidence that in 1995 and 1996 Miller claimed to be single, but in 2012 Miller claimed to have been married for 27 years, whether by common law or statutorily, is important evidence regarding both Miller's credibility

82

and Miller's claim that after he was fired from FFP he experienced emotional distress because he was unable to support his wife and children.  Even the evidence that Miller had an obligation for child support, either to his wife or to the state, might be admissible at a new trial if Miller's marriage status is not fully explained.

At a new trial, in addition to allowing a jury to decide the amount of compensatory damages, if any, to award Miller, the Court will allow the jury to decide the amount of punitive damages for which FFP may be liable.  Although compensatory damages serve a different purpose than punitive damages,[37] determining the reasonableness of a punitive damage award requires a comparison to the amount of compensatory damages.  *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. at 418 (stating that ratio of punitive damages to compensatory damages is one factor in determining constitutionality of punitive damages award); *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1122-23 (10th Cir. 2004) (noting that the ratio of actual to punitive damages is a factor in examining whether district court abused its discretion in remittitur order); *Bielicki v. Terminix Intern., Co., L.P.*, 25 F.3d 1159, (10th Cir. 2000) (upholding district court's ruling that punitive damages were reasonable based on ratio between punitive and compensatory damages and other factors); and *Deters v. Equifax Credit Information Svcs.,Inc.*, 202 F.3d 1262, (10th Cir. 2000) (noting that "ratio of the punitive damages awarded to the actual harm inflicted on the plaintiff" is one guidepost in determining whether a punitive damage award is constitutionally excessive).  After allowing a jury to determine both compensatory and punitive damage amounts, the Court may thereafter determine whether the

---

[37] *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (noting that compensatory damages are intended to redress a plaintiff's concrete loss, while punitive damages are aimed at the different purposes of deterrence and retribution) (citing *Cooper Industries Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001)).

ratio of punitive damages to compensatory damages is reasonable.

The Court is limiting the new trial to Miller's compensatory and punitive damages because, while the credibility of Miller's testimony was crucial to Miller's claim of damages, Miller's testimony was not vital proof of liability for retaliation. *See Firestone Tire and Rubber Co. v. Pearson*, 769 F.2d 1471, 1480 (10th Cir. 1985) (upholding new trial on damages only because "[t]he confusion concerning the proper measure of damages . . . did not affect the determination of liability."). It was undisputed that Miller engaged in protected activity by testifying about Martelli's use of racial epithets at Moreno's union arbitration hearing. It was also undisputed that Miller was fired seventeen days after giving that testimony. And, although FFP claimed that Miller's accident in FFP's parking lot was the reason for Miller's discharge, Miller's allegation that this reason was a pretext for retaliation was supported at trial by documentary and testimonial evidence showing that several other FFP employees had serious accidents but were not discharged. Consequently, the newly discovered evidence concerning Miller's credibility would not have altered the outcome on liability. But, Miller's credibility was crucial to his claim of compensatory damages for emotional distress because Miller's testimony was the only evidence offered to show that Miller suffered emotional distress after he was fired from FFP. Furthermore, a new trial on compensatory damages requires a new trial on punitive damages. Accordingly, the Court will order a new trial on the amount of compensatory and punitive damages awardable on Miller's retaliation claim against FFP in addition to the new trial already granted on compensatory and punitive damages for Miller's retaliation claim against Martelli.

IT IS ORDERED that DEFENDANTS' MOTION FOR RECONSIDERATION AND TO VACATE TRIAL AND JUDGMENT IN FAVOR OF PERKINS AND MILLER (1) BECAUSE

OF IRREGULARITIES; (2) FOR LACK OF JURISDICTION; (3) PURSUANT TO THE

COURT'S INHERENT POWERS OR RULE 59 OR 60, AND/OR FOR A NEW TRIAL

PURSUANT TO RULE 59 (Doc. No. 164) is granted in part and denied in part as follows:

1. The verdict and Judgment on Perkins' retaliation claim against Martelli is vacated and

a new trial is ordered on Perkins' retaliation claim against Martelli.

2. Due to the conflicting evidence at trial regarding Perkins' post discharge earnings, the

award of lost wages and benefits to Perkins against FFP and Martelli, jointly and

severally, is vacated and a new trial is ordered as to the amount of Perkins' lost wages

and benefits.

3. The verdict and Judgment on Miller's compensatory and punitive damages is vacated

and a new trial is ordered on the amount of compensatory and punitive damages that

should be awarded to Miller on his retaliation claim against FFP, which is in addition to

the new trial already ordered on the amount of Miller's compensatory and punitive

damages on his retaliation claim against Martelli.

4. In all other respects the DEFENDANTS' MOTION FOR RECONSIDERATION

AND TO VACATE TRIAL AND JUDGMENT IN FAVOR OF PERKINS AND

MILLER (1) BECAUSE OF IRREGULARITIES; (2) FOR LACK OF JURISDICTION;

(3) PURSUANT TO THE COURT'S INHERENT POWERS OR RULE 59 OR 60,

AND/OR FOR A NEW TRIAL PURSUANT TO RULE 59 (Doc. No. 164) is denied.

_____

SENIOR UNITED STATES DISTRICT JUDGE

Entered this 14th day of May, 2013