UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**RICHARD PERKINS and**
**RICHARD MILLER,**
    **Plaintiffs,**

vs.                                                        **No. 11 CV 542 JAP/KBM**

**FEDERAL FRUIT & PRODUCE COMPANY, INC. and**
**MICHAEL MARTELLI,**
    **Defendants.**

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANTS' MOTION TO EXCLUDE
## EXPERT TESTIMONY OF PATRICIA L. PACEY, PhD

This case was tried before a jury in May 2012 and resulted in a jury verdict in favor of Plaintiffs. Defendants filed several post-trial motions one of which was partially granted by the Court. *See* MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR RECONSIDERATION AND TO VACATE TRIAL AND JUDGMENT AND/OR FOR A NEW TRIAL (Doc. No. 194). In that Memorandum Opinion and Order, the Court, *inter alia*, set aside the damages awarded by the jury to Plaintiff Perkins for lost wages and benefits because the evidence presented by Perkins regarding his post discharge employment was inaccurate and misleading.  Consequently, Plaintiff Perkins' expert on damages, Dr. Patricia Pacey, based her opinion testimony on materially inaccurate information. The Court concluded that the discrepancies in the evidence presented at trial regarding Perkins' lost wages and benefits "left the jury with no solid basis on which to award lost wages and benefits[.]" The Court ordered a new trial on these damages as part of the re-trial of Perkins' retaliation claim against Defendant Martelli.

Defendants have now moved to exclude Dr. Pacey's testimony to be offered at the re-trial, which is based on Dr. Pacey's Third Supplemental Report. *See* DEFENDANTS' MOTION

1

TO EXCLUDE EXPERT TESTIMONYH OF PATRICIA L. PACEY, PhD (Doc. No. 241) (Motion). Defendants' objections to Dr. Pacey's opinion generally involve the weight and not the admissibility of the opinion.  However, the Court will deny the Motion without prejudice. The Court will order Dr. Pacey to prepare another supplemental opinion after she is provided accurate and complete records from Perkins' employment at FFP and a copy of the signed settlement agreement dated August 26, 2010 between Perkins, the Teamsters Union Local 455, and FFP.

## I. Standard of Review

Under Fed. R. Evid 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialize knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 requires expert testimony to meet two basic requirements: (1) the expert must be qualified; and (2) the expert's opinion must be reliable. *United States v. Crabbe*, 556 F. Supp. 2d 1217 (D. Colo. 2008). The proponent of the expert testimony bears the burden of proving the requirements by a preponderance of evidence. *Id.* at 1220.  While Defendants do not object to Dr. Pacey's qualifications, they argue that Dr. Pacey's opinion is unreliable.

"In order to assist the trier of fact, expert testimony must be reasonably reliable. Hence, the Supreme Court has charged the district court with the responsibility of acting as a gatekeeper to exclude unreliable expert testimony." *Turck v. Baker Petrolite Corp.*, 10 Fed. Appx. 756, 766, 2001 WL 589470, **10 (10th Cir. 2001) (unpublished) (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141 (1999) and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579,

597 (1993)). To prove reliability, the proponent must show (1) that the method or principle used is reliable; (2) that the witness used sufficient facts and data as required by the method or principle; and (3) that the witness properly applied the method or principle to the collected facts and data. *Crabbe*, 556 F. Supp. 2d at 1221. In essence, expert opinions "must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995) (quotation omitted). However, "absolute certainty is not required." *Id.*

Under Fed. R. Evid. 703, an expert may rely on "facts or data . . . perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

## II. Discussion

At the re-trial, the jury will be asked to determine liability and damages on Perkins' claim that Martelli approved of the decision to fire Perkins from his employment as a truck driver at FFP in retaliation for Perkins' complaints of racial discrimination. To compensate Perkins for losses incurred as a result of his unlawful discharge, the jury must determine the amount of wages and benefits Perkins would have earned in his employment with FFP if Perkins had not been fired, minus the amount of income Perkins has earned from the date of termination to the date of trial.

A. Dr. Pacey's Third Supplemental Report

1. *Wages Perkins Would Have Earned from FFP*

3

Dr. Pacey produced a Third Supplemental Report dated February 28, 2014 (Report) as the basis on which she would testify at the re-trial.[1] (*See* Mot. Ex. D.) Dr. Pacey started her calculation of lost wages and benefits as of August 26, 2010 because "Perkins received compensation for losses from the time of his termination on May 12, 2009 to August 26, 2010 (in the form of a settlement)." Report at p. 3. Since no trial date was set, Dr. Pacey calculated Perkins' lost wages and benefits incurred during a period of 3.7 years: from August 26, 2010 to September 23, 2014, the date of a pre-trial conference. In 2011, Perkins was unable to work for five weeks due to an injury from a motorcycle accident so Dr. Pacey omitted lost wages and benefits during this time period from her calculation. Dr. Pacey calculated an hourly wage amount of $15.35 per hour based on an unsigned copy of the settlement agreement. Hence, Dr. Pacey determined Perkins' yearly wages from FFP would have been "$31,900 (identified in 2010 dollars)." *Id.* at p. 4. Dr. Pacey figured in an annual .25% wage increase over the period based on the unsigned settlement agreement, but determined that this increase "is consistent with information indicating Teamster historical wages increases from 2007 through 2010." *Id.* Dr. Pacey also determined the value of Perkins' lost benefits according to the information provided in the unsigned settlement agreement "indicating monthly benefits of $632.19 or some $7,600 per year." *Id.* Dr. Pacey noted that the benefits amount used in her Report is 23% of the wages amount "slightly greater than the estimated 20% benefits included in [her] original report." *Id.* Her addition of benefits to the loss amount did not include lost benefits for the period after June 4, 2013 when Perkins began working for UPS and receiving full benefits.

2. *Overtime Earnings Were Included*

Dr. Pacey noted that there was some discrepancy in her documents regarding the amount of overtime Perkins received while working for FFP. The Court's Order (Doc. No. 194) granting

---

[1] Dr. Pacey noted that her report can be further supplemented once the date of trial is determined.

a new trial indicates Perkins did not earn overtime wages at FFP according to the evidence at trial. The unsigned settlement agreement showed Perkins earning an average of 10 hours of overtime per month at 1.5 times the regular hourly rate. Dr. Pacey calculated Perkins lost overtime pay at $2800 per year (in 2010 dollars), but she separated out the overtime wages from the regular wages calculation so that the jury can omit those amounts if necessary. Dr. Pacey concluded that over the 3.7 year period, Perkins would have earned wages totaling $119,400, overtime wages equaling $10,300, and benefits valued at $20,100.

### 3. *Perkins' Actual Earnings After May 12, 2009*

Next, Dr. Pacey calculated what Perkins actually earned during the relevant time period and subtracted that amount from the estimated lost wages amount. The first job Perkins held after he was fired from FFP was with GT Express. Dr. Pacey was given a letter from Matt Boryla, owner of GT Express, saying that Perkins began working for GT Express in May 2011 and earned $500 per week as an independent contractor. Perkins told Dr. Pacey that he worked for GT Express until June 4, 2013, when he began working for UPS. Dr. Pacey's calculation of Perkins' earnings from GT Express was $26,000 per year. Perkins testified at the first trial that he worked part time for GT Express from October 2010 to May 2011 and averaged two days per month earning $100 per day. Dr. Pacey included these earnings in her calculation and determined that over the seven month period, Perkins earned $1400 from GT Express. Dr. Pacey noted that Perkins did not file tax returns for 2011 and 2012 and she received no documentation from GT Express to verify Perkins' part time earnings. Dr. Pacey included no amount for benefits at GT Express since Perkins was an independent contractor.

Perkins told Dr. Pacey he began work for UPS on June 4, 2013 "earning $8.50 per hour, but increasing to $10 per hour shortly thereafter. Mr. Perkins further indicates he received a

5

promotion to supervisor in October 2013 earning $14.85 per hour." (Report at p. 5.) Perkins stated that he hoped for a full time position with UPS, but he currently works 25 to 30 hours per week; however, he does receive "the full array of benefits." (*Id.*) Dr. Pacey stated that Perkins' pay receipts indicated he earned $5,508 in 2013 with UPS, and Dr. Pacey projected that Perkins' 2014 earnings with UPS would be $21,200 per year. (*Id.*)

### 4. *Perkins' Total Lost Wages and Benefits*

Dr. Pacey determined that Perkins' post-discharge earnings equaled $68,900, consisting of $56,000 with GT Express and $12,900 with UPS. Dr. Pacey concluded that Perkins' total lost wages would be $50,400, which is the difference between $119,300, the amount Perkins would have earned at FFP, and $68,900, Perkins' actual earnings during the same time period. Adding the value of lost benefits, Dr. Pacey determined was $20,100 plus the amount of lost overtime earnings equaling $10,300, Dr. Pacey calculated Perkins' lost wages and benefits at $80,900.[2]

### B. Defendants' Objections

Defendants assert that Dr. Pacey's Report and proffered testimony should be excluded because her opinion is supported by incorrect and unverified data; and therefore, the opinion is unreliable and inadmissible under Rule 702. In preparing her Report, Dr. Pacey relied on 1) a one-hour conversation with Perkins about his post discharge employment; 2) her previous reports and notes; 3) Perkins' post trial deposition transcript; 4) the Court's post trial memorandum opinions; 5) all documents listed in previous reports; 6) an unsigned draft of a Union/FFP settlement agreement regarding some of Perkins' grievances; 7) a letter from GT Express owner Matt Boryla, one of Perkins' post discharge employers; (8) Perkins' Social Security Statement showing Perkins' work history from 1983 to 2010; and (9) two pay stubs from UPS, Perkins current employer, dated December 20, 2013 and January 24, 2014.

---

[2] Dr. Pacey made a slight mathematical error. The total should be $80,800 when all three figures are added together.

1. *Perkins' post-discharge earnings*

Perkins was discharged from FFP on May 12, 2009. According to Perkins' testimony at trial, in October 2010, GT Express employed Perkins as an independent contractor on a part time basis. Defendants argue that Dr. Pacey relied on undocumented information in forming her opinion on Perkins' part time earnings at GT Express. Dr. Pacey determined that Perkins began working full time for GT Express on May 1, 2011 based on a letter from a representative of GT Express, Matt Boryla. The letter states simply that Perkins was hired on May 1, 2011 and earned $500 per week. The letter does not indicate when Perkins stopped working for GT Express; however, Perkins told Dr. Pacey that he worked for GT Express until June 4, 2013, the date he began working for UPS. Mr. Boryla's letter says nothing about Perkins' part time work. Defendants point out that in his post-trial deposition, Perkins further contradicted his previous testimony when he testified that while he worked for GT Express he earned about $12 per hour or about $400 per week.[3]

2. *Perkins' projected earnings at FFP*

Dr. Pacey's calculation of the amount of wages and benefits Perkins would have earned from FFP is not supported by any verified documentation. Defendants point out that Perkins' counsel did not give Dr. Pacey Perkins' employment and earnings records from FFP even though Dr. Pacey asked for those records. Instead, Dr. Pacey derived the amount of lost wages based on the hourly wage rates and hours worked as specified in the unsigned settlement agreement. Defendants argue that Dr. Pacey's opinion on Perkins lost wages also includes overtime pay that

---

[3] Perkins testified at his post-trial deposition: 1) he was paid hourly at GT Express and he thought he was paid about "twelve bucks an hour" and he was unsure how often he worked for GT Express because it was sporadic; 2) he did not recall his weekly pay amount at GT Express but thought it was about $400 per week; 3) he is not aware of any documents that would confirm the number of hours or days per week he worked for GT Express; and 4) he cannot remember exactly when he started working for GT Express, but he stopped working for them when he took the job at UPS on June 4, 2013. (Mot. Ex. F at 7:17-9:2.)

7

Perkins never earned during his employment at FFP, a fact that would have been clearly shown in Perkins' FFP employment and earnings records. The unsigned settlement agreement contained a list purporting to be Perkins' earnings including amounts for wages and for overtime earnings of 10 hours per week, which were compensated at 1.5 times regular pay. Report at p. 5. At the first trial, however, the evidence showed Perkins did not earn any overtime at FFP, and this evidence was outlined in the Court's post trial Memorandum Opinion and Order (Doc. No. 194). At a post-trial deposition, Dr. Pacey was shown a copy of the signed settlement agreement containing a lump sum and no breakdown of the sum into regular and overtime wages. The signed settlement agreement merely indicated that Perkins received a lump sum of $54,523.76 "in full settlement of the union grievances identified above, filed on [Perkins'] behalf." Resp. Ex. 2. Dr. Pacey acknowledged the lack of information in the signed settlement agreement and separated out her calculation of overtime wages so that the jury could subtract that amount from the total lost wages calculation if it chose to do so.

Defendants argue that despite her recognition of problems related to overtime wages, Dr. Pacey's entire opinion should be excluded because Dr. Pacey did not properly verify any of the amounts she used in her calculations. Defendants contend that Dr. Pacey's opinion will confuse instead of assist the jury as required by Fed. R. Evid. 702. Defendants assert that Dr. Pacey should have based her opinion on additional information including 1) relevant portions of the trial transcript; 2) direct conversation with a person at GT Express to reconcile the contradictory dates as to when Perkins began working for GT Express, when Perkins stopped working for GT Express, and what Perkins earned for the part-time work he claimed he earned prior to May 2011; 3) Perkins' FFP employment records that Dr. Pacey requested, but did not receive, from Perkins' counsel; and 4) written records regarding the date Perkins began work for UPS that Dr.

Pacey requested, but did not receive. In essence, Defendants maintain that Dr. Pacey's opinion is unreliable because she used information from Perkins, whose testimony was inconsistent, because she used incomplete information from Mr. Boryla, and because she relied on an unsigned draft of the settlement agreement.

Perkins argues that all of the issues pointed out by Defendants go to the weight, not the admissibility of Dr. Pacey's report. Perkins asserts that on cross examination Defendants will be able to bring out these discrepancies, if any, and the jury can take that into account in determining the amount of lost wages to award. Perkins also stresses that Dr. Pacey accounted for overtime wages separately so the jury could easily omit those amounts.

To determine whether the objections raised by Defendants are sufficient to exclude Dr. Pacey's testimony, the case *Turck v. Baker Petrolite Corp.* is instructive. In *Turck*, the plaintiff claimed he was fired in retaliation for consulting a workers compensation attorney, a violation of Oklahoma law. Plaintiff's expert on damages was an accountant who determined lost wages. 10 Fed. Appx 756, 766 (10th Cir. 2001) (unpublished). At trial, the expert testified that he gathered information about the plaintiff's current and past salary, as well as information regarding overtime, bonuses and retirement savings plans and entered this information into a computer program to determine the present value of the plaintiff's lost wages and benefits. *Id.* The expert indicated that he did not factor real wage growth into the numbers he entered into the computer program. And, the expert testified that if the plaintiff received extra income from overtime or from raises at his new job, his calculation of future lost wages would be somewhat inaccurate. *Id.* The jury awarded about $130,000 less than what the plaintiff had requested. *Id.* The Tenth Circuit held the district court did not abuse its discretion in admitting the expert's testimony noting that the jury weighed the expert's testimony "in light of the potential uncertainty of the

figures." *Id.* n. 7. Although not identical, this case presents a similar issue, whether an expert's opinion that is supported by certain unverifiable information is nevertheless admissible. As in the *Turck* case, Defendants can attack the numbers in Dr. Pacey's opinion at the re-trial. Defendants have failed to convince the Court that Dr. Pacey's opinion should be excluded entirely.

Defendants further argue that the Court should not allow Dr. Pacey to testify because the damages for lost wages involves simple math that the jury can decipher from other evidence presented at trial. Plaintiffs counter that the Court determined that Dr. Pacey's opinion was helpful at the first trial, and her opinion again will be helpful in the re-trial. Dr. Pacey's expertise is necessary to present a compilation of years of pay-related data from Perkins and his three employers. Plaintiffs further point to Dr. Pacey's expertise in valuing lost benefits as a necessary component of the damages the jury may award. Plaintiffs say the opinion is necessary to assist the jury in awarding a correct amount to Perkins even though the jury might be able to do simple math. *See, e.g., BioCore, Inc. v. Khosrowshahi*, 183 F.R.D. 695, 701 (D. Kan. 1998) (holding that even though expert did mathematical calculation that jury could perform, "an expert can be employed if his testimony will be helpful to the trier of fact in understanding evidence that is simply difficult, [though] not beyond ordinary understanding.") (citation omitted).

Dr. Pacey relied in large part on Perkins' word, on an unsigned settlement agreement, and on a letter from Mr. Borlya concerning Perkins post-discharge employment that is possibly incomplete. Defendants can certainly confront Perkins on cross examination about his inconsistent testimony regarding the dates he worked a GT Express. More importantly, however, Dr. Pacey should have been given Perkins' employment and earnings records from FFP to verify

his wages, hours worked, of overtime earnings, if any, and the correct value of benefits Perkins received while working at FFP. These omissions are too important for the Court to overlook.

As stated by the Tenth Circuit, the Court should examine whether the witness obtained the amount of data that the methodology itself demands. *Crabbe*, 556 F. Supp. 2d at 1223. At trial, Dr. Pacey will be allowed to testify if she prepares and uses another supplemental report based on the actual records of Perkins' earnings and benefits at FFP. Moreover, Dr. Pacey should be given a copy of the signed settlement agreement so she can correctly value lost benefits and confirm that Perkins did not earn overtime. After her supplemental report is prepared, Dr. Pacey may testify as to her findings in that report at the re-trial, and Defendants may bring out on cross examination any weaknesses that remain in Dr. Pacey's calculations. If Dr. Pacey's supplemental opinion reveals that she was not given Perkins' payroll records from FFP and a copy of the signed settlement agreement, Defendants may renew their Motion.

IT IS ORDERED that:

1. DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF PATRICIA L. PACEY, PhD (Doc. No. 241) is denied without prejudice; and
2. Dr. Pacey must prepare a supplemental report based on payroll records showing Perkins' earnings and benefits from FFP and on a copy of the signed settlement agreement.

DATED this 5th day of September, 2014.

*James A. Parker*

SENIOR UNITED STATES DISTRICT JUDGE